James M. Maldonado, OSB No. 00784
Internet e-mail:jmaldonado@cvk-law.com
COSGRAVE VERGEER KESTER LLP
805 SW Broadway, 8th Floor
Portland, Oregon 97205
Telephone:    (503) 323-9000
Facsimile:    (503) 323-9019
Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| WAYNE McFARLIN,<br><br>              Plaintiff,<br><br>     v.<br><br>EDWARD GORMLEY, an individual; CITY OF McMINNVILLE, a Municipal Corporation; CITY COUNTY INSURANCE SERVICES TRUST; ROD BROWN, an individual; PUBLIC SAFETY LIABILITY MANAGEMENT INC., an Oregon corporation;  WALDO FARNHAM,<br><br>              Defendants. | Case No.: 3:06 CV 01594-HU<br><br><br><br>**DECLARATION OF JAMES M. MALDONADO IN SUPPORT OF DEFENDANT FARNHAM'S MOTIONS FOR SUMMARY JUDGMENT** |

I, James M. Maldonado, under penalty of perjury, declare pursuant to 28 U.S.C. § 1746, as follows:

1.     I am over the age of 18 and am one of the attorneys representing defendant Waldo Farnham in this matter.

2.     I provide this Declaration in support of Waldo Farnham's motion for summary judgment as to all of plaintiff's claims.

3.     Waldo Farnham is 72 years old and has lived in the greater McMinnville area for 71 years.

Page 1 – **DECLARATION OF JAMES M. MALDONADO IN SUPPORT OF DEFENDANT FARNHAM'S MOTIONS FOR SUMMARY JUDGMENT**                    481455

COSGRAVE VERGEER KESTER LLP
Attorneys
805 SW Broadway, 8ᵗʰ Floor
Portland, OR 97205
(503) 323-9000

4. Attached as Exhibit 1 to this Declaration are true and correct excerpts from both Volume I and Volume II of plaintiff's deposition.

5. Attached as Exhibit 2 to this Declaration are true and correct excerpts of the deposition of Mayor Ed Gormley.

6. Attached as Exhibit 3 to this Declaration are true and correct excerpts of the deposition of City Manager Kent Taylor.

7. Attached as Exhibit 4 to this Declaration is a true and correct copy of the October 28, 2005 document entitled "Resignation and Separation Agreement and Release of Claims" signed by plaintiff.

8. Attached as Exhibit 5 to this Declaration are true and correct excerpts of the deposition of Waldo Farnham.

9. Attached as Exhibit 6 to this Declaration is a true and correct copy of the two-page memorandum provided to Mayor Ed Gormley by Waldo Farnham.

**I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.**

EXECUTED this __12th__ day of __October__, 200_7_

James M. Maldonado

COSGRAVE VERGEER KESTER LLP
Attorneys
805 SW Broadway, 8th Floor
Portland, OR 97205
(503) 323-9000

## CERTIFICATE OF SERVICE

I hereby certify that I served a true and correct copy of the foregoing **DECLARATION OF JAMES M. MALDONADO IN SUPPORT OF DEFENDANT FARNHAM'S MOTIONS FOR SUMMARY JUDGMENT** on the date indicated below by:

☒      mail with postage prepaid, deposited in the US mail at Portland, Oregon,

☐      hand delivery,

☐      facsimile transmission,

☐      overnight delivery,

I further certify that said copy was placed in a sealed envelope delivered as indicated above and addressed to said attorney(s) at the address(es) listed below:

Terrence Kay
Terrence Kay PC
3155 River Rd. S. Suite 150
Salem, OR 97302
Attorneys for Plaintiff

Karen O'Kasey
Hoffman Hart & Wagner LLP
1000 SW Broadway, Suite 2000
Portland, OR 97205
Attorneys for Defendants Gormley and City of McMinnville

Robert S. Wagner
Miller & Wagner LLP
2210 NW Flanders Street
Portland, OR 97210-3408
Attorneys for Defendants Rod Brown and Public Safety Liability Management

DATED: October 12, 2007

James M. Maldonado

COSGRAVE VERGEER KESTER LLP
Attorneys
805 SW Broadway, 8th Floor
Portland, OR 97205
(503) 323-9000

1          IN THE CIRCUIT COURT OF THE STATE OF OREGON

2               FOR THE COUNTY OF YAMHILL

3

WAYNE MCFARLIN,                    )

4                                   )

                  Plaintiff,        )

5                                   )

     vs.                            )    Case No. CV060094

6                                   )

EDWARD GORMLEY, an individual,)

7   CITY OF MCMINNVILLE, a          )

municipal corporation,             )

8                                   )

                  Defendants.       )

9

0

11

12      VIDEOTAPED DEPOSITION OF RICHARD WAYNE MCFARLIN

13           Taken in behalf of the Defendants

14                  May 23, 2006

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT ___/___
PAGE _/_ OF _ /3

Page 54

1 else other than the language we've already talked
2 about in Section 5?
3     A.  I don't recall anything else.
4     Q.  I'd like you to look on the first page at
5 Section 2 where it says, "On November 30th, 2005,
6 City will pay employee as severance a lump sum
7 equal to three times employee's regular monthly
8 base salary."
9         Do you see where it says that?
10    A.  Yes.
11    Q.  Who proposed that amount as severance?
12    A.  I asked for severance.
13    Q.  When did you make that request?
14    A.  In the meeting I had on the afternoon of
15 Monday, October 24th.
16    Q.  Who was at that meeting?
17    A.  Mayor Gormley, Council President Rick
18 Olson, City Manager Kent Taylor.
19    Q.  Did you ask for a particular amount for
20 severance?
21    A.  I believe I asked for six months', but I
22 can't recall for sure.
23    Q.  And, to your memory, did you ask for, you
24 believe, six months' severance in this meeting on
25 October 24th?

Page 55

1     A.  I definitely asked for severance.  I
2 can't recall whether I -- I asked it originally --
3 with regard to the severance, I can't recall.
4     Q.  You recall asking for severance; you
5 don't recall whether you asked for six months' or
6 something more or something else?
7     A.  I didn't ask for anything more, but --
8     Q.  And you can't recall whether you at that
9 meeting said, "I would like six months'."  Am I
10 understanding you correctly?
11    A.  With regard to the severance, I can't
12 recall whether that was said.
13    Q.  Did you have any conversations after that
14 meeting with Mr. Taylor about the amount of
15 severance?
16    A.  Yes.
17    Q.  Do you remember when that conversation or
18 conversations took place?
19    A.  I think it might have been the following
20 day.  I don't know.
21    Q.  Do you remember how that conversation
22 took place?  Was it over the phone, by e-mail, in
23 person?
24    A.  I don't recall.
25    Q.  What do you recall about that

Page 56

1 conversation with Mr. Taylor?
2     A.  A great concern on my part for having my
3 health -- health -- health insurance premiums paid
4 during the time of the severance.
5     Q.  So you specifically remember raising with
6 Mr. Taylor a desire to have your medical benefits
7 covered for some period of time?
8     A.  Yes.
9     Q.  Do you remember anything else about your
10 conversation with Mr. Taylor regarding the
11 severance portion of this agreement?
12    A.  Well, are you talking about the whole
13 week?
14    Q.  Well, let's -- you said you had a
15 conversation with Mr. Taylor you think the next
16 day.  Do I understand you correctly?
17    A.  Yes.
18    Q.  And you've told me that you remember in
19 that conversation asking or having a concern about
20 your medical benefits?
21    A.  Right.
22    Q.  Was there any discussion during that
23 conversation about the amount of severance?
24    A.  No.
25    Q.  Did you have a discussion later on in the

Page 57

1 week with Mr. Taylor about the amount of severance
2 that you were being paid?
3     A.  That's a confusing question.  There
4 were -- I had discussions with the three on both
5 Monday and Tuesday, and then one discussion that
6 I -- I believe was just with Mr. Taylor with regard
7 to the health benefits.  And following those
8 discussions, I don't recall any more discussion on
9 the severance.
10    Q.  So my question is -- is not about the
11 meetings that you had with the three individuals.
12 My question is aimed at discussions that you had
13 only with Mr. Taylor about the severance.  And so
14 if I -- if I understand what you've previously told
15 me, you had one conversation with Mr. Taylor one on
16 one about your concern about medical benefits?
17    A.  Yes.
18    Q.  Is that correct?
19    A.  Correct.
20    Q.  Did you have any other discussions with
21 Mr. Taylor one on one about the amount of
22 severance?
23    A.  No.
24    Q.  Okay.  Do you remember when you got this
25 document -- and I believe you said you got it

Moore Henderson & Thomas (503) 226-3313
101 SW Main, Suite 280, Portland, OR 97204

EXHIBIT _____1_____

PAGE __2__ OF _13_

Page 62

1 tell you that he had a final document for you to
2 sign?
3    A.  On Friday, I believe.
4    Q.  Was that by phone call or e-mail or in
5 person?
6    A.  It wasn't in person, but I don't recall
7 whether it was e-mail or phone.
8    Q.  When — and you said that you signed this
9 in Mr. Taylor's office?
10   A.  Yes.
11   Q.  So you went to his office, and did he
12 hand it to you when you walked in the door?
13   A.  Yes.
14   Q.  Did you review it before you signed it?
15   A.  Yes.
16   Q.  Did you ask Mr. Taylor for more time to
17 review it before you signed it?
18   A.  No.
19   Q.  Between Wednesday and Friday, did you
20 have any discussions with Mr. Gormley, Mayor
21 Gormley, about wanting more time to consider
22 Exhibit 101?
23      MR. KAY:  Does that mean after Monday?
24      MS. O'KASEY:  He said he got it on -- I'm
25 asking between Wednesday and Friday.

Page 63

1      MR. KAY:  Thank you.  Excuse me.
2      MS. O'KASEY:  He did not have a
3 document --
4
5 BY MS. O'KASEY:  (Continuing)
6    Q.  My understanding is you did not have a
7 document to look at until Wednesday.
8      Is that correct?
9    A.  That's correct.
10   Q.  So after you got the draft from
11 Mr. Taylor on Wednesday and before you signed it on
12 Friday, did you have any discussions with Mayor
13 Gormley about wanting more time to consider Exhibit
14 101?
15   A.  No.
16   Q.  Did you have any discussions with Rick
17 Olson about wanting more time to consider 101?
18   A.  No.
19   Q.  Did you have any discussions with any of
20 the other council members about wanting more time
21 to consider 101?
22   A.  No.
23   Q.  Did you ask Mr. Taylor when you went into
24 his office on Friday to sign this document any
25 questions about Exhibit 101?

Page 64

1    A.  I don't believe so.
2    Q.  Did you have any questions about Exhibit
3 101 on October 28th when you went in to sign it
4 that you didn't ask Mr. Taylor?
5    A.  No.
6    Q.  After you signed it, did Mr. Taylor give
7 you a copy of it?
8    A.  Yes.
9    Q.  Did he give it to you that day?
10   A.  Yes.
11   Q.  Did you share a copy of the fully-signed
12 agreement with anyone after he gave you your copy?
13   A.  Yes.
14   Q.  Who was the first person you gave a copy
15 of the signed agreement to?
16      MR. KAY:  Object to the form.
17      THE WITNESS:  I didn't give a copy of the
18 signed agreement to anyone.
19
20 BY MS. O'KASEY:  (Continuing)
21   Q.  Who's the first person you showed it to?
22   A.  My wife.
23   Q.  When did you show it to her?
24   A.  That evening.
25   Q.  Who was the next person you showed it to?

Page 65

1    A.  I believe an attorney.
2    Q.  When did you first apply for the chief of
3 police position with the Salem Police Department?
4    A.  The application was submitted sometime in
5 the middle of September.
6    Q.  At the time that you applied in
7 September, did you tell anyone at the police
8 department in McMinnville about your application?
9    A.  No.
10   Q.  Did you tell any council member about
11 your application?
12   A.  No.
13   Q.  Did you tell the mayor about your
14 application?
15   A.  Yes.
16   Q.  When did you tell the mayor about your
17 application?
18   A.  I believe the date was October 4th.
19   Q.  Was that shortly after you sent in the
20 application or had some time passed?
21   A.  A bit of time passed.
22   Q.  Why did you choose to tell the mayor on
23 October 4th about your application?
24   A.  Because I thought it was the right thing
25 to do.

17 (Pages 62 to 65)

EXHIBIT _____1_____
PAGE __5__ OF __13__

Page 66

2 Q. At that point had you been told by Salem
2 that you were a finalist for that position?
3 A. I don't think so.
4 Q. Did you tell anyone else other than the
5 mayor at the city about the application?
6 A. Yes.
7 Q. Who?
8 A. Kent Taylor.
9 Q. Was that about the same time that you
10 told Mayor Gormley?
11 A. No.
12 Q. When did you tell Mr. Taylor?
13 A. I -- June of 2005.
14 Q. So you told Mr. Taylor about the
15 application before you actually sent it in?
16 A. Yes.
17 Q. And why did you choose to tell Mr. Taylor
18 in June of 2005 about it?
19 A. I -- I didn't tell him. I asked his
20 advice.
21 Q. What advice did you ask him about or what
22 were you looking for from Mr. Taylor?
23 A. I had been asked by the personnel
24 director at the City of Salem if I would be
25 submitting an application for the chief's

Page 67

1 position. When she asked me, I told her I hadn't
2 thought of it. And before I talked to her any
3 further, I went and talked to Kent Taylor, because
4 he's my boss, because I valued my job at the City
5 of McMinnville very much, and I didn't want to do
6 anything to jeopardize that job, and because I
7 wanted his opinion as my boss and somewhat of a
8 mentor whether it would be a good or a bad thing
9 for me to do to consider applying for the position.
10 Q. Who was the city -- city administrator
11 that contacted you?
12 A. Connie Munelle.
13 Q. Did you know her from your prior
14 employment at the City --
15 A. Yes.
16 Q. -- of Salem?
17 All right. So you went to Mr. Taylor,
18 basically, to tell him that this opportunity was
19 potentially presenting itself and you wanted his
20 ideas as to whether it was a good thing or a bad
21 thing?
22 A. Yes.
23 Q. Did you tell him that you were interested
24 in applying for the position?
25 A. Yes. But I didn't want to do anything to

Page 68

1 jeopardize my position with City of McMinnville.
2 Q. What do you recall Mr. Taylor telling you
3 in response to you raising these concerns?
4 A. He was very encouraging, and he indicated
5 to me that he thought it would be a good thing for
6 me to do. And then he kind of chuckled, and he
7 told me, he says, "But I hope you don't get it."
8 Q. Between June of 2005 and October 4th of
9 2005, did you tell anyone else at the city about
10 your application with Salem?
11 A. I don't recall. I don't -- I don't
12 believe I did.
13 Q. When you told the mayor on October 4th of
14 2005 that you had applied for the chief's position,
15 what was his response?
16 A. He was very encouraging and said he
17 thought that was a -- a worthy thing to do, that
18 others had -- had asked him for -- said that they
19 were going for other positions, and that he's
20 always been encouraging of that kind of positive
21 growth.
22 Q. Do you remember what stage you were in
23 that process when you told the mayor about the
24 application?
25 A. It was sometime after submitting it, and

Page 69

1 I don't think I knew I was a finalist at that time.
2 Q. Had you been interviewed by any oral
3 board by that time?
4 MR. KAY: Any what board?
5 MS. O'KASEY: Oral board.
6 THE WITNESS: I don't recall. I had a
7 phone interview, but I don't recall precisely when
8 that phone interview took place.
9
10 BY MS. O'KASEY: (Continuing)
11 Q. Was that phone interview with more than
12 one person?
13 A. Yes.
14 Q. Do you remember who interviewed you over
15 the phone?
16 A. The personnel director, Connie Munelle,
17 and the assistant city manager, and I don't recall
18 her name right off.
19 Q. How long did that interview last?
20 A. Roughly, 20, 30 minutes.
21 Q. When -- who -- what was the next time
22 that you told someone at the city about the fact
23 that you applied for the chief's position with
24 Salem after you told Mayor Gormley in October?
25 A. When I learned I was a finalist, I told

EXHIBIT 1
PAGE 4 OF 13

**Page 70**

Kent Taylor.

2    Q.  Do you remember when that was?

3    A.  Not precisely. It was mid-October, as

4  best as I can recall.

5    Q.  How did you find out that you were a

6  finalist?

7    A.  Connie Munelle called me and told me.

8    Q.  Did she tell you how many other people

9  were finalists?

10    A.  Yes. She said I was one of five

11  finalists.

12    Q.  When you told Kent Taylor about this,

13  what was his response?

14    A.  I don't recall.

15    Q.  Did you tell any council members about

16  the fact that you'd become a finalist after you

17  told Mr. Taylor?

18    A.  Not until the meeting of October 24th

19  when they demanded my resignation.

20    Q.  Was Mr. Olson the first council

21  member -- and I'm distinguishing him from the

22  mayor for purposes of the question --

23    A.  Uh-huh.

24    Q.  -- the first council member that you told

25  about being a finalist?

**Page 71**

1    A.  I believe so.

2    Q.  Do you have any information that either

3  Mr. Taylor -- well, let's break it down.

4    Do you have any information that

5  Mr. Taylor told anyone about your application after

6  you discussed it with him in June of 2005?

7    A.  I don't know who he told.

8    Q.  Do you know if he told anybody?

9    A.  No.

10    Q.  Did you ask him to keep it confidential?

11    A.  Uh-huh.

12    Q.  Is that a "yes"?

13    A.  Yes. I'm sorry.

14    Q.  To your knowledge, did he?

15    A.  To my knowledge, he did.

16    Q.  When you told Mayor Gormley on October

17  4th of 2005, did you ask him not to tell anyone

18  else?

19    A.  I believe I did, but I don't recall.

20    Q.  Do you have any information that he told

21  someone else after you told him on October 4th

22  about the application?

23    A.  No.

24    Q.  Did you at some point announce to your

25  troops that you had applied for this chief position

**Page 72**

1  with Salem?

2    A.  Yes.

3    Q.  Do you remember when you did that?

4    A.  The morning of October 25th.

5    Q.  Do you remember how you announced it?

6    A.  At a -- I did two things. I announced it

7  verbally at the -- at a morning briefing, as I

8  recall, and distributed an e-mail.

9    Q.  And why did you choose October 25th to

10  tell the troops that this application was out

11  there?

12    A.  Because at the meeting I had with the

13  mayor and the council president and the manager the

14  previous afternoon, they indicated that there

15  was -- that the police department wanted me gone

16  immediately.

17    Q.  What about that information made you

18  decide to tell the troops that you had applied for

19  the chief's position with Salem?

20    A.  Well, during the meeting, they didn't

21  want me to return to my office that day, and they

22  told me that, "The department wants you to be

23  gone." And I explained that to leave immediately

24  would virtually ruin my chances to be competitive

25  at Salem Police. And that if they were truly

**Page 73**

1  concerned about the troops wanting me out, that

2  announcing that fact right away would help take the

3  pressure off what they said was for them to get me

4  out of the department.

5    Q.  After you sent out the announcement and

6  made the announcement, did any of your officers

7  come up and talk to you about it?

8    A.  Some of the staff came up and talked,

9  yeah.

10    Q.  Who talked to you about it?

11    A.  My secretary.

12    Q.  And what's her name?

13    A.  Linda Gardner.

14    Q.  Anyone else that you recall coming up

15  right after you announced and -- and asking about

16  it?

17    A.  Well, nobody came up right after. I

18  mean --

19    Q.  Within the next couple of days, did

20  anyone ask you about it that was in the police

21  department?

22    A.  Well, it was a -- a bunch of people.

23  There was a lot of people that talked to me about

24  it, but --

25    Q.  In general, what did they -- what did

EXHIBIT _____1_____

PAGE _5_ OF _13_

Page 74

2   they say?
2     A.  They expressed a lot of concern that I
3  might be leaving.
4     Q.  What was your response to them when they
5  expressed that concern?
6     A.  I don't recall. I just said -- I -- I
7  don't recall what I said. I -- I do know that I
8  was very concerned about the organization. And I
9  had one discussion in particular with the union
10  president sharing that we needed to work together
11  to make sure that the organization dealt with this
12  news as positively as possible.
13     Q.  Was that Matt Scales?
14     A.  Yes.
15     Q.  Did you seek Mr. Scales out or did he
16  come to you to ask you about your announcement?
17     A.  I went to him.
18     Q.  What was his response to your request
19  that you work together?
20     A.  He seemed affirmative, but he didn't say
21  much.
22     Q.  When -- let me back up.
23     Did you get interviewed again as a result
24  of being a finalist?
25     A.  Yes.

Page 75

1     Q.  Do you remember when that interview took
2  place?
3     A.  Two days of interviews on November 2nd
4  and November 3rd, a Wednesday and a Thursday.
5     Q.  How many people interviewed you?
6     A.  There was a city manager's panel of about
7  six or eight, there was an equal number, roughly,
8  on an employee panel, and then there was a -- a
9  televised discussion with a panel with an audience,
10  and it was televised in the Salem area.
11     Q.  Was that the employee panel, the city
12  manager's panel, or a different panel?
13     A.  The televised panel was a community
14  panel.
15     Q.  Was that on November 2nd or 3rd or some
16  other date?
17     A.  I believe it was the 3rd.
18     Q.  During any of these interviews, were you
19  asked about your employment status with the City of
20  McMinnville?
21     A.  I believe I was. I believe -- I don't
22  know that I was asked, but it came up that I was a
23  chief of police in McMinnville.
24     Q.  And do you recall in response to any
25  questions about your status what your answer was?

Page 76

1     A.  It wasn't -- it was more of my
2  experience, not -- not a pending status question.
3     Q.  So no one asked you during any of the
4  interviews, "What is your current status at the
5  City of McMinnville?" It was simply discussed that
6  you were the chief of police of the City of
7  McMinnville?
8     A.  Yes.
9     Q.  Did you tell any of the interviewees that
10  you had resigned or were going to resign?
11     A.  Yes.
12     Q.  Who did you tell?
13     A.  I actually told the personnel director
14  and asked her to reveal it to the city manager.
15     Q.  Was that during an interview or was that
16  during some other conversation?
17     A.  That was during a phone call prior to the
18  interviews.
19     Q.  Was it during a phone call prior to the
20  interview with the city manager panel --
21     A.  Yes.
22     Q.  -- as you've described it?
23     A.  (Nodded head.)
24     Q.  What did you tell the -- the -- I'm
25  sorry. And I've forgotten her name.

Page 77

1     A.  Personnel director, Connie Munelle?
2     Q.  Yes. What did you tell the personnel
3  director?
4     A.  I explained to her that I wanted to
5  appraise her of the fact that I would be -- I'd
6  submitted my letter of resignation, I'd been asked
7  to submit a letter of resignation by the mayor, and
8  that -- that it would be made public shortly after
9  the Salem Police interview process, and I wanted to
10  make sure that the manager was aware of that so
11  that it didn't become a surprise during the
12  process.
13     Q.  Did she say that she would pass that on?
14     A.  Yes.
15     Q.  As far as you know, did that take place?
16     A.  Yes. I -- I assume it took place.
17     Q.  So were you asked about that in any of
18  the interviews, the fact that you were about to
19  announce your resignation?
20     A.  No.
21     Q.  When did you learn that you had not been
22  hired as the chief of Salem Police Department?
23     A.  I believe it was Tuesday, November 14th.
24     Q.  How did you find that out?
25     A.  Mr. Wells, the city manager, called me.

EXHIBIT _____/_____
PAGE __6__ OF __13__

Page 78

Q.   What did he say?
A.   He congratulated me on my performance and indicated that -- that they had chosen Jerry Moore as the new chief.
Q.   Did he give you any information about why you had not been chosen?
A.   No.
Q.   Have you ever been provided any information from anyone at the City of Salem about why you were not chosen?
A.   No.
Q.   Have you ever inquired?
A.   No.
Q.   Has anyone at the City of Salem told you that you did not get chosen because of your resignation from the City of McMinnville?
A.   No.
Q.   Do you have any information from any source at all that the reason you did not get the position with the City of Salem was because you resigned from your position with City of McMinnville?
A.   No.
Q.   After you were interviewed by the three different panels that you've described, did you

Page 79

have any conversations with anyone at the City of McMinnville about how the interviews went?
A.   I'm sure I did.  I don't recall any specifically.
Q.   Do you remember in general what you said about how the interviews went?
A.   I thought the interviews went well.
Q.   As of November 2nd, November 3rd, November 4th, were you still working in the police department?
A.   Yes.
Q.   What was the last day that you physically worked in the police department?
A.   Monday, November 14th.
Q.   How was that day chosen?
A.   I don't know.
Q.   Let me show you what I've marked as 107.  Let me know when you've had a chance to look at that.
A.   Okay.
Q.   And while you're looking at 107, look at 108, also.  Let me know when you've had a chance to look at that.
A.   All right.
Q.   Is that your handwriting up at the top of

Page 80

107?
A.   Yes.
Q.   Do you remember drafting -- did you draft 107?
A.   Yes.
Q.   And so you put the original date November 16th of 2005?
A.   Yes.
Q.   And you originally had, "November 30th will be my final day at work"?
A.   Yes.
Q.   Did you present Exhibit 107 to someone at the city?
A.   Yes.
Q.   Who was that?
A.   The mayor.
Q.   When did you do that?
A.   On the afternoon of October 25th in a meeting with the council president and Mr. Taylor.
Q.   Up at the top you say, "Kent Taylor made the corrections noted."
     Which corrections did Kent Taylor make?
A.   He changed the date of submission to the 11th, the date of the final day of work to the 14th, and put in, "Effective December 1, 2000 --

Page 81

'05."
Q.   In your meeting on the 24th with Mr. Olson, Mayor Gormley, and Kent Taylor, had you proposed that November 30th be your final day at work?
A.   No.
Q.   How did you come up with that day when you prepared Exhibit 107?
A.   They told me.
Q.   Who told you?
A.   The mayor.
Q.   And when did the mayor -- which meeting did the mayor tell you this at, the October --
A.   Monday.
Q.   The October 24th meeting?
A.   Yes.
Q.   So when you brought this in on the 25th to the second meeting that you've talked about, you had November 30th in there.  It was changed to the 14th.  Was it changed right there with the four of you?
A.   Yes.
Q.   Did Mr. Taylor give you a reason as to why he was changing it?
A.   No.

21 (Pages 78 to 81)

EXHIBIT  1
PAGE  7  OF  13

Page 82

```
 1       Q.  Did anyone in the room give you a reason
 2  as to why they were changing it?
 3       A.  No.
 4       Q.  What did you say when they changed it or
 5  Mr. Taylor changed it?
 6       A.  Nothing.
 7       Q.  Mr. -- you said Mr. Taylor changed at the
 8  end of the month to be effective December of 2005;
 9  is that correct?
10       A.  Yes.
11       Q.  Did Mr. Taylor give you a reason as to
12  why he was putting that language in Exhibit 107?
13       A.  Not that I recall.
14       Q.  Did either Mr. Olson or Mr. Gormley tell
15  you why Mr. Taylor was making it December of '05?
16       A.  I don't recall.
17       Q.  And then is Exhibit 108 the final version
18  of 107 after Mr. Taylor made his -- the changes
19  you've talked about?
20       A.  Yes.
21       Q.  After -- or where were you when you
22  signed Exhibit 108?
23       A.  I believe I was in my office.
24       Q.  Okay.  Do you remember when you signed
25  Exhibit 108?
```

Page 83

```
 1       A.  Minutes after I was given the changes to
 2  be made.
 3       Q.  So minutes after the October 25th meeting
 4  with Mr. Olson, Mr. Gormley, and Mr. Taylor?
 5       A.  Yes.
 6       Q.  After you signed the original of Exhibit
 7  108, what did you do with it?
 8       A.  I gave it to Mr. Taylor.
 9       Q.  When did you give it to Mr. Taylor?
10       A.  The afternoon of October 25th.
11       Q.  Did you give it to anybody else?
12       A.  No.
13       Q.  How did you find out that Mr. Olson,
14  Mayor Gormley, and Kent Taylor wanted to meet with
15  you on October 24th?
16       A.  I believe I got a phone call either from
17  Rose Lorenzen or the police department executive
18  assistant, Linda Gardner.
19       Q.  Where were you when you got the phone
20  call?
21       A.  In a meeting at my office.
22       Q.  Who were you meeting with?
23       A.  A background investigator.
24       Q.  Doing a check on one of your potential
25  candidates?
```

Page 84

```
 1       A.  No.  Doing a background check on Steve
 2  Theason.
 3       Q.  I'm sorry?
 4       A.  Doing a background check on Steve
 5  Theason.  He had applied to be -- to take a
 6  training position at Department of Police
 7  Standard -- Public Safety Standards and Training.
 8       Q.  Do you remember what day either
 9  Ms. Lorenzen or Ms. Gardner called you?
10       A.  The -- Monday, the 24th.
11       Q.  So the same day as the meeting?
12       A.  Yes.
13       Q.  What time did you get this phone call?
14       A.  I don't know.  It was in the afternoon,
15  and I recall the phone call was telling me I was
16  late for the meeting with the mayor and the
17  manager.  That had -- had not been on my calendar,
18  hadn't been scheduled, so I was surprised.
19       Q.  So as soon as you got the phone call from
20  either Ms. Gardner or Ms. Lorenzen, what did you
21  do?
22       A.  I immediately went over to Mr. Taylor's
23  office to meet with the -- the mayor and the
24  manager.
25       Q.  Did either -- and I understand you can't
```

Page 85

```
 1  remember which one called you, but did either of
 2  them, other than to tell you you were late for this
 3  meeting, did they tell you what the meeting was
 4  about?
 5       A.  No.
 6       Q.  Did you have any understanding when you
 7  went over there what the meeting was about?
 8       A.  No.
 9       Q.  And was the meeting held in Mr. Taylor's
10  office?
11       A.  Yes.
12       Q.  I understand Mr. Olson was there?
13       A.  Yes.
14       Q.  Kent Taylor was there?
15       A.  Yes.
16       Q.  And Mayor Gormley was there?
17       A.  Yes.
18       Q.  Was anyone else there?
19       A.  No.
20           And before we get -- can I take a break?
21       Q.  Yes.
22           (Recess was taken:  11:12 - 11:17.)
23
24  BY MS. O'KASEY:  (Continuing)
25       Q.  Before this meeting of October 24th,
```

22 (Pages 82 to 85)

EXHIBIT _____1_____

PAGE __8__ OF __13__

Page 126

Department --
Q. Which --
   MR. KAY: Were you done?
   THE WITNESS: No.

BY MS. O'KASEY: (Continuing)
Q. Sorry.
   MR. KAY: Please. That's about the third
or fourth time. I've let it go, but please take
some time, Counsel.
   THE WITNESS: -- and allow me to compete
for the Salem Police Department position. I told
them that that position was not going to be awarded
until the end of December, and they hope to have a
chief on board in January. So that although the
testing was the following week, that process was
going to continue for as long as another couple of
months, and I was concerned, deeply concerned, that
any change in my status at McMinnville within the
period of time that they announced the chief would
virtually eliminate my ability to effectively
compete there.

BY MS. O'KASEY: (Continuing)
Q. You said that you offered various

Page 127

different scenarios to them. Tell me what
scenarios you offered to them.
A. I explained that had I ever envisioned
myself in a situation like that, that I -- I be
given six months or so to gracefully find someplace
else to go, and referenced that's what I suspected
happened to my predecessor and just assumed during
my career that the same type of offer would be
extended to me.
Q. So did you suggest or ask for six months
of severance?
A. No. I asked them to allow me to continue
working for six or so months so that I could -- and
I specifically indicated that, that it -- even if
the Salem position wasn't successful, it still
would allow me to compete for another chief's
position. And that's important, because an
unemployed chief is a lot harder -- it's a lot
harder for a -- an unemployed person to get a job
at that level than an employed chief of police.
Q. After you said, "I would like to stay
employed for six months or so," I assume that was
the first request you made?
A. Yes.
Q. Who responded?

Page 128

A. The mayor.
Q. What was his response?
A. "No."
Q. Okay. Did you --
A. Something like, "No. It's not going to
work".
Q. Did you then make another proposal after
the mayor said, "No"?
A. Yes.
Q. What was that proposal?
A. I said, "Well, then you -- can you at
least give me a couple of months to allow me to
complete the Salem Police process?" And I
explained that they had -- the process would bring
a new chief to -- to Salem about the first of the
year.
Q. Did the mayor respond to that?
A. He said, "No."
Q. Did Mr. Taylor respond to that?
A. I don't recall him responding. The mayor
ultimately at some point agreed that, "Well, if" --
and he said something to the effect, "Well, if you
give me a -- your resignation today, we can
postdate it so that you can get through next week's
interviews."

Page 129

Q. Was any agreement reached in that -- at
that time about amount of severance?
A. No.
Q. Did --
A. The severance issue was beginning to be
discussed. I brought it up. I explained that if
I'm going to find myself unemployed in a matter of
days, that since I had -- was clearly not going to
negotiate a longer period of time working, I
explained that -- that I was hopeful that they
would be able to provide some sort of severance
package.
Q. Did you in that meeting of October 24th,
2005, reach an agreement as to when you would
actually leave the police department?
A. No.
Q. So if I understand you correctly, Mayor
Gormley said, "If you give me your resignation
today, we can back -- we can date it forward in
order to preserve your potential competitiveness
with the City of Salem"?
A. Well, that's not what he said. He said
we could date it forward, but it would not have had
any impact on my competitiveness with the City of
Salem.

Moore Henderson & Thomas (503) 226-3313
101 SW Main, Suite 280, Portland, OR 97204

EXHIBIT _____
PAGE _9_ OF _13_

Page 218

MS. O'KASEY: Object to the form of the
2. question.
3
4  BY MR. KAY: (Continuing)
5     Q.  Go ahead.
6        MS. O'KASEY: You can answer.
7        THE WITNESS: When the mayor told me, "We
8  need your resignation," it was clear to me that the
9  "we" meant the council, and that was reinforced by
10 the fact that the council president was sitting
11 alongside the mayor and that the manager was
12 sitting to the other side of the manager, and --
13 and that this was indeed the -- the official team
14 to deliver that order from the council. And that
15 was reinforced by the very forceful tone that was
16 being used, the fact that as hard as I tried to
17 wiggle out some other alternative but anything but
18 an immediate resignation, they were unwavering.
19       MR. KAY: Thank you.
20       MS. O'KASEY: I have one follow-up
21 question.
22
23 EXAMINATION BY MS. O'KASEY:
24    Q.  You said "forceful tone." Did Mr. Olson
25 raise his voice to you during that meeting?

Page 219

1     A.  No.
2     Q.  Did Mr. Taylor raise his voice to you
3  during that meeting?
4     A.  No.
5     Q.  Did Mayor Gormley raise his voice to you
6  during that meeting?
7     A.  No.
8        MS. O'KASEY: Those are all the questions
9  I have.
10       Thank you.
11       MR. KAY: Thank you. If ordered, the
12 witness will read and sign and make revisions to
13 his videotape testimony by supplement or correction
14 as necessary.
15       Thank you.
16       (Deposition concluded at 4:11 p.m.)
17
18
19
20
21
22
23
24
25

Page 220

1  STATE OF OREGON    )
                      ) ss.
2  COUNTY OF MULTNOMAH )
3
4      I, Amy A. Dalton, Court Reporter and
5  Notary Public, do hereby certify that RICHARD WAYNE
6  MCFARLIN personally appeared before me at the time
7  and place mentioned in the caption herein; that the
8  witness was by me first duly sworn under oath and
9  examined upon oral interrogatories propounded by
10 counsel; that said examination, together with the
11 testimony of said witness, was taken down by me in
12 stenotype and thereafter reduced to typewriting;
13 and, that the foregoing transcript, pages 1 to 219,
14 both inclusive, constitutes a full, true, and
15 accurate record of said examination of and
16 testimony by said witness, and of all other oral
17 proceedings had during the taking of said
18 deposition, and of the whole thereof.
19       Witness my hand and notarial stamp at
20 Portland, Oregon, this 2nd day of June, 2006.
21
22 _____
   Amy A. Dalton
23 My commission expires 5-27-08
24 I certify this original/duplicate original is
   valid only if it bears my stamp.
25 Amy Dalton

56 (Pages 218 to 220)

EXHIBIT  _____
PAGE _10_ OF _13_

1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF OREGON

3   WAYNE McFARLIN,                      )
                                         )
4              Plaintiff,                )
                                         )
5          vs.                           )    No. 3:06-CV-1594-HU
                                         )
6   EDWARD GORMLEY, an individual;       )
    CITY OF McMINNVILLE, a municipal     )
7   corporation; CITY COUNTY INSURANCE ) VOLUME II
    SERVICES TRUST; ROD BROWN, an        )
8   individual; PUBLIC SAFETY            )
    LIABILITY MANAGEMENT, INC., an       )
9   Oregon corporation; WALDO FARNHAM,   )
                                         )
10             Defendants.               )
    _____)

11

12

13                 SEALED PORTIONS

14

15      BE IT REMEMBERED That, pursuant to stipulation of

16  counsel for the respective parties, previously set out,

17          THE DEPOSITION OF WAYNE McFARLIN

18  was taken before Christine Spencer, Certified Shorthand

19  Reporter for Oregon, on August 22, 2007, at Mr. Kay's

20  offices in Salem, Oregon, at 9:10 a.m.

21

22

23  CHRISTINE SPENCER
    Court Reporter

24  255 Kashmir Court SE
    Salem, Oregon    97306

25  503-363-6677

EXHIBIT ___1___

PAGE _11_ OF _13_

1  But I also made no, never tried to hide how I left
2  McMinnville, because it was a resignation that was reported
3  in the newspaper.
4      Q.  Did that come up in your job interviews and
5  applications?
6      A.  Certainly.
7      Q.  Let me go back to the question I started out with
8  in which you, I was asking about Waldo Farnham's
9  involvement.  Three of your claims that involve Waldo
10  Farnham are conspiracy claims.  Do you have an understanding
11  of conspiracy?
12      A.  Yes.
13      Q.  What is your understanding?
14      MR. KAY:  You can answer that to the extent that
15  you do not reveal any attorney-client communications.  If
16  you have some separate independent understanding, you can.
17  Otherwise, you're not to do so.
18      THE WITNESS:  Well, my knowledge of conspiracy is
19  that you work with others to achieve a purpose.
20  BY MR. SWEEK:
21      Q.  When you were using the term orchestrated, using
22  and including the mayor and I think Rod Brown in that
23  description, that would meet your definition of conspiracy,
24  would it not, people planning together to do something?
25      A.  Yes.

1      Q.  And I assume your answers would be the same with
2  regard to this conspiracy, these conspiracy claims, as they
3  were when I asked you early on if you had any additional
4  knowledge since your deposition about Waldo Farnham's
5  involvement in this matter.  I think you said the additional
6  knowledge you had was from depositions of others.  That
7  would be your same answer?
8      MR. KAY:  Asked and answered.
9  BY MR. SWEEK:
10      Q.  Go ahead.
11      A.  I'm not sure I understand what you're asking.
12      Q.  I'm talking specifically about these conspiracy
13  claims that you have in the case.  I'm asking if you have
14  any knowledge that you've acquired, other than what you've
15  already told me about, related to those claims.
16      A.  Well, I haven't told you the depth of the
17  information I've heard in the depositions.  And I mean I
18  remember listening to those depositions and recognizing they
19  were substantial evidence to support that.
20      Q.  I'm not going to try to get you to regurgitate
21  those depositions because I can read them.
22      A.  Right, right.
23      Q.  But if I understand you correctly, the source of
24  knowledge that you're talking about came from hearing those
25  people.

1      A.  Correct, correct.
2      Q.  And then you have a claim of defamation, that you
3  were defamed by Waldo Farnham, among others.  And what do
4  you base that claim on?
5      A.  That he was telling others that I lied to him and
6  that I was was ineffective as a chief.
7      Q.  Are the two, those are the main?
8      A.  The -- yes.
9      MR. KAY:  I want to take a break.
10      MR. SWEEK:  Yeah.
11          (Brief recess)
12  BY MR. SWEEK:
13      Q.  We just had a little recess and you had a chance
14  to go out with your attorney.  Do you have anything to add
15  to any --
16      A.  Well, yes.  There was a written statement, a
17  written note or letter to Mayor Gormley that made a number
18  of false allegations.
19      Q.  This is this two-page document that was referred
20  to in deposition testimony?
21      A.  Yes.
22      Q.  Have you had any conversations with Waldo Farnham
23  since your deposition was taken?
24      A.  No.
25      Q.  Did you get a chance to tell about all the

1  conversations you had had with Waldo Farnham regarding your
2  job performance?  Were you asked that in your deposition?  I
3  can't remember that.  I apologize.  I don't remember that.
4      A.  Can you restate that one more time?
5      Q.  Yeah.  Do you recall whether you were asked about
6  your conversations with Waldo Farnham related to your job
7  performance?  Were you asked that?
8      A.  I can't recall.
9      Q.  Do you recall conversations you had with Waldo
10  Farnham about job performance?
11      A.  No.  He never talked to me about -- .
12      Q.  All right.  Do you know Alan Springer and Don New?
13      A.  Yes.
14      Q.  And I had a chance to see a public access taped
15  interview by -- I think it was conducted by Don New.  You
16  know what I'm talking about?
17      A.  Yes.
18      Q.  Have you had a chance to see that?
19      A.  Yes.
20      Q.  And just in general, were there any statements you
21  made on that that you would want to change or that you
22  disagree with?
23      A.  Not that I recall.
24      Q.  You think it was accurate?
25      A.  I haven't listened to it for probably a year and a

EXHIBIT ___1___
PAGE _12_ OF _13_
4 (Pages 229 to 232)

1  Springer, ever told you that the mayor said you had
2  assaulted Carol Benedict?
3      A.  No.
4      Q.  All right.  And the sixth statement was that you
5  had lunged at Ms. Benedict at a meeting in a fit of rage.
6  Was this also something that Mr. Springer told you about at
7  the same time he told you about these other statements?
8      A.  Yes.
9      Q.  And did Mr. Springer also state that this was
10 something Mayor Gormley stated in this one-time meeting
11 that he had with Mr. Springer?
12     A.  Yes.
13     Q.  Did anyone else at the city ever tell you that
14 they had heard Mayor Gormley state that you had lunged at
15 Ms. Benedict at a meeting in a fit of rage?
16     A.  I don't believe so.
17     Q.  Did you ever talk to Mayor Gormley about any of
18 the statements Mr. Springer claimed he had made?
19     A.  No.
20     Q.  Other than verbal statements that you've talked to
21 me about, is there anything that Mayor Gormley wrote that
22 you're aware of that you're claiming was defamatory?
23     A.  Perhaps.  I'm referring to some notes that were
24 part of discovery.
25         And I don't know the legal, I mean the impact

1  those have, but there were some notes that he made that
2  talked about those type of things, lying when I cough or
3  defamatory allegations.  But I don't know who he shared the
4  notes with, so I don't know.
5      Q.  Where did you see the notes that you're talking
6  about?
7      A.  During this discovery.  They were part of the
8  notes that, of Mayor Gormley's.
9      Q.  Did you see them during the depositions?
10     A.  Whenever we received the discovery documents.
11     Q.  Before you filed this lawsuit and went through
12 this process that you're referring to as discovery, did you
13 have any information that Mayor Gormley had written anything
14 about you that you felt was defamatory?
15     A.  No.
16     Q.  Do you have any information that these notes
17 you've referred to in general were given to anyone?
18     A.  No, I don't know.
19     Q.  What was Ms. Benedict's position at the city at
20 the time you were there?
21     A.  She was the director of finance.
22     Q.  Did you have meetings with her from time to time?
23     A.  Yes, I did.
24     Q.  What would those meetings be about?
25     A.  We met to discuss issues of financial aid at the

1  police department.  Communicating in the liaison between the
2  police department issues and the finance department, and
3  some personnel issues.
4         My wife and I also socially met with them, her and
5  her husband Andy occasionally.  Not frequently, but at least
6  once, maybe twice.
7      Q.  During the meetings that you had with Ms.
8  Benedict, did you ever raise your voice at her?
9      A.  No.
10     Q.  Were you ever aware that Ms. Benedict had
11 complained about your behavior in a meeting that the two of
12 you had had?
13     A.  No.
14     Q.  As the chief of police during the five years that
15 you were at the City of McMinnville, how many due process
16 hearings do you think you were involved in?
17     A.  A couple, maybe three.
18     Q.  And as the chief of police of the City of
19 McMinnville, I assume that you were familiar with the terms
20 of the collective bargaining agreement that the officers are
21 subject to?
22     A.  Yes.
23     Q.  And that collective bargaining agreement included
24 due process requirements before an officer could be
25 discharged?

1      A.  Yes.
2      Q.  I also assume that as the chief of police of the
3  City of McMinnville, you're familiar with the state statutes
4  that provide for due process for officers in the absence of
5  a collective bargaining agreement?
6      A.  Yes.
7      Q.  Between the meeting, the first meeting that you
8  had with Mayor Gormley, Mr. Olson and Mr. Taylor, and the
9  day that you signed the resignation agreement, did you ask
10 anyone at the city for a due process hearing yourself?
11     A.  No.  I didn't know that there was allegations
12 against me.
13         MS. O'KASEY:  That's all I have.  Thank you.
14         MR. KAY:  Thank you.
15             (Discussion off the record.
16             Deposition recessed at 11:50 a.m.)
17
18
19
20
21
22
23
24
25

EXHIBIT  1
PAGE  13  OF  13

1        IN THE CIRCUIT COURT OF THE STATE OF OREGON

2                 FOR THE COUNTY OF YAMHILL

3

WAYNE McFARLIN,                    )
4                                  )
                      Plaintiff,   )
5                                  )
         vs.                       )     No. CV060094
6                                  )
EDWARD GORMLEY an individual,)
7    CITY OF McMINNVILLE, a         )
Municipal corporation,             )
8                                  )
                      Defendants.  )
9

10            DEPOSITION OF EDWARD GORMLEY

11

12            BE IT REMEMBERED that the deposition

13    of EDWARD GORMLEY was taken pursuant to stipulation

14    hereinafter set out before Sally Parrish, Court

15    Reporter and Notary Public for the state of Oregon,

16    May 24, 2006, beginning at the hour of 9:15 A.M.,

17    at the McMinnville Fire Department, 175 NW First

18    Street, McMinnville, Oregon.

19

20                    APPEARANCES

21        Mr. Terrence Kay, Attorney at Law,
             representing the Plaintiff;
22        Ms. Karen O'Kasey Attorney at Law,
             representing the Defendants.
23        ALSO PRESENT:  Mr. Kirk Kindle, Capitol
             City Video, Mr. Wayne McFarlin, and
24           Ms. Candace Haines, City Attorney,
             City of McMinnville.
25

ORIGINAL

EXHIBIT 2
PAGE 1 OF 7

1   Q.  The first meeting in October -- strike
2 that.
3        Monday October 24th, 2005.
4   A.  That -- that -- that Monday was October
5 24th, not October 23rd? I -- I don't remember
6 that, I -- I'm sorry. The answer to your question
7 is Chief McFarlin, City Manager Taylor, Council
8 President Olson and myself.
9   Q.  Who called that meeting?
10   A.  Either Rose Lorenzen or Kent Taylor.
11   Q.  Where did you graduate from high school?
12   A.  Jesuit High School, Portland, Oregon.
13   Q.  Not -- Jesuit?
14   A.  Yes.
15   Q.  Not to suggest this but to ask as many
16 attorneys do, and please understand, have you ever
17 been convicted of a crime?
18   A.  No, I have not.
19   Q.  Charged with a crime?
20   A.  No, I have not.
21   Q.  Have you ever been personally sued, apart
22 from this lawsuit?
23   A.  No, I have not.
24   Q.  Do you have a personal attorney at the
25 present time with regard to this lawsuit?

1   A.  No, I do not.
2   Q.  Do you have any insurance which may
3 provide coverage for some or all of the claims or
4 damages alleged in this case against you?
5   A.  No, I do not.
6   Q.  Do you have an umbrella insurance policy?
7   A.  Yes, I do.
8   Q.  Do you have a homeowner's policy?
9   A.  Yes, I do.
10   Q.  In the meeting of the four of you in
11 October you've previously mentioned, Mr. Olson,
12 Mr. Taylor, yourself and Chief McFarlin, did you
13 make any demands on Chief McFarlin in that meeting?
14   A.  No, I did not.
15   Q.  Did you make any requests of
16 Chief McFarlin in that meeting?
17   A.  No, I did not.
18   Q.  Did anyone in that meeting make any
19 demands or requests upon Chief McFarlin?
20   A.  No, they did not.
21   Q.  Did you suggest to Chief McFarlin he take
22 a Coke break during that meeting at any time?
23   A.  No, I did not.
24   Q.  What was the purpose of that meeting?
25   A.  To discuss the situation within Wayne's

1 Department, the, uhm, community, the pending no
2 vote of confidence, the, uh, potential for, uhm,
3 the newspaper to, uh, run a large feature
4 concerning all the people that had left the Police
5 Department, and to basically meet with Wayne and
6 discuss what kind of impacts those things would
7 have upon his candidacy for his position in Salem
8 had those things taken place.
9   Q.  And, excuse me, you may have mentioned
10 this already, you say who called the meeting of the
11 four of you?
12   A.  I do not know, I have told you it was
13 either Rose Lorenzen or Kent Taylor.
14   Q.  How did you learn of the meeting?
15   A.  I received a phone call from Rose
16 Lorenzen.
17   Q.  When?
18   A.  I -- I don't remember when.
19   Q.  Same day of the meeting?
20   A.  I don't know.
21   Q.  Had you been involved in any way
22 arranging anything to do with this meeting
23 occurring?
24   A.  Yes.
25   Q.  What?

1   A.  I had been contacted by the president of
2 the union and had been contacted by the editor of
3 the newspaper, and, uh, had relayed all this
4 information to the City Manager.
5   Q.  Is that it? Does that comprise
6 everything you had to do or were involved with in
7 this meeting occurring with the four of you?
8   A.  (Pause) I'm, uhm, trying to answer your
9 question as I think you have stated it, and you
10 have asked me about arranging that meeting, and I
11 believe I've answered it to that end.
12   Q.  Have you explained everything which you
13 did regarding the preparation for this meeting
14 which occurred with the four of you?
15   A.  That -- that is a question?
16   Q.  Yes, it is.
17   A.  Uhm, I had contact with the City
18 Councilors prior to this meeting to discuss the
19 same situation, that, uhm, there was unrest with
20 the personnel, a pending vote of no confidence, and
21 that the newspaper was basically threat- --
22 threatening to, uhm, run a story based upon a phone
23 call they had received from a Mrs. Mike Full who
24 had gotten frustrated with his efforts to -- to
25 deal with morale issues in the Police Department.



1     Q.   Was Mr. Full employed at the Police
2 Department at the time you learned of that?
3     A.   No, he was not.
4     Q.   When was Mr. Full last employed by -- by
5 the Police Department?
6     A.   I don't know the specific date.
7     Q.   In the meeting with Chief McFarlin with
8 the four of you, did you fully and honestly
9 disclose all the information you've just testified
10 to to Chief McFarlin?
11     A.   Yes, I did.
12     Q.   To be quite clear, Mr. Gormley,
13 everything you've now testified that you were
14 involved in doing to help arrange for the meeting
15 or providing information for the meeting --
16     A.   I -- I did not arrange --
17     Q.   Let me finish --
18     A.   -- that meet-
19     Q.   -- let me finish the question, please.
20 Did you describe -- and I'll just rephrase it.
21       Did you describe to Chief McFarlin
22 openly and completely and honestly everything
23 relating to this meeting and the subjects of this
24 meeting when you then met with Chief McFarlin?
25     A.   I don't believe I detailed every

1 conversation I had with every councilor or, uhm,
2 Sergeant Soules or Mr. Bladine, the owner of the
3 paper, uh, I did not give him all the details that
4 had, uhm, been discussed with me other than to try
5 and provide a capsulized form of what -- you know,
6 a -- a summary of those things.
7     Q.   Why not?
8     A.   He didn't ask me for the information.
9     Q.   Did Chief McFarlin ever ask you why the
10 meeting was being held when the four of you were
11 meeting?
12     A.   No, he did not.
13     Q.   Did Chief McFarlin ask those of you in
14 attendance at that meeting, "Is there anything else
15 about what you're asking me that you haven't told
16 me?"
17     A.   I don't believe he did.
18     Q.   Did Chief McFarlin even ask any questions
19 in the meeting with the four of you?
20     A.   I don't -- I believe he did, but I cannot
21 give those to you specifically.
22     Q.   Did you fully, openly and honestly answer
23 all questions which Chief McFarlin raised in that
24 meeting with the four of you?
25       MS. O'KASEY: I object to the form of

1 the question.
2       You can answer.
3       MR. KAY: Let me address the
4 question, Counsel, what's the concern, to try and
5 remedy it?
6       MS. O'KASEY: First of all, the only
7 proper speaking objection in a deposition is object
8 to form, which I've done.
9       He just testified that he doesn't
10 remember what questions, if any, Mr. McFarlin
11 asked, so your question about his response is based
12 on facts that are -- that have not been
13 established, --
14       MR. KAY: I --
15       MS. O'KASEY: -- to be specific.
16       MR. KAY: I appreciate that
17 enhancement, and I think he can answer this.
18       MS. O'KASEY: Well, I'm going to --
19       MR. KAY: He --
20       MS. O'KASEY: -- I'm going to allow
21 him to answer the question, --
22       MR. KAY: No, I appreciate that, I'm
23 not --
24       MS. O'KASEY: -- I'm simply objecting
25 to the form, Counsel.

1       MR. KAY: And I was asking just to
2 try and to clarify that so we have a clear record,
3 and I appreciate you explaining. Let me rephrase
4 it and we'll come back to it.
5     Q.   (By Mr. Kay) Mr. Gormley, you realize
6 as the mayor and also in your role not as the
7 mayor, say, doing business, do you -- do you
8 conduct yourself honestly with people?
9     A.   Yes, I do.
10     Q.   Meaning you tell the truth to people?
11     A.   Absolutely.
12     Q.   If you're asked you answer fully, you
13 don't withhold information when people are asking
14 you?
15     A.   (Pause) I answer everyone truthfully.
16     Q.   You hesitated, is there something about
17 answering truthfully that you're still kind of
18 leaving some room open to mean you withhold some
19 things?
20     A.   Your question was not whether I asked
21 (sic) things, uh, truthfully but whether I fully
22 disclosed, maybe I misunderstood what you had said.
23     Q.   Well, do you think part of being truthful
24 is fully answering someone when they put a question
25 to you?

1   A.   Yes.
2   Q.   Okay. So did you, consistent with what
3 you've just said, answer fully, truthfully any
4 questions Chief McFarlin put to you or anyone else
5 in that meeting?
6         MS. O'KASEY: Same objection.
7         You can answer.
8         THE WITNESS: If Chief McFarlin asked
9 me a question I would have answered it truthfully.
10   Q.   (By Mr. Kay) Okay. You may not
11 remember the questions, as you've testified, that
12 occurred in that meeting but you do know you
13 answered truthfully questions that were raised,
14 because that is your way to conduct yourself,
15 correct?
16   A.   I don't remember any questions being
17 answered -- asked at that meeting.
18   Q.   I heard you say that, but you've
19 testified that you would answer questions
20 truthfully if put to you, so is it true that you
21 answered the questions that were put to you in that
22 meeting even though you don't remember the
23 questions, because that's the way you conduct
24 yourself?
25         MS. O'KASEY: Object to the form of

1 the question.
2         MR. KAY: Go ahead.
3         MS. O'KASEY: You can answer.
4         THE WITNESS: I do not remember any
5 questions. If I had a question I would have
6 answered it truthfully.
7   Q.   (By Mr. Kay) Right. And today you have
8 no memory of any question not being answered
9 truthfully?
10   A.   Yes.
11   Q.   Okay. And do you have any memory of
12 withholding any information in responding to a
13 question by Chief McFarlin?
14   A.   I don't remember any questions being
15 asked.
16   Q.   But do you have any memory of withholding
17 any information in response to any questions of
18 his?
19   A.   I do not.
20   Q.   Do you have any memory of anyone else in
21 that meeting withholding any information in
22 response to any questions Chief McFarlin asked?
23   A.   I do not.
24   Q.   Would you have expected that Mr. Taylor,
25 Mr. Olson and yourself in that meeting with

1 Chief McFarlin had an obligation as officials of
2 this city to answer questions truthfully if put to
3 you by the Chief?
4   A.   Yes, we would have.
5   Q.   And to not withhold information?
6   A.   Yes.
7   Q.   Chief McFarlin at the time, in October
8 2005, was a full-time employee of the City,
9 correct?
10   A.   Yes, he was.
11   Q.   The Personnel Handbook applies to him as
12 a full-time employee, correct?
13   A.   To the best of my recollection, yes.
14   Q.   Okay. Chief McFarlin was hired by the
15 City Council in a vote by the body called the City
16 Council, correct?
17   A.   I believe so.
18   Q.   Under the Charter of this City the Chief
19 is hired and fired by the City Council, correct?
20   A.   Yes.
21   Q.   The terms and conditions of employment
22 are determined by the City Council, correct?
23   A.   Through consultation with the City
24 Manager.
25   Q.   After the consultation, if any, it's not

1 required, but if any, the City Council determines
2 the terms and conditions of employment of the Chief
3 of Police, correct?
4   A.   Yes.
5   Q.   Now, did you have any objectives or
6 purposes in mind when you participated in the
7 meeting with Chief McFarlin with the other two
8 gentlemen, Mr. Taylor and Mr. Olson?
9   A.   Yes, I did.
10   Q.   What were those purposes or objectives?
11   A.   I was very concerned about Wayne and his
12 candidacy in Salem, uhm, we were all very proud
13 that he had been made -- made a finalist, thought
14 it was a wonderful career opportunity for him, and
15 the events that were taking place, uhm, outside of
16 Wayne's, uhm, uh, I guess focus I thought could be
17 really damaging to his application, and so my
18 involvement in that meeting was to be there and say
19 "We have a" -- "a problem." And I explained to him
20 what I had, uh, received in the way of information
21 from people and was concerned, what happens if the
22 newspaper runs this big article, uh, someone like
23 Katie Wilson, who had already tried to, uh,
24 intimidate the Police Department over a, uhm, -- a
25 mole issue, and if the, uh, paper ran public that

1 the potential vote of no confidence, what would
2 that do to his chances as, uhm, a candidate, a
3 finalist at the City of Salem.
4  Q.  Any other purposes or objectives that you
5 had in mind before or during that meeting with
6 Chief McFarlin?
7  A.  My sole purpose was -- was to deal with
8 his -- his welfare and that candidacy and not to
9 jeopardize that.  And it was to give him that
10 information.
11  Q.  Again, your sole purpose was his welfare
12 and his --
13  A.  His candidacy.
14  Q.  -- candidacy as a finalist for the Chief
15 of Police --
16  A.  Correct.
17  Q.  -- in Salem?
18  A.  Yes.
19  Q.  And you explained to him all the
20 information you testified about that were subjects
21 for this meeting?
22  A.  I explained to him what I have previously
23 testified about, yes.
24  Q.  Specifically, did you explain to him that
25 the newspaper was threatening to run an article,

1 "yes" or "no"?
2  A.  Yes.
3  Q.  Did you explain to him that Mrs. Full had
4 contacted the newspaper, "yes" or "no"?
5  A.  I don't believe I explained that.
6  Q.  Why not?
7  A.  (Pause)  I don't believe I would have any
8 reason to provide that information unless -- unless
9 it was, uhm, questioned of me.
10  Q.  Did you decided -- did you intentionally
11 decide not to tell him that information about
12 Mrs. Full?
13  A.  I really don't remember the specific
14 conversations, I may have said that Mike Full's
15 wife had been to -- to Jeb Bladine or had talked to
16 Jeb Bladine, I may have said that to Wayne, I
17 really don't remember.
18  Q.  Did you explain to him that Katie Wilson
19 had tried to intimidate the Police Department
20 previously and you were concerned about it
21 occurring again, did you tell that to
22 Chief McFarlin, or words to those effect?
23  A.  I don't know if I mentioned Katie Wilson,
24 I think I mentioned the -- the newspaper and the
25 editor.

1  Q.  Did you mention Mr. Bladine, the editor,
2 I think you said "owner," of the News Register was
3 threatening to run an article?
4  A.  I don't believe I said Mr. Bladine was,
5 uhm, but I said -- I'm sure I said the newspaper
6 was.
7  Q.  Did you explain to Mr. -- strike that.
8  Did you explain to the Chief that your
9 sole purpose was his welfare and his candidacy as a
10 finalist for the Chief of Police of Salem in
11 participating in this meeting?
12  A.  I did not use those words.
13  Q.  If that was your sole purpose --
14 (pause) -- well, let me rephrase this.
15  Did you tell him in so many words that
16 was your purpose in having this meeting?
17  A.  Yes.
18  MS. O'KASEY:  Take a break.  Go off
19 the record.
20  THE VIDEOGRAPHER:  All right, we are
21 off.
22  (Off the record)
23
24  THE VIDEOGRAPHER:  Okay, we are back
25 on the record, track 2 at 10:06.

1  Q.  (By Mr. Kay)  Mr. Gormley, for the
2 meeting we've been discussing on October 24th with
3 yourself, Mr. Olson, Mr. Taylor and Chief McFarlin,
4 you said the sole purpose was the Chief's welfare
5 and his candidacy in Salem, and -- and based on
6 that what did you explain to the Chief was your
7 plan or your suggestion to deal with these concerns
8 for his welfare, what did you tell him?
9  A.  I made no suggestions.
10  Q.  So your purpose was having the meeting to
11 address these issues for his welfare and his
12 benefit, but you made no suggestions in the meeting
13 whatsoever?
14  A.  I did not.
15  Q.  Did anyone else make any suggestions in
16 the meeting?
17  A.  (Pause)  I -- I don't believe so.
18  Q.  How long was the meeting?
19  A.  To the best of my recollec- --
20 recollection, maybe 30 minutes to 45 minutes.
21  Q.  Did Chief McFarlin make any requests to
22 you or anyone else in the meeting?
23  A.  My -- my best recollection is that after
24 I had explained to Wayne what was going on and,
25 uhm, what kind of impact it might have on, uhm, his

1 then.
2 Q. Was it perhaps the week before or --
3 A. Absolut--
4 Q. -- a month before?
5 A. No, no, it was --
6 Q. Same week?
7 A. Correct.
8 Q. All right. Now, let's step back since
9 you've mentioned the publisher. Referring to the
10 publisher of the paper, Mr. Jeb Bladine?
11 A. Yes, sir.
12 Q. And he approached you at the Chamber
13 dinner that Thursday night prior to the October
14 24th meeting?
15 A. Yes.
16 Q. And did he take you aside so you could
17 talk privately?
18 A. Yes, he did.
19 Q. What did he say to you?
20 A. He wanted to know if I was aware of all
21 the unrest within the Police Department. And I
22 asked him to explain himself, and he explained
23 about the -- the morale issue, about, uh, all the
24 people that had left, uhm, unwillingly, uhm, was I
25 aware of tho- -- those things and -- and said that

1 "I'm just now finding out about some of those
2 things."
3         And he wanted me to know that Mike
4 Full's wife had called him that day, and his
5 concern was if Katie Wilson, this investigative
6 reporter, got ahold of any of this, uhm, you know,
7 there would be -- I mean, Wayne would just be
8 brutalized.
9 Q. That's what Mr. Bladine said?
10 A. Yes.
11 Q. And in response to Mr. Bladine saying
12 that if his reporter, Katie Wilson, got ahold of
13 this information Mr. McFarlin, Chief McFarlin,
14 would be brutalized, what did you say to him?
15 A. I said I -- I -- I was -- I was concerned
16 and shocked and, you know, Wayne -- Wayne's,
17 uhm, -- I think I said to him, "Gosh, Wayne's a
18 candidate, that's just" -- "you know, what's this
19 going to do?"
20         And Mr. Bladine did not want anything
21 bad to happen to -- to Wayne either, uh, but he has
22 a young reporter that, uhm, has received a bunch of
23 awards and that just -- because of her exposes
24 she's done on things, so if she had any sense that
25 there was something not right at the Police

1 Department, uhm, it would become front page
2 information.
3 Q. Did Mr. Bladine say anything else to you
4 at that time?
5 A. I believe that was it.
6 Q. Did you say anything else --
7 A. Best of my recollection.
8 Q. Sure. Did you say anything else to him?
9 A. Not that I remember.
10 Q. Did you say what you were going to do?
11 A. I told him "I'm" -- "I'm doing the best I
12 can trying to get information and trying to
13 validate, you know, the facts and that, and -- and
14 so far it's" -- uhm, I didn't have a lot of facts
15 to work with.
16 Q. Did you tell him you had talked with
17 Chief McFarlin about it?
18 A. No, I -- I had not talked to
19 Chief McFarlin.
20 Q. Well, hearing this from the owner and
21 publisher -- that's correct, the owner and
22 publisher of the paper?
23 A. Yes.
24 Q. And -- and let's put that in context.
25 The News Register has been the -- the paper of this

1 city for decades, hasn't it?
2 A. Yes.
3 Q. Would you say the newspaper is the
4 primary source of information about local and city
5 and other matters here for the -- the general
6 public?
7 A. Absolutely.
8 Q. Okay. It's published how many days a
9 week?
10 A. Three days a week.
11 Q. Three days a week?
12 A. Monday -- or, excuse me, Tuesday,
13 Thursday and Saturday.
14 Q. Okay.
15 A. Is that three days?
16 Q. And did you get the impression in talking
17 with Mr. Bladine that he was asking for something
18 to be done to help avoid the risk of a newspaper
19 article being published by his employee and
20 reporter?
21 A. Could you ask that one more time, I --
22 I'm trying to remember that conversation, and...
23 Q. Did you have any impression when you were
24 speaking to Mr. Bladine, the publisher and owner of
25 the paper in this city, that he was suggesting or

```
 1   STATE OF OREGON   )
                       ) ss.
 2   County of Marion  )

 3

 4           I, Sally Parrish, Court Reporter and

 5   Notary Public for Oregon, certify that EDWARD

 6   GORMLEY personally appeared before me at the time

 7   and place set forth in the caption hereof; that at

 8   said time and place I reported in stenotype all

 9   testimony adduced and other oral proceedings had in

10   the foregoing matter; that thereafter my notes were

11   reduced to typewriting by me, and the foregoing

12   reporter's transcript, consisting of 327

13   consecutive pages, constitutes a full, true and

14   accurate record of such testimony adduced and oral

15   proceedings had and of the whole thereof.

16           Witness my hand and Notary Public seal

17   at Salem, Oregon, this 20th day of August, 2006.

18

19

20                    Sally Parrish, Court Reporter
                      Notary Public for Oregon
21                    My Commission Expires 1/17/10

22

23                         OFFICIAL SEAL
                           SALLY PARRISH
24                    NOTARY PUBLIC - OREGON
                      COMMISSION NO. 401331
25              MY COMMISSION EXPIRES JAN. 17, 2010
```

Sally Parrish, Court Reporter
(503) 363-5766

EXHIBIT 2
PAGE 2 OF 7

1    IN THE CIRCUIT COURT OF THE STATE OF OREGON

2         FOR THE COUNTY OF YAMHILL

3

WAYNE McFARLIN,                    )
4                                  )
              Plaintiff,           )
5                                  )
       vs.                         )    No. CV060094
6                                  )
EDWARD GORMLEY, an individual,)
7   CITY OF McMINNVILLE, a          )
Municipal corporation,             )
8                                  )
              Defendants.          )
9

10         DEPOSITION OF KENT TAYLOR

11

12            BE IT REMEMBERED that the deposition

13  of KENT TAYLOR was taken pursuant to stipulation

14  hereinafter set out before Sally Parrish, Court

15  Reporter and Notary Public for the state of Oregon,

16  May 25, 2006, beginning at the hour of 9:20 A.M.,

17  at McMinville City Hall, 230 NE 2nd Street,

18  McMinnville, Oregon.

19

20              APPEARANCES

21     Mr. Terrence Kay, Attorney at Law,
          representing the Plaintiff;
22     Ms. Karen O'Kasey Attorney at Law,
          representing the Defendants.
23     ALSO PRESENT:  Ms. Candace Haines,
          Attorney for the City of McMinnville,
24        and Mr. Wayne McFarlin.

25

              Sally Parrish, Court Reporter
                 (503) 363-5766



EXHIBIT    3
PAGE  1  OF  3

1  A.  Help me out, yeah.
2  Q.  Okay. Maybe there's a printed one handy.
3     MS. HAINES: (Counsel looking through
4  her file.)
5     MR. KAY: One is coming.
6     MS. HAINES: I can't possibly get it
7  out so I'll hand you the whole thing (indicating).
8     MS. O'KASEY: '05.
9     MR. KAY: Perfect.
10    MS. O'KASEY: October.
11    THE WITNESS: And the question is did
12 I have a meeting?
13    Q.  (By Mr. Kay) Did you participate in a
14 meeting, attend a meeting with Chief McFarlin
15 regarding his employment on Monday, October 24th?
16    A.  I don't know the dates, I can't – I
17 can't tell you the date.
18       Yes, I – I participated in a meeting
19 around that time with Chief McFarlin about his
20 employment, but I can't -- I don't remember the
21 exact date.
22    Q.  Was it a Monday?
23    A.  I can't tell you that either.
24    Q.  Is there some way you could reference or
25 figure out when the meeting occurred, do you have a

1  calendar that would say when that meeting happened?
2  A.  Yeah. Well, I hope it -- it might say
3  that.
4  Q.  We're here at City Hall, is your office
5  right down the hall?
6  A.  It's upstairs.
7  Q.  Could we take a break and have you please
8  get your calendar?
9  A.  Sure.
10 Q.  Thank you.
11 A.  Okay.
12    (Off the record)
13
14    (Whereupon, Deposition
15    Exhibit Nos. 19 and 20 were
16    marked for identification.)
17
18    THE WITNESS: Now I've got the order
19 right.
20 Q.  (By Mr. Kay) I'm sorry?
21 A.  Now I've got the order right.
22 Q.  May I?
23 A.  (Witness hands Counsel a document.)
24 Q.  (Counsel reviewing the document.)
25 A.  That's the 21st, that's --

1  Q.  Exhibits 19 and 20 are printouts from
2  your electronic calendar apparently maintained in
3  Outlook, Mr. Taylor?
4  A.  Correct.
5  Q.  Exhibit 19 being your calendar of the
6  21st, and 20 being your calendar of October 24th?
7  A.  Correct.
8  Q.  All right. Then looking at your
9  calendar, does it help you remember that Monday,
10 October 24th, you participated in a meeting in the
11 afternoon it says at 1:30?
12 A.  Yes.
13 Q.  Did that meeting occur here at City Hall?
14 A.  Yes.
15 Q.  Where?
16 A.  In my office.
17 Q.  Who was present?
18 A.  Wayne McFarlin, Ed Gormley, Rick Olson
19 and myself.
20 Q.  Okay. Who called that meeting?
21 A.  Uhm, I scheduled it in terms of having
22 Wayne come at 1:30.
23 Q.  Who decided to have the meeting?
24 A.  I'd describe it a collective decision
25 with the Mayor and -- and Councilman Olson and

1  myself.
2  Q.  The three of you decided to have that
3  meeting?
4  A.  (Nodding head.)
5  Q.  When did you decide to have that meeting?
6  A.  Following the meeting -- or meeting on
7  the 21st.
8  Q.  So on Friday, the 21st of October, the
9  three of you discussed Chief McFarlin and decided
10 to have a meeting with him on Monday, correct?
11 A.  Yes.
12 Q.  And what was the purpose of the meeting,
13 or the purposes for the meeting?
14 A.  The meeting on the 24th?
15 Q.  Yes.
16 A.  To discuss his performance and concerns
17 that had arisen.
18 Q.  Were there any other purposes?
19 A.  No.
20 Q.  Okay. So for the meeting on the 24th to
21 discuss issues that had arisen in his performance,
22 those being the two subjects of the meeting, is
23 that correct?
24 A.  Yes.
25 Q.  Thank you.

```
 1   STATE OF OREGON    )
                        ) ss.
 2   County of Marion   )

 3

 4              I, Sally Parrish, Court Reporter and

 5   Notary Public for Oregon, certify that KENT TAYLOR

 6   personally appeared before me at the time and place

 7   set forth in the caption hereof; that at said time

 8   and place I reported in stenotype all testimony

 9   adduced and other oral proceedings had in the

10   foregoing matter; that thereafter my notes were

11   reduced to typewriting by me, and the foregoing

12   reporter's transcript, consisting of 72 consecutive

13   pages, constitutes a partial, true and accurate

14   record of such testimony adduced and oral

15   proceedings had and of the whole thereof.

16              Witness my hand and Notary Public seal

17   at Salem, Oregon, this 18th day of August, 2006.

18

19

20                        Sally Parrish, Court Reporter
                          Notary Public for Oregon
21                        My Commission Expires 1/17/10

22

23                              OFFICIAL SEAL
                                SALLY PARRISH
24                          NOTARY PUBLIC - OREGON
                             COMMISSION NO. 401331
25                        MY COMMISSION EXPIRES JAN. 17, 2010
```

Sally Parrish, Court Reporter
(503) 363-5766

EXHIBIT 3
PAGE 3 OF 3

# RESIGNATION AND SEPARATION AGREEMENT AND RELEASE OF CLAIMS

This Agreement is by and between the City of McMinnville, a municipal corporation of the State of Oregon (hereinafter City) acting by and through its City Manager and Wayne McFarlin, an employee of the City (hereinafter Employee).

## RECITALS

Employee submitted a written resignation to City. The resignation is dated November 11, 2005 and states that Employee's resignation will be effective November 30, 2005. The resignation establishes that Employee's last working day will be November 14, 2005.

## TERMS OF AGREEMENT

For the mutual consideration set forth below, the parties agree as follows:

**Section 1.** Employee will continue working through November 14, 2005, absent other direction from the City Manager. Employee will be placed on leave with pay and with full benefits from his final working day through November 30, 2005. This Agreement will serve as the approval of the City Manager for such leave. Employee shall not be required to use any accrued leave (e.g. vacation) during this period.

**Section 2.** On November 30, 2005, City will pay Employee, as severance, a lump sum equal to three times Employee's regular monthly base salary (as of the October 2005 pay period) plus an amount equal to three times the monthly amount City pays toward Employee's health insurance premium (as of the October 2005 premium payment period). Taxes and other appropriate deductions will be deducted from the total amount before City issues the check.

**Section 3.** Upon fulfillment of the terms set forth in Section 2, Employee agrees that no further compensation of any kind shall be due from City.

**Section 4.** Employee hereby releases City, its officers, agents, employees, representatives, and insurers from any and all claims known or unknown arising out of Employee's employment with City and the termination of that employment relationship through Employee's resignation. This release includes, but is not limited to, all claims for additional salary or other forms of compensation, for pain and suffering damages, punitive damages, and all other applicable statutory, contract, tort, or other theories based on common law or upon any statute dealing with employment matters and discrimination in employment. These statutes included, but are not limited to, ORS Chapters 652, 653, 654, and 659, Title VII of the Civil Rights Act of 1964, the Post Civil War Civil Rights Acts, the Rehabilitation Act of 1973, the Americans Disabilities Act, the Federal Family Medical Leave Act, and the Oregon Family Leave Act, all as amended.

RESIGNATION AND SEPARATION AGREEMENT AND RELEASE OF CLAIMS
Page 1

EXHIBIT ___4___
PAGE ___1___ OF ___3___

The release contained in this paragraph is intended to operate in all judicial, non-judicial, and administrative forums for all matters related to Employee's employment with City and shall act to bar all remedies for actions related to such employment, including but not limited to claims for money damages, injunctive relief or re-employment rights.

Employee agrees not to lodge, file or bring any suit, charge, complaint, or any other form of action or claim against City or its officers, agents, or employees relating in any way to Employee's employment relationship with City. Employee agrees not to request, or to indirectly cause, any governmental agency or other person to commence any investigation or bring any action against City, its officers, agents, or employees, and Employee waives any remedy or recovery in any action which may be brought on Employee's behalf by any government agency or other person.

The release contained in this section is intended by the parties to be a full and complete release of all possible claims, and is to be construed by a court accordingly.

**Section 5.** With the single exception detailed below, City agrees not to lodge, file or bring any civil suit, charge, complaint, or any other form of civil action or civil claim against Employee relating in any way to Employee's employment relationship with City. City agrees not to request, or to indirectly cause, any governmental agency or other person to commence any civil investigation or bring any civil action against Employee. City waives any remedy or recovery in any civil action which may be brought on City's behalf by any government agency or other person. Exception: Any and all tax liability for money paid remains with Employee, and City, if charged for such, may seek indemnity.

**Section 6.** If a prospective employer contacts City regarding the potential future employment of Employee, City shall limit its response to a confirmation of the period of employment and final monthly salary unless the prospective employer's request for information is submitted to City with a release of information form signed by Employee. If a release of information form signed by Employee is submitted to City, City shall comply with the terms of the release of information form.

**Section 7.** Employee represents and acknowledges that in executing this Agreement, Employee does not rely and has not relied upon any representation or statement not set forth herein made by City, its officers, agents, or employees with regard to the subject matter, basis or effect of this Agreement.

**Section 8.** In the event that any party to this Agreement shall take any action, judicial or otherwise, to enforce or interpret any of the terms of this Agreement, each party shall be wholly responsible for its own expenses which it may incur in taking such action, including costs and attorney fees, whether incurred in a suit or action or appeal from a judgment or decree therein or in connection with any non-judicial action.

M 2

EXHIBIT 4

PAGE 2 OF 3

**Section 9.** After having carefully read each provision of this Agreement, Employee and City have chosen to execute the Agreement. Employee and City know and understand the contents of the Agreement and have signed the Agreement as their own free act.

**Section 10.** This document contains the entire agreement between the parties relating to Employee's separation from employment from City and may be amended only by execution of a written document by City and Employee.

**Section 11.** EMPLOYEE REPRESENTS AND AGREES THAT EMPLOYEE FULLY UNDERSTANDS EMPLOYEE'S RIGHT TO DISCUSS ALL ASPECTS OF THIS AGREEMENT WITH WHOMEVER EMPLOYEE DESIRES, THAT EMPLOYEE HAS EITHER DISCUSSED THIS AGREEMENT WITH WHOMEVER EMPLOYEE DESIRES OR CHOSEN NOT TO DISCUSS THIS AGREEMENT, THAT EMPLOYEE HAS CAREFULLY READ AND FULLY UNDERSTANDS ALL OF THE PROVISIONS OF THIS AGREEMENT, AND THAT EMPLOYEE IS VOLUNTARILY ENTERING INTO THIS AGREEMENT.

**PLEASE READ CAREFULLY. THIS SEPARATION AGREEMENT INCLUDES A RELEASE OF ALL KNOWN OR UNKNOWN CLAIMS.**

Kent L. Taylor
City Manager

Date    _10·28·05_

R. Wayne McFarlin
Employee

Date _10/28/05_

RESIGNATION AND SEPARATION AGREEMENT AND RELEASE OF CLAIMS
Page 3

M 3

EXHIBIT    4
PAGE    3   OF   3

```
 1        IN THE CIRCUIT COURT OF THE STATE OF OREGON
 2               FOR THE COUNTY OF YAMHILL
 3
    WAYNE McFARLIN,                    )
 4                                     )
                    Plaintiff,         )
 5                                     )
                                       )
         vs.                           )  No. CV060094
 6                                     )
    EDWARD GORMLEY, an individual,)
 7  CITY OF McMINNVILLE, a            )
    Municipal corporation,            )
 8                                     )
                    Defendants.        )
 9
10              DEPOSITION OF WALDO FARNHAM
11
12             BE IT REMEMBERED that the deposition
13  of WALDO FARNHAM was taken pursuant to stipulation
14  hereinafter set out before Sally Parrish, Court
15  Reporter and Notary Public for the state of Oregon,
16  June 2, 2006, beginning at the hour of 11:25 A.M.,
17  at McMinnville City Hall, 230 NE 2nd Street,
18  McMinnville, Oregon.
19
20                    APPEARANCES
21    Mr. Terrence Kay, Attorney at Law,
            representing the Plaintiff;
22    Ms. Karen O'Kasey Attorney at Law,
            representing the Defendants;
23    Mr. D. Michael Mills, Attorney at Law,
            representing the Deponent, Mr. Waldo Farnham.
24    ALSO PRESENT:  Ms. Candace Haines,
            Attorney for the City of McMinnville,
25         and Mr. Wayne McFarlin.
```

P. 49 - docs/email
provided?

EXHIBIT 5

PAGE 1 OF 10



1    Q    Okay. Now, do you understand that when
2  you're sworn to tell the truth you need to answer
3  the questions fully with what you know and not
4  withhold anything. Again, I'm not suggesting
5  you're going to withhold anything, I just want to
6  make sure you know you need to answer fully and
7  completely, do you understand that?
8    A    Yes.
9    Q    Okay. Now, if any of the questions I ask
10  are unclear or confusing to you will you tell me
11  that before you answer?
12    A    Yes.
13    Q    Okay. And the reason I'm asking you to
14  do that, sir, is that this court reporter is going
15  to type up an official court record of your sworn
16  testimony, and if we end up in front of a jury or a
17  judge and I ask you the same kind of question and
18  you answer it differently in court than you do here
19  I just want to make sure we don't have an issue
20  with you saying, "Well, I was confused on the day
21  that my deposition was taken," and so you've told
22  me you're going to explain when you're confused and
23  we'll clear it up, all right?
24    A    Yes.
25    Q    Therefore, when you answer today may I

1  conclude that you've not been confused about the
2  question?
3    A    Repeat the question, please.
4    Q    Since you've agreed to tell us whenever
5  you're confused may we conclude when you answer you
6  haven't had any confusion in your mind that you've
7  been not telling us about?
8    A    Yes.
9    Q    Thank you very much.
10        Now, not to suggest there's any
11  problem with your memory, this is something we do
12  with witnesses, lawyers do it all the time, are you
13  under any medication or condition or fact that may
14  impair the quality of your memory?
15    A    No.
16    Q    Okay. Do you have any questions before
17  we begin?
18    A    No.
19    Q    Okay. Let's do some background things
20  first, if we could, please. Your age, please?
21    A    71.
22    Q    Your Social Security number?
23    A    (Witness looking in his wallet)
24  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.
25    Q    And while you have your wallet out, your

1  Oregon driver's license number, please.
2    A    653291.
3    Q    And your date of birth?
4    A    11-13-34.
5    Q    Again, please understand, Mr. Farnham,
6  this is not a question to suggest this has ever
7  happened, but in being thorough lawyers we ask
8  these kind of questions, and the next one I'm going
9  to ask is like that, have you ever been convicted
10  of a crime?
11    A    No.
12    Q    Have you ever been charged with a crime?
13    A    No.
14    Q    Have you ever been a party to a lawsuit,
15  that is, you've sued somebody or they've sued you?
16    A    Yes.
17    Q    How many times?
18    A    I don't know.
19    Q    More than five, less than ten?
20    A    Less than ten.
21    Q    Okay. Were all of those lawsuits
22  involving your electrical contracting business?
23    A    Yes.
24    Q    Okay. Were any of those involving any
25  personal issues, that is, something that was not

1  about electrical contracting matters?
2    A    No.
3    Q    Okay. Have you had attorneys represent
4  you in those cases?
5    A    Yes.
6    Q    Okay. The same attorney or different
7  attorneys?
8    A    I can't remember.
9    Q    Did Mr. Mills represent you in any of
10  those cases?
11    A    Yes.
12    Q    What's the name of your electrical
13  contracting business?
14    A    Farnham Electric Company.
15    Q    Corporation, limited liability, or any
16  other entity?
17    A    Corporation.
18    Q    Formed when?
19    A    I don't know.
20    Q    Who formed it?
21    A    My father.
22    Q    You inherited it?
23    A    Yes, sir.
24    Q    Okay. You're the sole owner?
25    A    Yes.

EXHIBIT  5
PAGE  2  OF  10



1   Q   And you've been the president and sole
2   owner of that company for how long?
3   A   (Pause)
4   Q   You can estimate.
5   A   Uhm, since 1968.
6   Q   How many employees does the company have
7   at the present time?
8   A   30.
9   Q   Roughly?
10  A   Yes.
11  Q   Union shop or non?
12  A   Union.
13  Q   How long?
14      MR. MILLS:  How long a union shop?
15      MR. KAY:  Yes.  Fair.
16      MR. MILLS:  Okay.
17  Q   (By Mr. Kay)  How long have you had a
18  union shop?
19  A   I don't know.
20  Q   What union local is it?
21  A   IBEW Local 280.
22  Q   Okay.
23  A   IBEW Local 48 in Portland.
24  Q   Okay.  Do you have a management labor
25  attorney that represents your company?

1   A   (Pause)  Okay, please say again.
2   Q   Have you or do you have a labor attorney
3   for your company?
4   A   No.
5   Q   Have you ever?
6   A   No.
7   Q   Are you married?
8   A   Yes.
9   Q   Your wife's name, please.
10  A   Bonnie.
11  Q   B-o-n-n-i-e?
12  A   Yes.
13  Q   How long have you been married?
14  A   Humm?
15  Q   You can estimate.  Off the record --
16  (laughter) -- you can estimate.
17  A   Okay, 41 years.
18      MR. KAY:  Off the record.
19          (Off the record)
20
21  Q   (By Mr. Kay)  About 43 years you've been
22  married?
23  A   41.
24  Q   41 years.  Children?
25  A   Yes.

1   Q   How many?
2   A   Five.
3   Q   Rough approximately their ages, please.
4   A   Oldest is 53.  The next one is 51.  The
5   next one is 45 -- no, 48 maybe, and then probably
6   43, and 39.
7   Q   You were married previously?
8   A   Yes.
9   Q   Okay.  Second marriage at the present
10  time?
11  A   Yes.
12  Q   Do any of your children work in the
13  business?
14  A   Yes.
15  Q   How many?
16  A   One.
17  Q   Which one?
18  A   The oldest.
19  Q   His name or her name?
20  A   It's Dennis McGill.
21  Q   Dennis McGill (enunciating)?
22  A   Yes.
23  Q   And what is Dennis McGill's position in
24  your company?
25  A   Uhm, Manager.

1   Q   What, generally, does your electrical
2   company do, what kind of contracting work do they
3   do?
4   A   Commercial industrial.
5   Q   Okay.  Any residential?
6   A   Small amount.
7   Q   Okay.  90 percent or more is industrial
8   commercial?
9   A   Yes.
10  Q   All in the state of Oregon?
11  A   No.
12  Q   Where else?
13  A   We've been -- we've been to Peru.
14  Q   Peru?
15  A   Uh-huh.  Pusong (ph), South Korea,
16  Hawaii, Guam, Arizona, Arkansas, Alabama,
17  Washington.
18  Q   Any other states?
19  A   No.
20  Q   In the last five years would over 80
21  percent of the business be in the state of Oregon,
22  or thereabouts?
23  A   Yes.
24  Q   Okay.  What business has your company or
25  you, yourself, done with the -- excuse me.  What

EXHIBIT   5
PAGE  3  OF  10

4 (Pages 10 to 13)

1    A   (Pause) I don't know about the four to
2  six weeks, I wasn't -- I -- I don't have the exact
3  dates, but there was a time after that I was -- I
4  was made aware of it.
5    Q   Ed Gormley told you at some point "I
6  asked the Chief to resign," correct?
7    A   Yes.
8    Q   Did he tell you the Chief had agreed to
9  resign?
10    A   Yes.
11    Q   Did he tell you he was going to ask the
12  Chief to resign before he did it?
13    A   (Pause) So the question again is?
14    Q   Did Ed Gormley tell you before he asked
15  the Chief to resign, did he tell you, "I'm going to
16  ask the Chief to resign"?
17    A   Yes.
18    Q   All right. So you asked Ed Gormley to
19  seek the resignation of Chief McFarlin, Ed Gormley
20  told you he was going to do it at some point, and
21  then afterwards he told you he had done it,
22  correct?
23    A   Yes.
24    Q   All right. Did you ever give anything in
25  writing to Ed Gormley asking him to seek the

1  resignation or the termination of Chief McFarlin's
2  employment?
3    A   Okay, repeat the question.
4    Q   Did you ever give anything in writing to
5  Ed Gormley which asked for Chief McFarlin's
6  resignation or termination?
7    A   I did. Yes, I did.
8    Q   When did you do that?
9    A   I -- end of -- end of October, or
10  November.
11    Q   The end of October or November of 2005?
12    A   I -- yes, I -- I believe that's accurate,
13  but --
14    Q   And --
15    A   -- I'm not -- I'm not certain.
16    Q   So it might have been earlier than that?
17    A   Yes.
18    Q   Where did you give this written request
19  for the Chief's resignation to Ed Gormley? Where
20  were you when you gave this written request for the
21  Chief's resignation to Ed Gormley?
22    A   In Ed's office.
23    Q   Was it the same meeting at the plumbing
24  office you mentioned earlier?
25    A   No.

1    Q   The second meeting, correct?
2    A   I don't -- I can't remember.
3         MR. MILLS: Did you say "a second
4  meeting" or "the second meeting"?
5    Q   (By Mr. Kay) Was this a second meeting
6  with Ed Gormley at his plumbing office?
7    A   Yes.
8    Q   Okay. So you asked Ed Gormley in person
9  orally, you just said, "I want you to get the
10  Chief's resignation," and then in another meeting
11  you had at the plumbing office you gave him a
12  written request for the Chief's resignation,
13  correct?
14    A   Yes.
15    Q   Okay. Now, those requests were given by
16  you to Ed Gormley as the Mayor of the City? In
17  other words, and I'm not being facetious, you're
18  not asking him to do this as a plumbing contractor,
19  you're asking him to do this as the Mayor of the
20  City of McMinnville?
21    A   Yes.
22    Q   All right. And so your written request
23  was directed to the Mayor of the City, right?
24    A   I gave it to him.
25    Q   Did you intend it to be directed to him

1  as the Mayor of the City?
2    A   Yes.
3    Q   And you kept a copy of your written
4  request that you've referred to, right?
5    A   Yes.
6    Q   And you gave that to your attorney?
7    A   Yes.
8    Q   And that's been provided to us, right, as
9  far as you know?
10    A   (Pause)
11    Q   You assume it's been provided to us?
12    A   Yes.
13    Q   Okay. Have you ever written anything
14  else in a letter, a memo or an e-mail to Ed Gormley
15  requesting Chief McFarlin's resignation or
16  termination from office?
17    A   No.
18    Q   Just that one two-page document?
19    A   Yes.
20    Q   Is everything you stated in that two-page
21  document truthful, as far as you know?
22    A   Yes.
23    Q   Did you intend the Mayor to rely on what
24  you were giving him in -- in seeking the Chief's
25  resignation?

EXHIBIT 5
PAGE 4 OF 10

7 (Pages 22 to 25)

1    A    No.
2    Q    Did he say anything about the questions
3    he was asked?
4    A    No.
5    Q    Did he tell you anything about what had
6    occurred involving Chief McFarlin's termination
7    from office?
8        MR. MILLS:  Are you talking about in
9    the conversation he's recounting?
10       MR. KAY:  Yes.
11       THE WITNESS:  No.
12   Q    (By Mr. Kay)  Did he tell you that he
13   was not permitted to talk to you about any of those
14   subjects?
15   A    Yes.
16   Q    What did he say?
17   A    He said he can't talk about it.
18   Q    Were you asking and he said, "I can't
19   talk about it"?
20   A    No.
21   Q    He just offered that on his own?
22   A    That's correct.
23   Q    All right.  Who else was present when you
24   had this conversation with him?
25   A    Nobody.

1    Q    Where were the two of you?
2    A    I was in my office.
3    Q    He came to visit you?
4    A    He was in Mexico.
5    Q    You said the discussion was in your
6    office.
7    A    I had a telephone.
8    Q    Well, I thought you were in person,
9    excuse me.  So he called you from Mexico?
10   A    Yes.
11   Q    Okay.  You've testified to two occasions
12   on which you asked Ed Gormley to seek the
13   resignation of Chief McFarlin, were there any other
14   times you requested Ed Gormley to obtain the
15   Chief's resignation?
16   A    No.
17   Q    You sure?
18   A    (Pause)  I don't know.
19   Q    So on the two or maybe more occasions you
20   asked Ed Gormley to seek the Chief's resignation,
21   why did you do it?
22       MR. MILLS:  Objection, form of
23   question.
24   Q    (By Mr. Kay)  Why did you ask Ed Gormley
25   to seek the Chief's resignation?

1    A    I -- as a citizen I went out and did a --
2    on my own did a review of the accomplishments of
3    the Chief, and after I completed that I gave him
4    what I learned and my opinion as a citizen.
5    Q    That's why you asked for the resignation?
6    A    Uh-huh.  Yes.
7    Q    When did you conduct this review of the
8    Chief's accomplishments?
9    A    Latter part of May of 2005.
10   Q    Did you prepare anything in writing?
11       MR. MILLS:  Are you talking about as
12   a result of the review?
13       MR. KAY:  Yes.
14   Q    (By Mr. Kay)  As a result of your review
15   of the Chief's accomplishment, did you prepare
16   anything in writing?
17   A    You told me you had a document --
18       MR. MILLS:  "Yes" or "no."
19       THE WITNESS:  Yes, I did, yes.
20   Q    (By Mr. Kay)  And is the written review
21   that you did of Chief McFarlin's accomplishments
22   contained in the document you gave to Ed Gormley?
23   A    Yes.
24   Q    So you did it in May of 2005, correct?
25   A    Started.

1    Q    You started it, when did you finish it?
2    A    Uhm, sometime in October.
3    Q    So between May and October you'd
4    conducted your own review of the Chief's
5    accomplishments and reduced it to your -- or put it
6    into the document you gave Ed Gormley, correct?
7    A    Yes.
8    Q    All right.  Now, you're a citizen of the
9    city of McMinnville?
10   A    Yes.
11   Q    Okay.  And as a citizen of the city of
12   McMinnville you were doing this review?
13   A    Yes.
14   Q    And as a citizen of the city of
15   McMinnville you were requesting that the Chief be
16   required to resign from office, correct?
17   A    Yes.
18   Q    Okay.  Now, as a citizen of the city of
19   McMinnville what did you do in conducting this
20   review?
21   A    I talked to people.
22   Q    What else?
23   A    That's about it.
24   Q    Did you look at any paperwork?
25   A    Yes.

EXHIBIT    5
PAGE   5   OF   10
10 (Pages 34 to 37)

1    Q    Why didn't you mention that a moment ago?
2    A    Uhm, --
3         MR. MILLS: Object, argumentative.
4    Q    (By Mr. Kay) Well, I asked you what you
5    had done and you said you'd talked to people, and
6    you didn't add looking at paperwork.
7         MR. MILLS: Objection, argumentative.
8         THE WITNESS: My mistake then.
9    Q    (By Mr. Kay) Okay.
10   A    I did, yes.
11   Q    Okay.  So what people did you talk to in
12   reviewing Chief McFarlin's accomplishments?
13   A    The people that I've talked to, I gave
14   them my word that I would not expose them and that
15   I would not tell anybody who I talked to, and I
16   gave them my word that I wouldn't do that; at this
17   time I wouldn't be prepared to.
18   Q    Did you -- at the time you're not
19   prepared --
20   A    To -- to give names.
21   Q    You don't intend to give any names?  If I
22   ask them you'll refuse, is that right?
23   A    If you would do what?
24   Q    If I ask you who those people are you'll
25   refuse?

1    A    I would.
2    Q    Okay.  Now, how many people did you talk
3    to, more than five, less than 20?
4    A    Less than 20.
5    Q    More than ten?
6    A    Yes.
7    Q    Did you tell Ed Gormley you were going to
8    be doing this review before you started?
9    A    No.
10   Q    Did Ed Gormley ask you to do this review?
11   A    No.
12   Q    Did anybody ask you to do it?
13   A    No.
14   Q    You took it upon yourself?
15   A    Yes.
16   Q    Did you ever tell anybody you were doing
17   the review other than the people you promised to
18   keep confidential -- whose names you say you've
19   promised to keep confidential?
20   A    Yes.
21   Q    Who?
22   A    Uhm, Rod Brown and Lee Vasquez.
23   Q    You told Rod Brown and Lee Vasquez you
24   were conducting this review of the Chief's
25   accomplishments, correct?

1    A    Yes.
2    Q    When did you tell Rod Brown that, before
3    you started or while you were doing it?
4    A    (Pause)  Before -- I can't remember.
5    Q    A little bit before you started or during
6    it, it's one of the two?
7    A    Very close, yes.
8    Q    All right.  Same answer as to Lee
9    Vasquez?
10   A    Probably maybe a month after I started.
11   Q    Okay.  Why did you tell Rod Brown?
12   A    He was in my office, we were taking care
13   of some business, electrical business on a house,
14   and when we got through I told him that I was going
15   to do a review.  And he wanted to know why, and I
16   told him that I wanted to do it and maybe there
17   ought to be some changes made.
18   Q    You told Rod Brown that?
19   A    Uh-huh.
20   Q    A little before you did it or shortly
21   after you began, correct?
22   A    Yes.
23   Q    And why did you tell Rod Brown you
24   believed you needed to conduct this review of the
25   Chief's accomplishments?

1    A    Because he was the ex-Chief, and I just
2    made a statement to him.
3    Q    You told him because he was the ex-Chief?
4    A    Yes.
5    Q    He'd been required to resign earlier, is
6    that right?
7    A    I don't know that.
8    Q    So you told Rod Brown you were doing this
9    review because he was the ex-Chief, and why did you
10   tell Lee Vasquez?
11   A    I need -- I was overwhelmed with
12   information, and I asked him for some help.
13   Q    Did he help you?
14   A    Yes.
15   Q    What did he do?
16   A    He had some interviews with me.
17   Q    How many?
18   A    I can't remember -- or I don't know.
19   Q    You were overwhelmed with the amount of
20   information you were getting?
21   A    Yes.
22   Q    How did you decide who to contact to
23   conduct your review of the Chief's accomplishments?
24   A    I made my pager available to the people
25   that wanted to talk to me.

EXHIBIT    5
PAGE    6    OF    10

1  Q   And put out the word you were willing to
2  talk to people?
3  A   Uh-huh.
4  Q   How did you put out the word?
5  A   I think the -- Rod Brown made a -- a
6  couple of contacts, I believe.
7  Q   So Rod Brown put out the word -- Rod
8  Brown put out the word for you?
9      MR. MILLS:  Objection, form of
10  question, mischaracterizes the testimony.
11  Q   (By Mr. Kay)  Well, I asked you how you
12  put the word out, and were you telling me that Rod
13  Brown put the word out for you?
14  A   All I know is I -- I would get a page
15  with the number in it, I would call it, and I was
16  asked if the people could come talk to me.
17  Q   Was that Rod Brown's suggestion?
18  A   Uhm, that was my suggestion.
19  Q   It was your suggestion to Rod Brown that
20  he give out your pager number, is that right?
21      MR. MILLS:  Is that a question?
22      MR. KAY:  Yes, that's a question.
23      THE WITNESS:  Yes.
24  Q   (By Mr. Kay)  Okay.  And then he did it?
25      MR. MILLS:  Did what?

1  Q   (By Mr. Kay)  He -- did Rod Brown tell
2  you that he had given folks your pager number?
3  A   He told me that, yes, it was given out.
4  Q   Okay.  And as a result of you telling Rod
5  Brown your pager number and that you were available
6  to get calls did you get contacted by 10 to 20
7  people?
8  A   Yes.
9  Q   All right.  And you talked with 10 to 20
10  people?
11  A   Yes.
12  Q   Were they all employees of the Police
13  Department?
14  A   No.
15  Q   Were more than half of them?
16  A   Uhm, say the -- the question again.
17  Q   Were more than half of the people you
18  spoke with employees of the Police Department?
19  A   No.
20  Q   Were any of them?
21  A   Yes.
22  Q   How many?
23  A   Four.
24  Q   And all the others were not employees of
25  the Police Department, correct?

1  A   Correct.  Yes.
2  Q   What's your work phone number?
3  A   503-472-2186.
4  Q   Home phone?
5  A   472 -- excuse me, 503-472-5237.
6  Q   Cell phone number?
7  A   503-550-1491.
8  Q   Pager number?
9  A   503-434-6969.
10  Q   Any other phone numbers where you can be
11  reached?  Do you have phone numbers at vacation
12  homes or second homes or third homes?
13  A   No.  I do have a number of 472 -- or,
14  excuse me, 503-472-4271.
15  Q   What number is that?
16  A   That's a telephone in the shop at my
17  home.
18  Q   In your workshop at home?
19  A   Uh-huh.  Yes.
20  Q   Okay.  Is that kind of -- is that your
21  personal work line at home?
22  A   No.
23  Q   It's a second home phone number?
24  A   I don't live there.
25  Q   Well, I know that.  Oh, the shop's in

1  another location?
2  A   Yes.
3  Q   Okay.  Any other phone numbers where you
4  can be reached?
5  A   No.
6  Q   "No"?
7  A   No.
8  Q   Do you have an e-mail address?
9  A   Yes.
10  Q   What is it, please?
11  A   It's waldo@farnhamelectric.com.
12  Q   Is that the only e-mail address that you
13  have?
14  A   Yes.
15  Q   And what computers in the last year have
16  you received or sent e-mail from?  Well, let's --
17  do you have a home computer?
18  A   No.
19  Q   Do you have an office computer?
20  A   No.
21  Q   Do you have any computers?
22  A   No.
23  Q   Why do you have an e-mail address?
24  A   Because people like to talk to me.
25  Q   Well, for these people who like to talk

EXHIBIT 5        12 (Pages 42 to 45)

PAGE 7 OF 10

1   Q   Okay. So at least as far as what you
2   witnessed he didn't make a promise to keep
3   confidentiality with these people, would that be
4   accurate?
5   A   Yes.
6   Q   Did you get any legal advice from anybody
7   before you started conducting this review?
8   A   No.
9   Q   Did you get any legal advice while you
10  were carrying on this review?
11  A   No.
12  Q   Did you have any idea in your own mind as
13  to whether your promise of confidentiality would
14  stand up if you were in a deposition like this
15  under oath?
16      MR. MILLS: Objection, form of
17  question, "stand up."
18  Q   (By Mr. Kay) Well, let me -- you're
19  under oath and you have to answer questions that
20  are put to you unless your attorney feels there's a
21  sufficient basis to instruct you not to answer, and
22  if we disagree about that we go to a judge and the
23  judge decides whether you have to answer. And all
24  I'm trying to find out, Mr. Farnham, is if you had
25  ever thought to yourself about whether your promise

1   of confidentiality to these people would be
2   ironclad and could not be -- and you could not be
3   forced to give the names?
4   A   I gave them my word.
5   Q   But you didn't think through the legal
6   implications of that?
7   A   No.
8   Q   Okay. If I ask you to tell me the names
9   of the people you spoke with will you refuse?
10  A   Yes.
11      MR. MILLS: Objection, asked and
12  answered.
13  Q   (By Mr. Kay) Okay. And will you only
14  answer if a judge orders you to do it?
15  A   Yes.
16      MR. KAY: Counsel, I'm going to ask
17  him for the names, are you going to instruct him
18  not to answer?
19      MR. MILLS: I'm not going to instruct
20  him not to answer, no.
21      MR. KAY: Okay, as a courtesy I was
22  just asking.
23      MR. MILLS: No.
24  Q   (By Mr. Kay) Who were the individuals
25  you spoke with in your review, Mr. Farnham?

1   A   (No response.)
2   Q   Their names, please.
3   A   I'm not going to tell you.
4   Q   You're under oath and required to answer
5   my questions, Mr. Farnham.
6       MR. MILLS: Well, I don't think
7   that's a correct statement of the law, but you can
8   go ahead.
9   Q   (By Mr. Kay) Please give me the names
10  of the people that you spoke with conducting this
11  review of the accomplishments of Chief McFarlin.
12      MR. MILLS: I think the record's
13  clear he's not going to tell you without a judge's
14  order, so you might --
15      MR. KAY: Well, I'm just getting
16  it -- I'm just getting it crystal clear, this is
17  kind of a unique situation.
18      MR. MILLS: I think it is crystal
19  clear.
20      THE WITNESS: I can't do that.
21      MR. MILLS: He's informed me he's not
22  going to break his promise unless the judge orders
23  him to do so.
24      MR. KAY: Okay, I didn't know he'd
25  informed you of that.

1       MR. MILLS: Yes, he has.
2       MR. KAY: All right, thank you for
3   making that clear.
4   Q   (By Mr. Kay) Did you ever demand or
5   request Ed Gormley to get a drug dog in the Police
6   Department?
7   A   Yes.
8   Q   When?
9   A   Sometime in May of 2005.
10  Q   And did he?
11  A   No.
12  Q   Did that make you mad?
13  A   Yes.
14  Q   Is that one of the reasons you started
15  this review of the Chief's accomplishments?
16  A   Yes.
17  Q   Did you think the -- Ed Gormley had to
18  get a drug dog if you asked him to?
19  A   Say the question again.
20  Q   Did you believe Ed Gormley would have to
21  get a drug dog if you asked him to?
22  A   No.
23  Q   Did he say why he wouldn't do it or
24  didn't do it?
25  A   (Pause) I think I'm confused.

EXHIBIT   5
PAGE   8   OF   10

16 (Pages 58 to 61)

1    Q   About what?
2    A   Can we --
3    Q   Start over?
4    A  . Back at the drug dog thing.
5    Q   Yeah.  You said you demanded or requested
6  of Ed Gormley to get a drug dog in the Police
7  Department at McMinnville, right?
8    A   I did not demand Ed Gormley to get a drug
9  dog.
10    Q   You requested he get a drug dog, didn't
11  you?
12    A   Yes.
13    Q   Okay, so you requested he get --
14  "demand," "request," you requested the Mayor to get
15  a drug dog in the Police Department --
16    A   Yes.
17    Q   -- in May of 2005?
18    A   Yes.
19    Q   Right.  And he didn't do it, right?
20    A   The drug dog was in -- didn't get
21  immediately bought.
22    Q   And you got mad because it didn't get
23  immediately bought?
24    A   No.
25    Q   Well, why did you get mad?

1    A   I sat in a -- I had talked to
2  Chief McFarlin about a drug dog and pointed out to
3  him that there was two available in Yamhill County,
4  and I was at a meeting of the School Board, joint
5  meeting of the School Board and City Council, and
6  the Chief explained to them that there was no drug
7  dogs in Yamhill County, thus there would be no --
8  no drug sniffing at the high school.
9    Q   And why did that make you mad?
10    A   Because there were drug dogs in Yamhill
11  County.
12    Q   All right, let's back up.  You wanted a
13  drug dog in the Police Department, right?  I'm just
14  going to go through this.  You wanted a drug dog in
15  the Police Department, correct?
16    A   I wanted the schools to be drug --
17  somehow drug tested ordered by the Chief.
18    Q   Please answer my question.  You wanted a
19  drug dog in the Police Department, correct?
20    A   (Pause)
21         MR. MILLS:  I'm going to object, it's
22  been asked and answered.
23         MR. KAY:  He hasn't answered yet.
24         MR. MILLS:  Yes, he did.
25    Q   (By Mr. Kay) I appreciate you want the

1  lockers sniffed for drugs, but my question,
2  Mr. Farnham, is did you want a drug dog in the
3  Police Department, "yes" or "no"?
4    A   I guess I don't care if the Police
5  Department had a drug dog, but I wanted the schools
6  looked after.
7    Q   Okay.  But you asked Ed Gormley to get a
8  drug dog in the Police Department so that drug dog
9  could go sniff the lockers in the high school for
10  drugs, right?
11    A   (Pause)  If McMinnville Police Department
12  was going to sniff the drugs they would need to
13  have a drug dog, and, yes, I thought that they
14  would need to have a drug dog if -- in the Police
15  Department if they were going to go sniff, uhm,
16  drugs at the high school.
17    Q   And you told Ed Gormley -- did you tell
18  Ed Gormley, "I want a drug dog to go sniff the
19  lockers in the high school before school is out
20  here in the spring of 2005"?
21    A   Repeat the question.
22    Q   Well, in -- school's just about out,
23  there's just a few weeks of school left here in
24  McMinnville in the spring of 2005, and -- and
25  didn't you want the drug dog to go in and sniff the

1  lockers at the high school, and you asked Ed
2  Gormley to get a drug dog to do this, right?
3         MR. MILLS:  Objection, compound.
4         MR. KAY:  I'm just trying to expedite
5  it.
6    Q   (By Mr. Kay) Isn't that what happened,
7  Mr. Farnham?
8    A   No.
9    Q   Did you ask Ed Gormley to do anything
10  about getting a drug dog to go sniff lockers in the
11  school -- schools before they ended the 2005 school
12  year?
13    A   I told Mr. Gormley that I would like to
14  add a drug dog to go sniff the lockers at the high
15  school.
16    Q   Before the school year ended in 2005?
17    A   Yes.
18    Q   All right.  But he did -- did he say he
19  would do it or not?
20    A   No.
21    Q   He did not say he would do it?
22    A   No.
23    Q   He just listened to you, and then you
24  learned later they didn't get a drug dog and sniff
25  the lockers before the school year was over, right?

EXHIBIT 5
PAGE 9 OF 10

17 (Pages 62 to 65)

```
 1        THE WITNESS:  Okay.
 2               (Off the record)
 3               (Deposition concluded)
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1    STATE OF OREGON  )
                        ) ss.
 2    County of Marion  )
 3
 4        I, Sally Parrish, Court Reporter and
 5    Notary Public for Oregon, certify that WALDO
 6    FARNHAM appeared before me at the time and place
 7    set forth in the caption hereof; that at said time
 8    and place I reported in stenotype all testimony
 9    adduced and other oral proceedings had in the
10    foregoing matter; that thereafter my notes were
11    reduced to typewriting by me, and the foregoing
12    reporter's transcript, consisting of 102
13    consecutive pages, constitutes a full, true and
14    accurate record of such testimony adduced and oral
15    proceedings had and of the whole thereof.
16        Witness my hand and Notary Public seal
17    at Salem, Oregon, this 29th day of October, 2006.
18
19
                       _____
20                     Sally Parrish, Court Reporter
                       Notary Public for Oregon
21                     My Commission Expires 1/17/10
22
23
24
25
```

```
 1        CORRECTION SHEET
 2    PAGE  LINE            CORRECTION
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
          I hereby certify that I have read the foregoing
15    deposition and that this deposition, together with
      the corrections, is a true and accurate record of
16    my testimony given at this deposition.
17
18    _____
19        WALDO FARNHAM
20
          Subscribed and sworn to before me this _____
21    day of _____, 2006.
22
23    _____
          Notary Public for Oregon
24        Commission expires:
25
```

EXHIBIT __5__

PAGE _10_ OF _10_

The following are observations recently offered by a number of present and past McMinnville Police Department employees regarding Wayne McFarlin's performance as Chief:

1) Morale at present is lower among staff today than it was over a year ago when the police association contemplated a vote of no-confidence against the Chief of Police.

2) Some present and former staff report that they do not find Chief McFarlin as either credible or trustworthy. A few suggest that he has been dishonest in some of his dealings with them. They note that he frequently uses manipulation to play one staff member against another in order to cement his power over them all.

3) A number suggest that Chief McFarlin approaches problems by "spinning" the facts in such a manner as to point the blame and responsibility away from himself. They note that the Chief frequently directs actions and then challenges staff by asking why they did what they did. They say that, in such cases, the Chief denies making the initial request—thus making them wrong for following the original order.

4) Both past and present staff point to Chief McFarlin's practice of assigning work plans as a disguised manner of discipline as particularly unfair. They note that it is his common practice to establish a work plan and, *without consulting the affected staff member,* adding to and changing the plan. The result is that staff fail in compliance because they are unaware of expectations.

5) These same staff note that Chief McFarlin does not welcome ideas, comments or suggestions, and, in fact, it is their sense that staff who disagree are targeted for consequences. His method is to openly ask for input during a meeting and then methodically direct and tell them what their opinion is going to be thereby making the members responsibility should the decision fail.

6) Staff also point out that Chief McFarlin does not complete background checks on Reserve Officers until after they have completed the Academy. In cases when candidates eventually fail their background checks, the result is considerable waste of time and money that could have been avoided had checks been done prior to training.

The following are my conclusions and concerns based on these discussions:

I note several questionable/unnecessary purchases:

- New handguns were purchased for all department members at a cost of approximately $ 29,000.00 when existing guns were completely serviceable. (Note that old guns were sold to members at a reduced price—should the public have been offered this same opportunity?)

- New expensive low-profile light bars were purchased at approximately $ 2,200.00 each when existing light bars were still serviceable.

- Failure to consider making use of motorcycle(s) at approximately $600.00/year in favor of much more expensive sedans for traffic enforcement.

EXHIBIT 6
PAGE 1 OF 2

I seriously question the veracity of Chief McFarlin when he went before a joint meeting of the City Council and the School Board claiming that no drug dogs were available within the county in response to the request for such a dog to search lockers and cars at McMinnville H.S. In point of fact, certified drug dogs are available in surrounding police departments, including the Salem Police Department from which he came, who would be willing to assist the McMinnville Police Department. Additionally, the city of McMinnville already does own a trained drug dog which only needs to be certified in order to do this work.

Subsequently, after the Council made such funds available, the Chief went forth to request citizen donations for a drug dog, fronting with the claim that this was the only means of replacing the retired city drug dog. Among the many responses was one from a retiree who donated her entire Social Security check to this cause! It seems to me that the city should reimburse all those who donated drug dog money, as they have already paid their fair share through city property taxes.

Further to this, Chief McFarlin has now appointed a drug dog handler who lives in Salem. This means that he will be using a city car to travel back and forth to his home—on the city's dime! This does not seem to be to good stewardship of our city's limited funds.

Chief McFarlin continues to micromanage the police department, as well as the YCINT team in his position as board chair. An example of this was recently evident in the News Register where Chief McFarlin stated the YCINT board had authorized the "Mole's" approach, when, in fact, this is not the board's role. It is evident that he, himself, intervened to authorize this tactic.

Overall—to stress their discomfort with the current administration—those I interviewed went to far as to say that, given a choice between a new building and a new Chief, they would opt for a new Chief.

The performance of Chief McFarlin is ineffective, inefficient, and intolerable and action should be taken immediately.

W.F.

EXHIBIT 6
PAGE 2 OF 2