Terrence Kay
OSB#814375
Terrence Kay, P.C.
3155 River Road S, Suite 150
Salem, OR  97302-9836
Telephone:  503/588-1944
Fax:  503/588-1946
Email:  Terrence@kaylawfirm.com


<u>Attorney for Plaintiff</u>


IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| WAYNE McFARLIN<br><br>       Plaintiff,<br><br>v.<br><br>EDWARD GORMLEY, an individual; CITY OF McMINNVILLE, a Municipal Corporation; CITY COUNTY INSURANCE SERVICES TRUST; ROD BROWN, an individual; PUBLIC SAFETY LIABILITY MANAGEMENT INC., an Oregon corporation; WALDO FARNHAM<br><br>      Defendants. | Case No.  3:06-CV-1594-HU<br><br><br>**AFFIDAVIT OF WAYNE MCFARLIN IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT** |

| | |
|---|---|
| STATE OF OREGON | ) |
| | ) ss. |
| County of Marion | ) |

    I, Wayne McFarlin, having been duly sworn, state as follows and would so testify as a witness:

    1.  I am the Plaintiff in this case and the former Chief of Police for the City of McMinnville.

Page 1 – Affidavit of Wayne McFarlin
G:\1-WP\McFARLIN\Aff McFarlin 111107.wmfinall.doc

2. During my deposition in this case I answered questions as stated in the transcripts. I will refer to some of my testimony in this Affidavit to give context to additional testimony I would have provided if I had known many of the facts, which only came out later in this case during depositions of others, and in documents that were received later. I also would have given this additional testimony if I was more fully asked during my deposition and if I had the knowledge I learned during subsequent depositions of others and in reviewing documents. Any references below refer to deposition testimony in Exhibits submitted on my behalf to this Court.

3. I devoted my career to law enforcement and public service with the satisfaction of serving the public. I was last able to provide that as Chief of Police in McMinnville (the "City"). The City hired me through a unanimous vote of its City Council ("Council"). To serve the City as Police Chief my wife and I sold our home in Salem, moved to McMinnville, bought a home and enrolled our children in local public schools so we were fully a part of the community. In my experience as the Police Chief, my responsibilities as Chief for the City put my wife, our children and myself in public view for the citizens.

4. While employed as Chief, I understood the City Council was the public body which would act in public or executive meetings to make decisions about my employment, and other officials named in the City Charter. While the City had a Mayor ("Gormley") and six City Councilors, those seven officials had to act as a body, by majority vote according to the law, to make decisions for the City. In 2005, the six City Councilors also had a President, Rick Olson ("Olson"). While the City Manager, Kent Taylor ("Taylor"), was a conduit between Council and myself as Chief, I understood Council acted as a voting body with no councilor or the Mayor empowered to make a decision which the Council must make as a public body. It was the City Council that I understood unanimously hired me as Chief, beginning the agreement or contract for my employment as Chief. It was also my understanding that the City Council as a body only requiring four votes had decided to demand my resignation under what I sincerely understood as a threat of being fired unless I resigned, which occurred in October 2005 and which I will

Page 2 – Affidavit of Wayne McFarlin
G:\1-WP\McFARLIN\Aff McFarlin 111107.wmfinall.doc

**TERRENCE KAY, P.C.**
*Attorney at Law*
3155 River Road S., Suite 150 - Salem, OR 97302
Telephone: 503/588-1944  Fax: 503/588-1946
Email: terrence@kaylawfirm.com

describe in more detail.

5. In my personal experience for years as the Chief, I saw the Council strongly led and rarely at odds with the views of the City's long standing Mayor, Ed Gormley. When contrary views were presented on issues important to Gormley he would seek to undermine resistance as he did when he told me to withhold public information about police activity from Councilors with a contrary political view of the level of budgetary support for the Police Department. To my memory, little if anything was done by Council contrary to the objectives of Gormley, to the point where a custom or policy was followed by Gormley acting in the name of the City. This perception was reinforced watching Gormley's deposition testimony in this case, which underscores this custom or practice when he stated, "I am the City." (Ex. 42 p. 185). Although he has been the Mayor, he is but one vote on a Council, which is only empowered to act as a public body under the City Charter.

6. In September, 2005, I informed Gormley that I was an applicant for the City of Salem Chief of Police position, and in early October 2005, I informed City Manager Taylor that I had been selected as a finalist for this position. The Salem selection process was down to myself and four other finalists, with further reviews scheduled in the next month or two and a selection of the new Chief to be made shortly thereafter. In my years in law enforcement, with the experience and knowledge I have about law enforcement and the selection of key management leaders and Chiefs, my status as the Chief at McMinnville was essential to being considered for the position of Chief at Salem. In my experience and opinion, if I were forced to resign as Chief, as occurred in October, or if I were fired, that would end the likelihood of being selected as Chief in Salem. From my experience and in my opinion, a resignation would and clearly did imply there were serious problems with my performance, perhaps so serious that a mysterious resignation was being suddenly announced.

7. In October 2005, prior to the Monday October 24 meeting when my resignation was demanded, my wife Sheryl faced serious medical issues which were being diagnosed. Over the

Page 3 – Affidavit of Wayne McFarlin
G:\1-WP\McFARLIN\Aff McFarlin 111107.wmfinall.doc

**TERRENCE KAY, P.C.**
*Attorney at Law*
3155 River Road S., Suite 150 - Salem, OR 97302
Telephone: 503/588-1944  Fax: 503/588-1946
Email: terrence@kaylawfirm.com

weeks prior to the October 24 meeting, she had been receiving a number of tests for a yet undiagnosed condition that I feared to be pancreatic cancer. I had informed City Manager Taylor about this. This was especially difficult because she had been diagnosed with malignant melanoma in the summer of 2001. On the morning of Monday, October 24, 2005, I was with Sheryl for another lengthy test and had returned to my office for a couple of hours before an afternoon appointment with her doctor to hear the results of this most recent test. I mention this to explain the extremely emotional, life-threatening situation I believed my wife faced at that time. I feared the loss or serious illness of my wife at that time and the devastating consequences that might pose for our children. As I will now begin to explain, with what my wife was facing, and as a finalist for Police Chief in Salem, having my resignation demanded was a terrible moment for me, my wife, our children, and my career, and made worse to learn later that I was intentionally deceived and mislead.

8. On Monday, October 24, 2005, I was called to a meeting, about which I had no prior notice, with Mayor Gormley, Council President Olson and City Manager Taylor. At this time my career appeared by all measures to be approaching its high point. I had been McMinnville's Chief of Police for over 5 years and had enjoyed a number of notable community public safety successes. I consistently received excellent evaluations on my performance as Chief of Police from my supervisor the City Manager. I had been notified that an article I wrote entitled, "Jump Starting a Leadership Team", describing our accomplishments in developing leadership within the McMinnville Police Department that had been approved by City Manager Taylor would be published in the FBI Law Enforcement Bulletin, a national professional magazine. I had also just been selected as a finalist in the selection process for the City of Salem Chief of Police position. After accompanying my wife earlier that morning to another medical test, my wife and I were scheduled to meet that afternoon with her doctor. After a brief inquiry about my wife's health by Gormley, he began the meeting by stating "we need your resignation," I understood "we" in the presence of Council President Olson and City Manager Taylor to mean the Council,

TERRENCE KAY, P.C.
*Attorney at Law*
3155 River Road S., Suite 150 - Salem, OR 97302
Telephone: 503/588-1944 Fax: 503/588-1946
Email: terrence@kaylawfirm.com

represented by these men. They could not demand my resignation for the Council unless the Council had authorized, with a minimum of four votes, that my resignation be demanded under a threat of firing. In this meeting, I believed, although I later learned it was false, that the Council as a body had decided my employment as Chief should end, and Gormley had been authorized to demand my resignation under the threat or alternative of being fired. I repeatedly asked in the meeting why and was told, falsely I learned later, that a police union vote of no confidence was scheduled to occur. Despite my repeated requests, I was not told about the details or even the alleged details Gormley had falsely told others. As I learned well after my departure from the City, many facts, events and statements, including false statements about me as a professional and Chief were in documents and discussions intentionally concealed and withheld from me, which I had a right to know about in responding to the demand for my resignation. If I had been told the truth in this meeting, or even learned some of the material but concealed facts, events and false statements about me, I would never have resigned. I have lived my life and conducted my career in a manner to demonstrate unquestioned integrity and professionalism. I have done this knowing that for me to be effective as a public official and law enforcement leader my conduct must always be above reproach to earn the trust of those I serve. Although I was stunned, confused and hurt that the City no longer wanted me to serve as their Chief of Police, had I been aware that there was anything that would taint my integrity or professionalism, I would have vigorously confronted the allegations. I would have demanded, as is my right, all the information in the written complaints about me that Gormley hid at his private plumbing office and did not even give to the City Manager let alone the City Council or myself so I could respond. I will detail that more below but in fact, the City's former Chief of Police, Defendant Rod Brown, who acted for the City as a Risk Manager Consultant, had previously warned me that my life was in jeopardy based on the threats or conduct of a disgruntled former City Police employee named Mike Full ("Full"). Brown was concerned enough about the risk to my life that he informed me about Full, and an FBI profile review was performed that confirmed the risk to

Page 5 – Affidavit of Wayne McFarlin
G:\1-WP\McFARLIN\Aff McFarlin 111107.wmfinall.doc

my life. I shared this information with Manager Taylor who I expected would share it with Mayor Gormley. Despite Full as an unpredictable individual who is viewed as posing a threat to my life, Gormley had received written complaints about me that he kept at his private plumbing office and gave to no one and secretly used as part of the basis to demand my resignation for the Council. Before explaining more about the undisclosed material facts I will address the false limited information I was given when my resignation was demanded.

9. When I asked why my resignation was being demanded I was only told a union vote of no confidence was set to occur, which neither Olson nor Taylor corrected, and that I was a poor fit for the City, or words to that effect. After my employment ended I learned there was no union vote set. As to the second subject, of not being a good fit for the City, I believe that was part of the reason the City Council had decided to end my employment because the Council as a body had a right to terminate my employment. It was my belief during this meeting that a handful of well-connected disgruntled police employees had convinced four or more members of Council to remove me as Chief to enable them to continue their work with less scrutiny and accountability. Here again, after my employment ended I learned the Council had not made that decision, and many statements and events which I should have been told about in being demanded to resign were concealed and not disclosed to me. I will now turn to what was not disclosed to me in being demanded to resign. The failure to give me the following information and the other concealed information revealed in deposition testimony and documents, which would be material to me in deciding whether to resign, together with the false statements I was told, caused me to resign. At the time I believed there was no alternative, either resign or be fired. I took the lesser of two evils, although I would never have resigned had I known the truth and been told the following.

10. Gormley owns and runs a significant plumbing company in McMinnville. At his private plumbing office, and not at the City offices, Gormley received and concealed from me, the City and the Council, four written complaints about me as the Chief, labeled Exhibits 2, 3, 4

**TERRENCE KAY, P.C.**
*Attorney at Law*
3155 River Road S., Suite 150 - Salem, OR 97302
Telephone: 503/588-1944  Fax: 503/588-1946
Email: terrence@kaylawfirm.com

and 18. These were received by Gormley prior to the demand for my resignation but never provided to me, the Council or Manager before my resignation was demanded. These are City public records which should have been provided to me when the City received them through Gormley because my performance and employment are being challenged. These would have been essential to me because they contain false, unsubstantiated accusations about me in my profession and as Chief, especially the statement in Exhibit 2 that Gormley is stated to have discussed knowledge on his part of failings by me which lead Gormley to the conclusion my tenure as Chief should be ended. This October 9, 2005 letter to Gormley, Exhibit 2, attributes that statement regarding Gormley's conclusion and contemplating of my employment being terminated being stated at least a month earlier in September, 2005. One or more of these documents (Exhibits 2, 3, 4 and 18) demand my employment be terminated as well as Taylor's. As other testimony revealed, my termination as Chief was being considered in private official discussions before the demand for my resignation. Under the City's employment policies, *Exhibit 15*, at the moment "termination (is) being contemplated, the following steps must be taken to ensure due process" which then describes the requirement that I get written notice of the charges and supporting facts, have the right to refute those with the right to be represented by an attorney for the obvious purpose of giving "due process" to inform me what is being alleged that could end my job and career so I can respond to protect my interests and frankly so the City can learn the truth in deciding what to do. Under these policies, I should have received Exhibits 2, 3, 4 and 18 before being demanded to resign, to have my due process with a right to respond. It is a tragedy, and the loss of the career I loved as a Chief in law enforcement, to learn after I was forced to resign under the threat of termination, that false, misleading and unsubstantiated statements about me were privately held and used by Gormley to deceitfully engineer my fraudulently induced resignation. It was only more galling to witness Gormley say he had only my interests in mind when he was deposed and deny I was demanded to resign, which Council President Olson confirmed did in fact occur in that meeting as Olson, Taylor and I have testified.

Page 7 – Affidavit of Wayne McFarlin
G:\1-WP\McFARLIN\Aff McFarlin 111107.wmfinall.doc

11.  I was not informed City Council never met as a body to authorize Gormley with Olson and Taylor to demand my resignation, and that Gormley concealed the complaints, Exhibits 2, 3, 4 and 18, from the Council and Manager.  I was never told Gormley had revealed part of one or more of these complaints to certain Councilors to merely confirm he would be talking to me about my performance, I was not informed Gormley heard about a threatened newspaper article about me from Phil Bladine, owner of the local city newspaper, that Gormley wanted to avoid.

12.  I never saw Exhibits 2, 3, 4 or 18 until this case was filed and documents were demanded from the City.  These complaints contain false, misleading and unsubstantiated statements, which defamed me in my work and profession as a Chief.  I have explained this, in part, based on my knowledge, for these complaints, Exhibits 2, 3, 4, and 18, in *Exhibits A, B, C and D* which I have attached to this Affidavit and I am incorporating by reference as part of my Affidavit.

13.  I was not informed that City Councilor Allen Springer, a friend and supporter of mine on the Council, was told the following false and defamatory statements about me as Chief by Gormley to convince Springer or deter him from interfering with Gormley's plan to achieve the termination of my employment by demanding my resignation on behalf of Council.  Springer was told the following by Gormley, which are not true:

    (a) That I had a potential prescription drug problem.

    (b) I had a "Dr. Jekyll and Mr. Hyde" personality and some mental instability.

    (c) That I had "anger management problems"; and

    (d) That there were several women employees at the City that would not be alone with me in the room, including the City Attorney Candace Haines and the City Finance Director.

14.  I was never informed of a meeting on Friday, October 21, prior to my resignation being demanded more than three days later, to discuss my employment being terminated, including the City's risk management adviser, Rod Brown, wanting my termination.  That

Page 8 – Affidavit of Wayne McFarlin

G:\1-WP\McFARLIN\Aff McFarlin 111107.wmfinall.doc

meeting included Gormley, Olson, Taylor, Rod Brown, and Farnham, but not the Council, which was not informed about that meeting.

15. I was not informed Rod Brown, who was supposed to provide risk management services to the City, was asked before my resignation was demanded to be looking for an interim chief of police, that he wanted my termination, that he met privately with Gormley and the police union President Scales who told them there was not a vote of no confidence scheduled, and that Brown had been working directly with Waldo Farnham to help Farnham prepare information to support a demand for my termination to Gormley. The information from Farnham including false and misleading defamatory statements is contained in Exhibit 18 to which I have responded in part in *Exhibits A-D*.

16. When I left the October 24 meeting to meet my wife at the doctor's office, I had been told to come back the next day. The next day when I sought a later ending date for my employment, I was told no and that it would not be soon enough. This reaffirmed to me that I was responding to a decision of the Council requiring my resignation with authority to tell me when it should end. I had been stunned at the demand for my resignation and devastated by the manner I was being dismissed after the service and sacrifice I had made for the City. When I was convinced by the Mayor's tenacious insistence that the decision by Council to terminate me was final, I sought to make the best of a tragic situation and depart professionally, in spite of the shameful manner that I felt I had been treated. To be quite clear, I would not have resigned, not have signed a letter of resignation and not signed the Separation Agreement *(Ex. 101)* if I had known the statements made to me were false, and if any of the concealed information had been provided to me. In my opinion and experience as a career public official and as Chief at the City of McMinnville, if the City Council knew about Gormley making false statements to Springer, concealing complaints about me that were false and had heard my response to these various accusations, the Council would not have demanded my resignation. The false statements Gormley made and the information concealed from me described in this Affidavit and supporting

**TERRENCE KAY, P.C.**
*Attorney at Law*
3155 River Road S., Suite 150 - Salem, OR 97302
Telephone: 503/588-1944  Fax: 503/588-1946
Email: terrence@kaylawfirm.com

documents were all material to me, or would have been if I had known, in signing a letter of resignation and Release Agreement. These false statements, non-disclosures and concealed facts and events should have been provided to me before any demand to resign so I could decide how to respond. Simply stated, I did not and could not have made an informed decision.

17. It was not only reasonable, but I had a right to rely on what Gormley was telling me, and by silence what Olson and Taylor were confirming in the October 24 and 25, 2005 meetings, and in signing a letter of resignation and Separation Agreement. I believed at that time, unfortunately, they were truthful in what they stated and by the absence of the information I have since learned was concealed. It was my genuine belief I could trust the honesty of these public officials knowing the oath of office they, too, had sworn an oath to, and knowing that the City Ethics Policy stated in Exhibit 15 requires City employees and officials to "maintain the highest standards of integrity, truthfulness and honesty in all public activities to inspire public confidence and trust." The City Ethics Policy, Exhibit 15, goes on to state on the same page that known or suspected improper government conduct is supposed to be reported and will be fairly investigated including "abuse of authority" and "any action of City employees, officials or agents that constitutes a violation of a federal, state or local law, rule or regulation, or…mismanagement." These policies affirm my belief that what I was being told and, by implication, what was not being told to me, was the truth and was done honestly. The complaints concealed about me, Exhibits 2, 3, 4, and 18, is the kind of alleged "improper government conduct" which should have been revealed by Gormley to me and others, so the due process rights I was entitled to, let alone not being deceived and being demanded to resign, could see the light of day, so I could have protected myself, my family and my career from the loss I have suffered, and so the City could have avoided these claims by dealing with me openly, honestly and fairly.

18. As to the Separation Agreement, I was never informed nor did the Agreement state I should seek my own legal counsel. Before I signed the Agreement and after, I remained

Page 10 – Affidavit of Wayne McFarlin

G:\1-WP\McFARLIN\Aff McFarlin 111107.wmfinal1.doc

the Chief of Police, a primary city official and I genuinely believe the City Attorney had made sure there was nothing improper or unauthorized, and certainly nothing fraudulent about the way my resignation was demanded. I did not have an attorney represent me at that time because I believed what occurred was done by duly authorized action of the City Council, with whatever involvement of the City Attorney to make sure this was done properly for the City's and my protection as a public official. The Agreement does not expressly state I release any claims for "fraud, non-disclosure or concealment" or for "violation of due process." If I had been informed about the falsity of what Gormley said, and the misleading or falsity of what I was being told by the list of concealed facts, events and statements, I would not have signed the resignation or Separation Agreement. If asked in the face of those disclosures if I would have released claims for fraud, non-disclosure and violation of due process, I would not have agreed. As part of my case asking to rescind the Separation Agreement, I have been ready, willing and able to give back the severance pay provided to me as part of that Agreement.

19. My initial case against Gormley and the City was filed in March 2006. I did not discover the conduct of Brown, for himself, the City or Defendant Trust involving my employment and resignation until less than six months before my Notice of Claims was given and filed against CCIST, Rod Brown and his company PSLMI. I only learned about this after documents were received in discovery and depositions were taken, all of which did not occur until less than six months before my written claims were given to these three defendants in October 2006. As the former Chief of Police with the experience and training I have in management, based on the conduct of Rod Brown it is my opinion that he was negligent on behalf of the City, himself, the Trust and his company, by not informing me before my resignation, or recommending others fully inform me, that City Council had not authorized my resignation to be demanded, Gormley had concealed complaints about my conduct, others had asked for my termination including Brown and my due process rights to notice of these matters and a right to respond was being denied when the City was contemplating the termination of my

**TERRENCE KAY, P.C.**
*Attorney at Law*
3155 River Road S., Suite 150 - Salem, OR 97302
Telephone: 503/588-1944  Fax: 503/588-1946
Email: terrence@kaylawfirm.com

employment. As a risk manager, Brown testified he was aware of the risk this could pose for the City but did not take steps as a risk manager to avoid potential liability for the City and myself to make sure I was informed. Brown should have made sure Gormley acted only within his authority, and that I receive due process notice and rights about the truth of what these individuals were doing regarding my contemplated termination through resignation. City Manager Taylor testified as to my employment that when Gormley insisted my employment end sooner than I desired, employment action or discipline was then involved and that I did not then have notice for due process. Brown testified that he may or did inform the Defendant Trust about the situation at the City but I am not aware of anything the Trust did to direct Brown to avoid the actions taken against me, the facts concealed from me, and the lack of notice and due process I faced.

I HEREBY DECLARE THAT THE ABOVE STATEMENT IS TRUE TO THE BEST OF MY KNOWLEDGE AND BELIEF, AND THAT I UNDERSTAND IT IS MADE FOR USE AS EVIDENCE IN COURT AND IS SUBJECT TO PENALTY FOR PERJURY.

Dated this 17th day of November, 2007.

Wayne McFarlin

SUBSCRIBED AND SWORN TO before me this 27th day of November 2007, by Wayne McFarlin, in Marion County, Oregon.

OFFICIAL SEAL
BRENT L FURBY
NOTARY PUBLIC – OREGON
COMMISSION NO. 375347
MY COMMISSION EXPIRES DEC 8, 2007

Notary Public for Oregon .
My Commission expires: Dec. 8, 2007

TERRENCE KAY, P.C.
*Attorney at Law*
3155 River Road S., Suite 150 - Salem, OR 97302
Telephone: 503/588-1944  Fax: 503/588-1946
Email: terrence@kaylawfirm.com

**Exhibit 2**
**October 9, 2005**
**Letter of "Formal Complaint" to Mayor Gormley**
**False and Misleading Statements**

The references to "Line" by number refer to the copy of Exhibit 2 labeled Exhibit 2A with vertical line numbering in the left hand column.

<u>Line 7</u>: "various violations of City Policy by Chief of Police and City Manager, and the unwillingness or inability of them to conform to the standards expected of employees of the City of McMinnville"

> <u>FALSE STATEMENT:</u> McFarlin violated no City policies and has maintained and met performance standards as is evidenced by his performance evaluations.
>
> • Excerpt from May 23, 2005 Performance Evaluation:
>
> "…you consistently represent the Department and the City in a professional manner. You are committed to the Department mission and the City."
>
> "You are a consistent contributor to the team and have responded in a timely manner to requests I have made of you."
>
> "Such service (to others and the community) continues to be a strong motivator for all you do."
>
> • Excerpt from February 23, 2004 Performance Evaluation:
>
> "You consistently perform in a professional manner and are a professional representative of the Police Department and the City."
>
> "You have high standards for yourself and you work to carry over those expectations to your staff.
>
> "You have high standards with regard to "customer service" for the department and have made in-roads in this area."
>
> • Excerpt from November 21, 2002 Performance Evaluation:
>
> "Possesses a high level of skill, knowledge, and ability in assigned functional area. Is not limited by complexity and gets the job done. A subject matter expert."
>
> "I believe you have led well during a period of transition and change. You work to set the example and expect professionalism from your troops."
>
> "Overall, your performance has been excellent."



Exhibit _A_
Page___I_

- Excerpt from September 4, 2001 Performance Evaluation:

"The material which I have received from you personally, and that which I have seen from the department generally, have been very professionally done."

"I trust your judgment, and that is the bottom line. I have confidence in your willingness and ability to make decisions. Your decision-making has included planning, a comprehensive and inclusive process, including one that, when appropriate, involves others and good thinking."

"You have exhibited excellent leadership in your first year as Chief."

Line 15-16: "occasions of outrageous behavior and breeches of professional conduct by the Chief of Police which has had detrimental effects…to include loss of valuable programs and resources"

FALSE STATEMENT: McFarlin has consistently performed in a professional manner and met performance standards as is evidenced by his performance evaluations. A summary of program status during McFarlin's tenure follows these excerpts from his evaluations.

- Excerpt from May 23, 2005 Performance Evaluation:

"…you consistently represent the Department and the City in a professional manner. You are committed to the Department mission and the City."

"You are a consistent contributor to the team and have responded in a timely manner to requests I have made of you."

"Such service (to others and the community) continues to be a strong motivator for all you do."

- Excerpt from February 23, 2004 Performance Evaluation:

"You consistently perform in a professional manner and are a professional representative of the Police Department and the City."

"You have high standards for yourself and you work to carry over those expectations to your staff.

"You have high standards with regard to "customer service" for the department and have made in-roads in this area."

- Excerpt from November 21, 2002 Performance Evaluation:


Exhibit _A_
Page_____

"Possesses a high level of skill, knowledge, and ability in assigned functional area. Is not limited by complexity and gets the job done. A subject matter expert."

"I believe you have led well during a period of transition and change. You work to set the example and expect professionalism from your troops."

"Overall, your performance has been excellent."

- Excerpt from September 4, 2001 Performance Evaluation:

"The material which I have received from you personally, and that which I have seen from the department generally, have been very professionally done."

"I trust your judgment, and that is the bottom line. I have confidence in your willingness and ability to make decisions. Your decision-making has included planning, a comprehensive and inclusive process, including one that, when appropriate, involves others and good thinking."

"You have exhibited excellent leadership in your first year as Chief."

|  | PROGRAMS STATUS | |
|---|---|---|

- DARE
Eliminated due to budget cuts July 2003
  - Goal was to reinstate with a School/City partnership

- Middle School Officer Eliminated due to budget cuts July 2002
  - <u>Reinstated</u> January 2005 through a School/City partnership

- Accreditation
Eliminated due to budget cuts July 2003
  - <u>Reinstated</u> in 2004

- Drug dog
Eliminated due to budget cuts July 2003
  - <u>Reinstated</u> through cooperative effort of $22,000 community donations and budget dollars

- Police reserves
Eliminated due to budget cuts July 2003
  - <u>Reinstated</u> August 12, 2004

- Auxiliary program
Renamed to Volunteers Program and increased in scope:
  - Park Watch volunteers program added
  - Bilingual ride-along volunteers added
  - New uniforms for all volunteers obtained
  - Volunteer office equipment upgrades made

- Traffic Safety—A renewed commitment to traffic safety because
  - 1)  it is our most requested service type
  - 2) citizens are more likely to be injured or suffer property damage as a result of a traffic crash and
  - 3)  police are the only authorized enforcement resource
  - The result—lower traffic crashes and a safer community.
    - Traffic enforcement
    - Fix-it ticket program
    - Motor program proposals

<u>Line 16</u>: "…poor morale…"

<u>FALSE AND MISLEADING STATEMENT:</u> "poor morale"
1)  Taylor was told by police union President Matt Scales in September 2005 that morale in the police department was good.
2)  McFarlin was told by police union President Matt Scales in September 2005 that morale in the police department was good.
3)  Information McFarlin was receiving from other employees supported the belief that morale was good.
4)  Only after the Mayor let it be known to the union personally and through his envoy Rod Brown after he received pressure from Waldo Farnham, Mike Full, Dan Brown and Frank Butler (former union president) that he would welcome



a vote of no confidence to provide him a reason to demand McFarlin's resignation did the union membership respond in this negative fashion.

Although good morale is frequently intangible and difficult to document, the email below from Ofc. Steve Macartney is an excellent indicator that morale was good among PD employees. This observation is further supported by statements from police union President Matt Scales who told both Kent Taylor and Chief McFarlin in separate conversations in September 2005 that PD morale was good.

| From: | Kent Taylor |
|---|---|
| Sent: | Tuesday, September 20, 2005 8:30 AM |
| To: | Wayne McFarlin |
| Subject: | RE: Some positive feedback |

Thanks for sharing this. It's particularly surprising coming from Off. McCartney. I sat next to him for the first part of the Strat Plan session. I found him to be relatively negative/grumpy and certainly not expressing the kind of awareness or appreciation evident in his e-mail.

-----Original Message-----
| From: | Wayne McFarlin |
|---|---|
| Sent: | Tuesday, September 20, 2005 4:58 AM |
| To: | Kent Taylor |
| Subject: | FW: Some positive feedback |

Kent,
Just thought I'd pass on this positive feedback. Although it's not specifically mentioned in this email, our personnel have a greater appreciation of the support they receive from you and our Mayor and Council. They've been impressed with the Community Choices video and I sense an overall feeling of excitement about our future as a city organization.
Wayne

-----Original Message-----
| From: | Steve Macartney |
|---|---|
| Sent: | Tuesday, September 20, 2005 1:42 AM |
| To: | PD PATROL |
| Subject: | Some positive feedback |

To all, I had some time to reflect on what has been accomplished around here recently and wanted to pass the information along. Sometimes we get focused on the downers of the job, but over the last couple years our environment has significantly changed.
A quick review:

1) New patrol jackets/rain gear
2) Serious upgrade of fleet with three more cars almost here to rid us of the last of the older/less functional cars
3) New sidearms with lights, holsters, etc
4) New radio system still being implemented
5) MDC's within the next 6-8 months



6) Tasers are coming
7) Reserve program back in operation
8) Narcotics canine back on the road
9) Newer style and more functional uniforms
10) On the verge of going to the public with a new facility plan for bonding

I'm sure I missed some very important stuff, but this is just a thumb nail sketch of some of the recent accomplishments. For an agency of this size to get half of these things done in a couple fiscal years would be amazing, much less what we have been able to accomplish together. Thanks for all the hard work in constantly evaluating our agency, getting involved to help us grow and change, and looking for the solution rather than always focusing on the problems. I know its weird, but line staff really does have a tangible leadership role in this agency when seeking positive change. I look forward to what comes next...

Line 16: "…driving the most experienced officers from the Department."

> FALSE & MISLEADING STATEMENT: The higher than normal turnover claim is not grounded in relevant or comparable facts and fails to recognize a fundamental difference in the PD when McFarlin became chief. The department's aging workforce produced a number of employees that reached retirement age while McFarlin served as chief. As with other police departments many tenured police officers chose to retire as soon as they were eligible while others continue to work even though they could retire. Five employees retired in McFarlin's 5 ½ year tenure while 3 employees chose to work after achieving retirement eligibility. The details of the other departures are listed (from McFarlin's memory) below.
>
> Although unable to access City personnel data, it is believed that the Police Department turnover rate was less than the Fire Department's turnover rate.
>
> On the positive side, 5 experienced personnel from other law enforcement agencies joined McMinnville PD instead of choosing other police departments (see below) and new employees hired in the last 3 years of McFarlin's term as chief successfully achieved probation contrasting the poor retention rate when McFarlin arrived.
>
> ### INFORMATION ON THE TWENTY DEPARTING EMPLOYEES
>
> - DISCIPLINARY ACTION: Three (3) career staff were lost by disciplinary means (Robin Huber, Nancy Law, and Kelsey Stirling). Each of these cases is unique and represents a great deal of effort of the supervisors that worked to help the people achieve success. However, when after remedial training and other supervisory assistance the

Exhibit _A_
Page _6_


employee is unable to meet performance standards ending employment is the appropriate and necessary action for the organization, the community and even the employee that has lost their job.

- o UNSUCCESSFUL PROBATION: Three (3) employees (Casey Rosenbalm, Gary Kiser, and Debbie Garrison) failed to successfully complete their probationary period. This decision was made by a team of trainers and the employee's supervisory chain of command.
- BUDGET CUTS: Two (2) employees were lost due to budget cuts. In 2003 severe budget cuts felt by all City Departments dramatically impacted the Police Department. When first announced 11 positions were at risk. The Police Department's Management Team decided which positions would be eliminated and in what order of priority. After making those tough decisions and by creatively identifying additional resources (i.e. overtime savings, salary savings by not rehiring vacant positions, etc.) the potential cuts were limited the loss to just two employees. When Dan Brown was told his position would be eliminated he obtained his job as Chief of Police in Amity. Bill Christianson chose to quit before losing his job when he was hired at Forest Grove PD.
- RETIREMENTS: Five (5) employees (Full, Hantze, Henry, Reid & Killius), less than one a year, retired during McFarlin's tenure as Chief. Just as important, however, is the fact that three (3) employees (Sawyer, Stuart and Palen) that were eligible to retire during McFarlin's tenure and chose to continue working.
- RESIGNATIONS: Six (6) employees quit (Frank Butler, Dan Zimardo, Stephanie Olson, Deb Ehnes, Sean Noble and Angie Berry)
  - Frank Butler      Promotion to Carlton Chief of Police
  - Dan Zimardo      Moved to S. California (family/friends)
  - Stephanie Olson    Moved to Tennessee to get married
  - Deb Ehnes       Quit work when her husband retired
  - Sean Noble       Quit when he obtained a full time job
  - Angie Berry      Quit when she obtained another job

POSITIVE EMPLOYMENT INFORMATION:
- EXPERIENCED L.E. EMPLOYEES HIRED:  During McFarlin's tenure the department attracted and hired five (5) employees with experience with other law enforcement agencies (Steve Macartney—Yamhill County Sheriff's Office, Jose Salas—Salem PD, Marshall Roache—Hillsboro PD, Kristin Twenge—Newberg PD, Sherry McCuistion—Newberg PD)
- SUCCESSFUL PROBATIONS:  New employees hired in the last three years of McFarlin's tenure as chief were successful in achieving career status at the end of their probation.


Line 17-18:  "You yourself (Gormley) brought up specific instances of actionable conduct on the part of the Chief of Police, to include demeaning conduct toward other City employees.

FALSE AND MISLEADING STATEMENT:  Gormley never stated specific instances of actionable conduct by me, or demeaning conduct toward City employees.


Line 18-19:  "You discussed with us an ongoing knowledge on your part of failings on the part of the Chief of Police which led you to the conclusion that his tenure should be ended."

FALSE AND MISLEADING STATEMENT:  Gormley did not describe ongoing knowledge to McFarlin of "failings on the part of the Chief of Police" and never stated of his conclusion that Chief McFarlin's tenure should be ended.

Line 21-26:  "You acknowledged that the City Manager had kept from you specific information of deep dissatisfaction with the Chief of Police, as evidenced by
1)      the results of an evaluation of him completed by the McMinnville Police Department." (2001)
2)      exit interview
3)      Employee requesting an exit interview, but wasn't given one

FALSE AND MISLEADING STATEMENT:  Neither Gormley nor Taylor described specific information to McFarlin of deep dissatisfaction with him as Chief evidenced by the above items.

PAGE TWO of Exhibit 2

Line 1-2:  "You (Gormley) advised of a deep resistance on the part of the City Manager to confront the ongoing problems, and went so far as to suggest you might be forced to use your executive powers to get him to do his job."



FALSE AND MISLEADING STATEMENT:　Taylor did not tell McFarlin there were ongoing problems or show any resistance to take action on alleged ongoing problems.

Line 4: "You are of course aware of a lack of credibility which has attached itself to the Chief of Police and the City Manager throughout much of the Department."

　　　FALSE AND MISLEADING STATEMENT:　Gormley did not mention specific incidents to McFarlin indicating other City departments share the feeling of Gormley there was a lack of credibility in him.

Line 5; "You mentioned to us specific incidents which indicate that other City Departments share this feeling of a lack of credibility.

Exhibit_ A
Page_ 9

Exhibit 3
Letter of Complaint to Council
False & Misleading Statements

The references to "Line" by number refer to the copy of Exhibit 3 labeled Exhibit 3A with vertical line numbering in the left hand column.

Line 7 – 8: "…various violations of City Policy by the Chief of Police and the City Manager and the unwillingness of the inability for them to conform to the standards expected of employees of the City of McMinnville."

> FALSE STATEMENT:  McFarlin violated no City policies and has maintained and meets performance standards as is evidenced by his performance evaluations.

- Excerpt from May 23, 2005 Performance Evaluation:

> "…you consistently represent the Department and the City in a professional manner.  You are committed to the Department mission and the City."

> "You are a consistent contributor to the team and have responded in a timely manner to requests I have made of you."

> "Such service (to others and the community) continues to be a strong motivator for all you do."

- Excerpt from February 23, 2004 Performance Evaluation:

> "You consistently perform in a professional manner and are a professional representative of the Police Department and the City."

> "You have high standards for yourself and you work to carry over those expectations to your staff."

> "You have high standards with regard to "customer service" for the department and have made in-roads in this area."

- Excerpt from November 21, 2002 Performance Evaluation:

> "Possesses a high level of skill, knowledge, and ability in assigned functional area.  Is not limited by complexity and gets the job done.  A subject matter expert."

> "I believe you have led well during a period of transition and change.  You work to set the example and expect professionalism from your troops."

> "Overall, your performance has been excellent."

Page 1 – Exhibit 3 – False and Misleading Statements
I:\McFARLIN\Exhibit3False&MisleadingStatements110707.1clh.doc



Exhibit _B_
Page___/___

- Excerpt from September 4, 2001 Performance Evaluation:

"The material which I have received from you personally, and that which I have seen from the department generally, have been very professionally done."

"I trust your judgment, and that is the bottom line. I have confidence in your willingness and ability to make decisions. Your decision-making has included planning, a comprehensive and inclusive process, including one that, when appropriate, involves others and good thinking."

"You have exhibited excellent leadership in your first year as Chief."


Line 12: "...reporting employees...were subjected to retaliation...by Chief McFarlin."

FALSE STATEMENT: Chief McFarlin was not made aware of the complaints mentioned and therefore there was no basis for retaliation to occur.

- Had retaliation did occur why didn't the Union demand an investigation by the City Manager immediately? City rules are specific and clear on workplace harassment issues.

Line 14: "Chief McFarlin's continuing poor management and administration..."

FALSE STATEMENT: The evaluations of Chief McFarlin's performance and the lack of a specific allegation of mismanagement is evidence that this statement is false.

- Excerpt from May 23, 2005 Performance Evaluation:

"...you consistently represent the Department and the City in a professional manner. You are committed to the Department mission and the City."

"You are a consistent contributor to the team and have responded in a timely manner to requests I have made of you."

"Such service (to others and the community) continues to be a strong motivator for all you do."

"You have had some good successes this past year under some difficult circumstances. Particularly the personnel shortage strains resources and people. Hopefully your focus on getting slots filled will alleviate this issue—along with getting some people well! The Department certainly garnered some positive recognition for its police work on the Stamper case—one measure of the department's effectiveness and professionalism. Your work on the "enhanced enforcement" ordinance is to be commended."



- Excerpt from February 23, 2004 Performance Evaluation:

"You consistently perform in a professional manner and are a professional representative of the Police Department and the City."

"You have high standards for yourself and you work to carry over those expectations to your staff. You're not afraid to ask questions and get assistance from others in order to put together a quality work product. You have high standards with regard to "customer service" for the department and have made in-roads in this area."

"I believe you've had a very good year. You endured a good deal of change management and some internal turmoil. You've been a great team player and communicated well with me. You managed a tough budget preparation process and the accompanying stress. You provided effective leadership on several key issues—i.e. the chronic nuisance ordinance, the daytime curfew ordinance and juvenile issues in the downtown area."

- Excerpt from November 21, 2002 Performance Evaluation:

"Possesses a high level of skill, knowledge, and ability in assigned functional area. Is not limited by complexity and gets the job done. A subject matter expert."

"I believe you have led well during a period of transition and change. You work to set the example and expect professionalism from your troops."

"You've had a full and challenging year. Overall, your performance has been excellent."

- Excerpt from September 4, 2001 Performance Evaluation:

"A very visible strong point (Operations) in your first year with the City."

"The material which I have received from you personally, and that which I have seen from the department generally, have been very professionally done."

"I trust your judgment, and that is the bottom line. I have confidence in your willingness and ability to make decisions. Your decision-making has included planning, a comprehensive and inclusive process, including one that, when appropriate, involves others and good thinking."

"You have exhibited excellent leadership in your first year as Chief."

Exhibit 4
Attachment of Letter of Complaint to Council
False & Misleading Statements

The references to "Line" by number refer to the copy of Exhibit 4 labeled Exhibit 4A with vertical line numbering in the left hand column.

Line 7: "Poor management and administration."

FALSE STATEMENT: The evaluations of Chief McFarlin's performance and the lack of a specific allegation of mismanagement is evidence that this statement is false.

- Excerpt from May 23, 2005 Performance Evaluation:

"...you consistently represent the Department and the City in a professional manner. You are committed to the Department mission and the City."

"You are a consistent contributor to the team and have responded in a timely manner to requests I have made of you."

"Such service (to others and the community) continues to be a strong motivator for all you do."

"You have had some good successes this past year under some difficult circumstances. Particularly the personnel shortage strains resources and people. Hopefully your focus on getting slots filled will alleviate this issue—along with getting some people well! The Department certainly garnered some positive recognition for its police work on the Stamper case—one measure of the department's effectiveness and professionalism. Your work on the "enhanced enforcement" ordinance is to be commended."

- Excerpt from February 23, 2004 Performance Evaluation:

"You consistently perform in a professional manner and are a professional representative of the Police Department and the City."

"You have high standards for yourself and you work to carry over those expectations to your staff. You're not afraid to ask questions and get assistance from others in order to put together a quality work product. You have high standards with regard to "customer service" for the department and have made in-roads in this area."

"I believe you've had a very good year. You endured a good deal of change management and some internal turmoil. You've been a great team player and communicated well with me. You managed a tough budget preparation process and the accompanying stress. You provided effective leadership on several key

issues—i.e. the chronic nuisance ordinance, the daytime curfew ordinance and juvenile issues in the downtown area."

- Excerpt from November 21, 2002 Performance Evaluation:

"Possesses a high level of skill, knowledge, and ability in assigned functional area. Is not limited by complexity and gets the job done. A subject matter expert."

"I believe you have led well during a period of transition and change. You work to set the example and expect professionalism from your troops."

"You've had a full and challenging year. Overall, your performance has been excellent."

- Excerpt from September 4, 2001 Performance Evaluation:

"A very visible strong point (Operations) in your first year with the City."

"The material which I have received from you personally, and that which I have seen from the department generally, have been very professionally done."

"I trust your judgment, and that is the bottom line. I have confidence in your willingness and ability to make decisions. Your decision-making has included planning, a comprehensive and inclusive process, including one that, when appropriate, involves others and good thinking."

"You have exhibited excellent leadership in your first year as Chief."


Line 12: "Employee teambuilding and empowerment has been replaced by autocratic centralization."

FALSE STATEMENT: Chief McFarlin implemented a participative management philosophy when he created the Department's Management Team meeting process. This process was created to inspire teamwork, encourage ideas and suggestions from throughout the department and to ensure a collaborative decision-making process.

- Excerpt from Chief Deu Pree's 2003 Department Review:
"Chief McFarlin implemented a participatory management decision-making system shortly after assuming responsibility for the agency. This is a typical participatory management system tailored for the McMinnville Police."

"For policy decisions and other decisions that allow time for the exploration of options, participatory management is currently the preferred style in law enforcement agencies."

- Excerpt from Chief McFarlin's article, "Jump Starting a Leadership Team":
  "Since we wanted the centerpiece of our decision-making to be the Management Team, we designed the process increase communication and understanding and be conducive to participatory management principles. Although monthly Management Team meetings are mandatory for supervisors, non-supervisory staff are invited to attend. However, when few non-supervisors accepted the invitation we asked the police association executive board to assign one of the board to attend Management Team meeting. When an employee develops a proposal for the Management Team we ask them to attend the meeting so that they can personally present their proposal. We strive to have at least two non-supervisors attend these meetings. Participating non-management team members are not at the meetings as silent visitors. They are frequently asked for their input on issues under discussion and are encouraged to participate in the meetings."

- Excerpts from May 23, 2005 Performance Evaluation:

  "You work at trying to solve problems by involving others."

  "You are a consistent contributor to the team and have responded in a timely manner to requests I have made of you."

- Excerpt from February 23, 2004 Performance Evaluation:

  "You've been a great team player and communicated well with me."

- Excerpt from November 21, 2002 Performance Evaluation:

  "You have worked to create a "team" atmosphere in the PD."

- Excerpt from September 4, 2001 Performance Evaluation:

  "Your decision-making has included planning, a comprehensive and inclusive process, including one that, when appropriate, involves others and good thinking."

Line 20: "Systematically driving experienced and dedicated officers and employees from the Department."

> FALSE & MISLEADING STATEMENT: The higher than normal turnover claim is not grounded in relevant or comparable facts and fails to recognize a fundamental difference in the PD when McFarlin became chief. The

department's aging workforce produced a number of employees that reached retirement age while McFarlin served as chief. As with other police departments many tenured police officers chose to retire as soon as they were eligible while others continue to work even though they could retire. Five employees retired in McFarlin's 5 ½ year tenure while 3 employees chose to work after achieving retirement eligibility. The details of the other departures are listed (from McFarlin's memory) below.

Although unable to access City personnel data, it is believed that the Police Department turnover rate was less than the Fire Department's turnover rate.

On the positive side, 5 experienced personnel from other law enforcement agencies joined McMinnville PD instead of choosing other police departments (see below) and new employees hired in the last 3 years of McFarlin's tenure successfully achieved probation contrasting the poor retention rate prior to McFarlin.

## INFORMATION ON THE TWENTY DEPARTING EMPLOYEES

- DISCIPLINARY ACTION: Three (3) career staff were lost by disciplinary means (Robin Huber, Nancy Law, and Kelsey Stirling). Each of these cases is unique and represents a great deal of effort of the supervisors that worked to help the people achieve success. However, if after remedial training and other supervisory assistance the employee is unable to meet performance standards ending employment is the appropriate and necessary action for the organization, the community and even the employee that has lost their job.
  - UNSUCCESSFUL PROBATION: Three (3) employees (Casey Rosenbalm, Gary Kiser, and Debbie Garrison) failed to successfully complete their probationary period. This decision was made by a team of trainers and the employee's supervisory chain of command.
- BUDGET CUTS: Two (2) employees were lost due to budget cuts. In 2003 severe budget cuts felt by all City Departments dramatically impacted the Police Department. When first announced 11 positions were at risk. The Police Department's Management Team decided which positions would be eliminated and in what order of priority. After making those tough decisions and by creatively identifying additional resources (i.e. overtime savings, salary savings by not rehiring vacant positions, etc.) the department limited the cuts to the loss of just two employees. When Dan Brown was told his position would be eliminated he obtained his job as Chief of Police in Amity. Bill Christianson chose to quit before losing his job when he was hired at Forest Grove PD.
- RETIREMENTS: Five (5) employees (Full, Hantze, Henry, Reid & Killius), less than one a year, retired during McFarlin's tenure as Chief. Just as



Exhibit C
Page 4

important, however, is the fact that three (3) employees (Sawyer, Stuart and Palen) that were eligible to retire while McFarlin served as Chief chose to continue working.

- <u>RESIGNATIONS:</u>  Six (6) employees quit (Frank Butler, Dan Zimardo, Stephanie Olson, Deb Ehnes, Sean Noble and Angie Berry)
  - Frank Butler           Promotion to Carlton Chief of Police
  - Dan Zimardo        Moved to S. California (family/friends)
  - Stephanie Olson   Moved to Tennessee to get married
  - Deb Ehnes            Quit work when her husband retired
  - Sean Noble            Quit when he obtained a full time job
  - Angie Berry           Quit when she obtained another job
  - AARON BUCKMASTER???

### POSITIVE EMPLOYMENT INFORMATION:

- <u>EXPERIENCED L.E. EMPLOYEES HIRED:</u>   During McFarlin's tenure McMinnville Police attracted and hired five (5) employees with experience with other law enforcement agencies (Steve Macartney—Yamhill County Sheriff's Office, Jose Salas—Salem PD, Marshall Roache—Hillsboro PD, Kristin Twenge—Newberg PD, Sherry McCuistion—Newberg PD)
- SUCCESSFUL PROBATIONS:  New employees hired in the last three years of McFarlin's tenure successfully achieved career status at the end of their probation.

<u>PAGE TWO</u>
<u>Line 1:</u> "Destabilizing the Department Internally"

> <u>FALSE STATEMENT:</u>  Chief McFarlin implemented a participative management philosophy in which any Department member can propose organizational change and the police department's Management Team, composed of corporals, sergeants, lieutenants, civilian supervisors and the chief, collaboratively make nearly all organizational decisions.  All department personnel were invited and encouraged to attend and participate in Management Team meetings.  The years of Management Team minutes attest to the fact that empowerment was a reality and decisions are made as a team.

<u>Line 14:</u> "Time loss due to injured, accidents, illness and stress has sky-rocketed.

> <u>MISLEADING STATEMENT:</u> The statistics indicate the nature and reality of the injuries.  The historic under budgeted police department staffing level exacerbated the time loss due to injury and illness.  The only stress-related illness was caused by the hostile work environment created by Lt. Rob Edgell according to Sgt. Palen.

> <u>INJURIES:</u> In the year prior to McFarlin's resignation there were 11 injuries that kept officers from working for over month and some many months.  Over half of



Exhibit_____ C
Page_____ 5

these were <u>non-duty</u> related injuries. Three of these kept the officer off full duty for over a year. Injuries include:

1) Stuart-hit by car
2) Salas-rotator cuff—<u>off duty</u>
3) Cerda-broken arm—<u>off duty</u>
4) Stirling-substance treatment—<u>off duty</u>
5) Edgell-hip replacement—<u>off duty</u>
6) Sawyer-knee injury-foot chase
7) Willis-knee injury-fight
8) Albright-cat bite
9) Scales-back injury—<u>off duty</u>
10) Stuart-shoulder injury
11) Palen-diabetes—<u>off duty</u>

<u>Line 25:</u>  "Manipulating Department processes and positions"…"He promised the same evaluation in six months…the promised evaluation did not happen…"

> <u>MISLEADING:</u>  This refers to the "Supervisors Feedback" form McFarlin distributed in 2001. Although there were many positive and supportive comments about the direction of the Department, Kent Taylor, whose executive assistant administered the process, suggested modifying the process to avoid the vicious personal attacks that a few Department members made in 2001. The "Supervisors Feedback" form was replaced by a nominal group process administered by Carol Reid and Nicole Heidt.

<u>PAGE THREE</u>
<u>Line 5:</u>  "He manipulated a sergeant hiring board, eliminating a person with what he considered a "bad attitude" from the promotional board."

> <u>PROBABLY TRUE:</u>  Although McFarlin can't recall this event, there was a time in late 2001 and early 2002 when Chief McFarlin indicates that he would not have assigned Sgt. Mike Full to a promotional board due to his bizarre, disruptive and unprofessional demeanor that the Chief did not want to taint or disrupt a promotional or hiring process.

<u>Line 8:</u>  "Withdrawing the Department from national accreditation"

> <u>MISLEADING:</u>  Chief McFarlin supports the accreditation program. The program was eliminated due to severe citywide budget cuts July 2003. This program was reinstated in 2004.

<u>Line 17:</u>  "Eliminating the DARE program"


Exhibit   C
Page    6

MISLEADING: Chief McFarlin has supported the DARE program throughout his career. The program was eliminated due to severe citywide budget cuts July 2003. The school resource officer program reinstated the middle school officer in 2004 with long term plans to reinstate the DARE program.

Line 23: "Eliminating the Police Reserve and Cadet Programs"

MISLEADING: The Cadet program was eliminated in 2002 due to a lack of interest among police officers to support it.

FALSE STATEMENT: Funding for the Reserve program was cut due to severe citywide budget cuts July 2003, however, the program continued uninterrupted when Chief McFarlin helped reserves convert to a self-funding model. Because of Chief McFarlin's continuing commitment to the Reserve Program he was able to obtain Council support to once again provide funds for this program in August 2004.

PAGE FOUR
Line 5: "Eliminating replacement funding for Police Canines"

MISLEADING: Replacement funding for the Canine program was eliminated due to severe citywide budget cuts July 2003. In spite of failed attempts to gain full Council support for canine replacement in subsequent budget years Chief McFarlin supported a community fundraising effort in 2005 to replace the first canine that retired following the loss of replacement funding by the Council.

Line 10: "Attempting (unsuccessfully) to eliminate the Auxiliary program."

FALSE STATEMENT: There was never an attempt to eliminate the Auxiliary program. However, it was renamed and increased in scope adding:
  o Park Watch volunteers program
  o Bilingual ride-along volunteers
  o New uniforms for all volunteers obtained
  o Volunteer office equipment upgrades made

Line 16: "Initiating the current fiasco in the police radio system"

MISLEADING STATEMENT: The radio project was headed by the Fire Department and managed by a paid consultant that was contracted by the City. Chief McFarlin did ensure that a representative team of police radio users (e.g. patrol officers) played a weekly role in providing input on system performance and assist technical staff in problem solving.

<u>Line 21</u>:  The Police Firing Range was once built and managed with all volunteer manpower and donated materials, but now, "all work done is strictly for wages, all material must be bought and most equipment must be rented."

> <u>MISLEADING STATEMENT</u>:  When Sgt. Mike Full, the primary custodian of the Firing Range, retired he was an outspoken antagonist of Chief McFarlin.  In addition to lobbying the Council to fire Chief McFarlin, he also attempted to discourage volunteers from working at the range.  Chief McFarlin continued to encourage community donations and volunteer labor for maintenance and development as long as that activity did not violate the Federal Labor Standards Act (FLSA).  He also budgeted funds to ensure the range continued to serve the police department in an effective and safe fashion.

Exhibit 18
Waldo Farnham Complaint to Mayor Gormley
False and Misleading Statements

The references to "Line" by number refer to the copy of Exhibit 18 labeled Exhibit 18A with vertical line numbering in the left hand column.

1. "Morale at present is lower among staff today than it was over a year ago when the police association contemplated a vote of no-confidence against the Chief of Police."

   FALSE STATEMENT:
   1) Kent Taylor was told by police union President Matt Scales in September 2005 that morale in the police department was good.
   2) Chief McFarlin was told by police union President Matt Scales in September 2005 that morale in the police department was good.
   3) Information McFarlin was receiving from other employees supported the belief that morale was good.
   4) Only after the Mayor let it be known to the union personally and through his envoy Rod Brown after he received pressure from Waldo Farnham, Mike Full, Dan Brown and Frank Butler (former union president) that he would welcome a vote of no confidence to provide him a reason to demand my resignation did the union membership respond in this negative fashion.
   5) Although good morale is frequently intangible and difficult to document, <u>the email below from Ofc. Steve Macartney is indicates that morale was good among PD employees</u>. This observation further supports the statements by police union President Matt Scales to Kent Taylor and Chief McFarlin in separate conversations in September 2005 that PD morale was good.

   From:      Kent Taylor
   Sent:      Tuesday, September 20, 2005 8:30 AM
   To:         Wayne McFarlin
   Subject:   RE: Some positive feedback
   Thanks for sharing this. It's particularly surprising coming from Off. McCartney. I sat next to him for the first part of the Strat Plan session. I found him to be relatively negative/grumpy and certainly not expressing the kind of awareness or appreciation evident in his e-mail.
   -----Original Message-----
   From: Wayne McFarlin
   Sent:  Tuesday, September 20, 2005 4:58 AM
   To:      Kent Taylor
   Subject:       FW: Some positive feedback
   Kent,
   Just thought I'd pass on this positive feedback. Although it's not specifically mentioned in this email, our personnel have a greater appreciation of the support they receive from you and our Mayor and Council. They've been impressed with the Community Choices video and I sense an overall feeling of excitement about

Exhibit  D
Page          1

our future as a city organization.
Wayne

-----Original Message-----
From:      Steve Macartney
Sent:      Tuesday, September 20, 2005 1:42 AM
To:        PD PATROL
Subject:   Some positive feedback

To all, I had some time to reflect on what has been accomplished around here recently and wanted to pass the information along. Sometimes we get focused on the downers of the job, but over the last couple years our environment has significantly changed. A quick review:

1) New patrol jackets/rain gear
2) Serious upgrade of fleet with three more cars almost here to rid us of the last of the older/less functional cars
3) New sidearms with lights, holsters, etc
4) New radio system still being implemented
5) MDC's within the next 6-8 months
6) Tasers are coming
7) Reserve program back in operation
8) Narcotics canine back on the road
9) Newer style and more functional uniforms
10) On the verge of going to the public with a new facility plan for bonding

I'm sure I missed some very important stuff, but this is just a thumb nail sketch of some of the recent accomplishments. For an agency of this size to get half of these things done in a couple fiscal years would be amazing, much less what we have been able to accomplish together. Thanks for all the hard work in constantly evaluating our agency, getting involved to help us grow and change, and looking for the solution rather than always focusing on the problems. I know its weird, but line staff really does have a tangible leadership role in this agency when seeking positive change. I look forward to what comes next...

---

2. "Some present and former staff report that they do not find Chief McFarlin as either credible or trustworthy."

MISLEADING STATEMENT: Anyone may unreasonably lack trust in another, such as occurs with an individual that suffers from extreme cynicism or someone with a mental health disorder such as schizophrenia. Such a distorted perception of reality is outside the control of others.

Integrity and trustworthiness is impossible to achieve without consistently behaving in a credible manner, which Chief McFarlin has done during his tenure

Exhibit  D
Page ____ 2

as Chief. Here are some excerpts from his performance evaluations that touch on Wayne McFarlin's credibility and integrity as Chief of Police.

- Excerpt from May 23, 2005 Performance Evaluation: "You are one of the most open members of the Management Team."

- Excerpt from February 23, 2004 Performance Evaluation: "You consistently perform in a professional manner and are a professional representative of the Police Department and the City."

- Excerpt from November 21, 2002 Performance Evaluation: "Integrity and consistency are critical. You responded professionally and with integrity when both were challenged by one particular employee (Mike Full) and the Council became involved (June 2002 meeting). The problem we all have is that we have to work doubly hard, it seems anyway, to overcome such accusations, even when found unsubstantiated."

- Excerpt from September 4, 2001 Performance Evaluation: "I trust your judgment, and that is the bottom line. I have confidence in your willingness and ability to make decisions. Your decision-making has included planning, a comprehensive and inclusive process, including one that, when appropriate, involves others and good thinking."

---

3. "A number suggest that Chief McFarlin approaches problems by "spinning" the facts in such a manner to point blame and responsibility away from himself."

FALSE STATEMENT: Chief McFarlin's management philosophy has long been to focus on solutions—not blame. Below is a recent documented example of Chief McFarlin accepting responsibility for his decision-making that refutes Farnham's unsupported allegation.

| | |
|---|---|
| From: | Wayne McFarlin |
| Sent: | Wednesday, August 03, 2005 5:40 PM |
| To: | POLICE |
| Subject: | Graveyard supervisors |

Recently I made a decision involving supervisory assignments on graveyard shift. The decision I made was wrong. I removed Cpl. Sandoval's working out of class sergeant's responsibilities and Ofc. Tim Symons working out of class corporal responsibilities when Sgt. Scales returned to limited duty. When Cpl. Sandoval shared her concern about my decision with me I scheduled a special Supervisor's Meeting today to revisit my decision.

As a group we are in consensus that my decision should be reversed. Consequently, Cpl. Sandoval will be shown as working out of class as a sergeant and Ofc. Symons will be shown as working out of class as a corporal

continuously from the time Sgt. Scales left his full duty status. I apologize for the frustration and confusion my decision caused Cpl. Sandoval, Ofc. Symons and our graveyard officers that were also affected by this decision.

Thank you all for your patience and the extra effort you demonstrate daily while our department copes with the many issues raised with our recent staffing challengees.

Wayne

4. Both past and present staff point to Chief McFarlin's practice of assigning work plans as a disguised manner of discipline as particularly unfair. They note that it is common practice to establish a work plan and *without consulting the affected staff member,* adding to or changing the plan. The result is that staff fail in compliance because they are unaware of expectations."

FALSE STATEMENT: This is contrary to training Department staff has been provided and is not allowed.

5. "These same staff note that Chief McFarlin does not welcome ideas, comments or suggestions, and in fact, it is their sense that staff who disagree are targeted for consequences."

FALSE STATEMENT: Chief McFarlin implemented a participative management philosophy when he created the Department's Management Team meeting process. This process was created to encourage ideas and suggestions from throughout the department and to ensure a collaborative decision-making process. If Chief McFarlin didn't welcome this input he could have easily retained the previous decision-making process which gave the Chief total control over these decisions.

- Excerpt from Chief Deu Pree's 2003 Department Review: "Chief McFarlin implemented a participatory management decision-making system shortly after assuming responsibility for the agency. This is a typical participatory management system tailored for the McMinnville Police." "For policy decisions and other decisions that allow time for the exploration of options, participatory management is currently the preferred style in law enforcement agencies."

- Excerpt from Chief McFarlin's article, "Jump Starting a Leadership Team": "Since we wanted the centerpiece of our decision-making to be the Management Team, we designed the process increase communication and understanding and be conducive to participatory management principles.

Exhibit D
Page 4

Although monthly Management Team meetings are mandatory for supervisors, non-supervisory staff are invited to attend. However, when few non-supervisors accepted the invitation we asked the police association executive board to assign one of the board to attend Management Team meeting. When an employee develops a proposal for the Management Team we ask them to attend the meeting so that they can personally present their proposal. We strive to have at least two non-supervisors attend these meetings. Participating non-management team members are not at the meetings as silent visitors. They are frequently asked for their input on issues under discussion and are encouraged to participate in the meetings."

- Excerpt from May 23, 2005 Performance Evaluation: "You work at trying to solve problems by involving others."

- Excerpt from November 21, 2002 Performance Evaluation: "You have worked to create a "team" atmosphere in the PD."

- Excerpt from September 4, 2001 Performance Evaluation: "Your decision-making has included planning, a comprehensive and inclusive process, including one that, when appropriate, involves others and good thinking."

---

6. "Staff also point out that Chief McFarlin does not complete background checks on Reserve Officers until after they have completed the Academy."

MISLEADING STATEMENT: Background checks are typically completed prior to reserve officers attending the academy. However funding for the Reserve program was cut due to severe citywide budget cuts July 2003 and it wasn't until August 2004 before Chief McFarlin was able to obtain Council approval for reserve funding. This approval was unique and came outside the normal budget cycle. Department personnel immediately implemented a recruitment and selection process, but due to the late funding decision it was not possible to complete the entire process prior to the annual training academy beginning. All reserve candidates did receive partial background checks. However due to the complexity of the background checks that McMinnville PD chooses to complete and the unique circumstance presented due to the late funding decision, reserve candidates were allowed to begin attending classes.

"...In cases when candidates eventually fail their background checks, the result is considerable waste of time and money that could have been avoided had checks been done prior to training."

MISLEADING STATEMENT: Only one candidate failed the final portion of the background check after beginning the academy. The cost of registration was



$100, which represented the cost of materials that could be used by another academy participant.

---

"I note several questionable/unnecessary purchases:
- "New handguns were purchased for all department members at a cost of approximately $29,000 when existing guns were completely serviceable."

FALSE STATEMENT:  The bulk of the handguns used by regular (non-reserve) police officers were approximately 11 years old and had exceeded their recommended life span of 7 years.  Department firearms instructors have reported an increasing number of maintenance problems with the aging guns that presented a safety risk for police officers.  The purchase to replace most (not all) of the department handguns was approved by the City Manager, the Budget Committee and ultimately the City Council—see attached 2005-2006 PD Budget Proposal.

---

- "New expensive low-profile light bars were purchased at approximately $2,200.00 each when existing light bars were still serviceable."

MISLEADING STATEMENT:  Since 2000 the police decreased its' fleet of vehicles by 25% to create a smaller, but more reliable fleet of vehicles.  When a critical piece of equipment (i.e. a siren, or light bar) fails to operate the patrol car is removed from service, sometimes for several days, until it is repaired.  To minimize downtime of patrol cars caused by defective equipment, the fleet manager recommended a replacement cycle for critical equipment to balance cost effectiveness with patrol car availability.  Light bars are used on two patrol cars (roughly 200,000-300,000 road miles of use over 10 years) before they are replaced.

---

- "Failure to consider making use of motorcycle(s) at approximately $600.00/year in favor of much more expensive sedans for traffic enforcement."

FALSE STATEMENT: Each of the two previous years Chief McFarlin proposed a motorcycle program.  In the FY 2004-20005 budget process City Manager Kent Taylor denied the request before the City Manager's recommended police budget was seen by the Budget Committee.  In the FY 2005-2006 budget process the City Manager excluded the motorcycle program again, but allowed it to be presented to the Budget Committee as a "wish list" proposal—see attached 2005-2006 PD Budget Proposal.

---



PAGE TWO

Paragraph 1: "I seriously question the veracity of Chief McFarlin when he went before a joint meeting of the City Council and the School Board claiming that no drug dogs were available within the county in response to the request for such a dog to search lockers and cars at McMinnville High School."

MISLEADING STATEMENT: At the time of this meeting this statement was accurate. The County's drug dog's certification had lapsed and I was told my our Canine Team leader, Sgt. Marks, that the Carlton PD drug dog team did not meet our operating standards due to information Sgt. Marks had learned of a possible illegal search made by the handler. Sgt. Marks' information was later found to be inaccurate and sometime in June the Carlton drug dog met McMinnville PD standards and could then be used by our department in searches.

There was never any question that a drug dog from outside the county could be obtained if necessary, which is what I told Waldo Farnham and Lee Vasquez in our May 31, 2005 meeting on this subject.

Paragraph 2: "Subsequently, after the Council made such funds available,..."

FALSE STATEMENT: Council eliminated funding to replace police canines effective July 1, 2003. The first police canine to retire following that budget cut was "Clyde", the drug dog, in September 2004. The email below announces a citizens group formed in December 2004 to begin fundraising efforts to replace the drug dog. The Budget Committee made a decision not to allocate funds for the drug dog (as had been proposed in the PD's budget recommendation) in their meeting on May 18, 2005, leaving it to be considered by Council for later in the summer when the citizen's fundraising efforts were completed.

- Email announcing the Citizen Fundraising Committee:
From: Dennis Marks
Sent: Wednesday, December 08, 2004 7:43 PM
To: Wayne McFarlin; Rob Edgell; Dennis Marks; Hugo Cerda; Mike Huber; Rhonda Sandoval
Subject: narcotic canine citizen group - Veronica Gaston and others

Chief and Lt,
    Veronica Gaston, Rex Steens, and Debbie Clark are meeting at 1400 on Sunday the 12th at Shari's. I am planning to be there to express the issues that need resolved within the department and city government (including a potential timeline) and to get some idea of what they are planning on trying to do as a community action group. My last voice mail from Veronica indicates that she has



found several business willing to donate a canine and many citizens interested in helping out.

Just wanted to keep you posted. I should have more information after this meeting. I would also be happy to get any advice or guidance that you think is important beforehand.

Dennis

"...the Chief went forth to request citizen donations for a drug dog, fronting with the claim that this was the only means of replacing the retired city drug dog."

FALSE STATEMENT: Funds to purchase a portion of a drug dog were not approved by the Budget Committee, as the Budget Committee had referred this decision to the Council in their May 18, 2005 meeting. Mayor Gormley in a meeting he had with me and Kent Taylor on July 6, 2005 instructed me to order the drug dog immediately because he was receiving pressure from Waldo Farnham.

- Sgt. Marks' Memo to Council for their June 14, 2005 meeting regarding the narcotic canine:

Memo

To: Wayne McFarlin, Chief of Police
From: Dennis Marks, Sergeant
Date: June 9, 2005
Re: Narcotic Canine Program Information

At the request of the Budget Committee, I have prepared the following information for consideration regarding the narcotic canine budget request.

COSTS:
The start up cost for fielding a narcotics canine will be $17,500. These costs include purchase of the dog and training the dog and handler, vehicle retrofit, kennel, and basic supplies. The recurring costs for a canine team include on-going skills training, officer's premium pay, vehicle expenses, training, food, and medical costs. Based on a seven-year average canine career, the annual expense is $16,700.

SEIZED ASSETS:
During his eleven-year career Canine Clyde assisted in the forfeiture of over $120,000.00 in US currency and over $100,000.00 in the seizure of vehicles, boats, and other personal property related to narcotics use. This results in seized assets that averaged $20,000 a year.

**CRIMINAL INVESTIGATIONS:**

During his career, he assisted in the seizure of 50 pounds of marijuana, 10 pounds of methamphetamine, and 1 pound of cocaine. Clyde was involved in 445 cases involving 123 search warrants and 343 arrests.

- Email exchange between Mayor Gormley and Chief McFarlin following the Mayors order to purchase the drug dog:

From: Wayne McFarlin
Sent: Wednesday, July 06, 2005 4:30 PM
To: 'Ed Gormley'
Cc: Kent Taylor
Subject: RE: today's meeting

Thank you! I really appreciate you taking time to share your insight on the issues we discussed. I'll get the dog ordered and I'll keep you (both) posted on how things progress with the meeting I'll be setting up.

Wayne

-----Original Message-----
From: Ed Gormley [mailto:ed@gormleyplumbing.com]
Sent: Wednesday, July 06, 2005 1:37 PM
To: Kent Taylor; Wayne McFarlin
Subject: today's meeting

thanks for taking the time to meet with me...

ed

- Email from Chief McFarlin to Mayor Gormley on drug dog status

From: Wayne McFarlin
Sent: Tuesday, August 09, 2005 8:20 AM
To: Ed Gormley (E-mail)
Subject: FW: Narcotic Canine update
Good morning Mayor,

I continue to get calls from Waldo with questions on the canine program so thought I'd send him and Lee this update to keep them apprised of our progress. I thought you'd like this information as well. I've also shared it with Kent.

See you tonight at Council.

Wayne

-----Original Message-----
From:     Wayne McFarlin
Sent:     Monday, August 08, 2005 6:56 PM
To:       Waldo Farnham (E-mail); Lee Vasquez (E-mail)
Subject:  Narcotic Canine update

Waldo and Lee,

I just wanted to keep you both updated on our narcotic canine progress.

1. Our staff is in Texas now selecting our new narcotic canine. The handler will train with the (already trained) dog for the next three weeks returning the week of August 26th. I don't know what local training Sgt. Marks will have in store for new team, but they should be on patrol by the first of September.

2. We've arranged to have Yamhill County's narcotic team (Dep. Caruth & Flash) conduct the pre-school search of the high school August 15th. (Thanks to Sheriff Crabtree and Dep. Caruth!)

3. I've talked with Sheriff Crabtree and Chief Butler from Carlton and offered to let them know when we were conducting canine training in hopes all the County's drug dogs (and patrol canines) could train together. It should increase our effectiveness developing this county resource as a group.

4. McMinnville School District and Mac PD are updating and coordinating their canine policies to ensure we're on the same sheet of music in the fall. Just last Friday Sgt. Palen attended a School District training to hone our plans for use of the dog in the fall.

5. Lt. Edgell and Sgt. Palen (our supervisors with school responsibilities) have met with school staff to schedule the many drug dog presentations and searches planned once the school year gets started. At a minimum we will conduct a search a quarter at the high school. We'll see how things go at the high school and then decide how we'll include the other schools in the district.

6. Waldo had asked recently about the possibility of cross training one of our current patrol canines for narcotics work (he mentioned Mac Reid said one of our dogs had previous drug detection training). I checked with Sgt. Marks and confirmed that although this is technically possible (and discussed briefly several years ago), we could only do so by taking the dog off the road more for training or not using the dog any longer for some tracking he performs as a patrol canine. In the past this wasn't considered the best use of the dog. However, with the increased need for narcotic detection in the area I'm asking Sgt. Marks to research this possibility again and present it to the PD's Management Team to decide.

Thanks again for your interest on this project. You've both had a positive impact helping restart our narcotic canine program.

Wayne

CERTIFICATE OF SERVICE

I hereby certify that on the _12_ day of November, 2007, I served the foregoing

AFFIDAVIT OF WAYNE MCFARLIN IN OPPOSITION TO DEFENDANTS' MOTIONS

FOR SUMMARY JUDGMENT on the following parties:

Karen O'Kasey
Hoffman Hart & Wagner LLP
1000 SW Broadway, Suite 2000
Portland, OR 97205
*Fax: (503) 222-2301*
        *Of Attorneys for Defendants Gormley and City of McMinnville*

Mr. Robert S. Wagner
Miller & Wagner LLP
2210 NW Flanders Street
Portland, OR 97201
*Fax: (503) 299-6106*
                *Of Attorneys for Defendants Brown, CCIST and PSLM*

Frank Lagesen
Walter Sweek
Cosgrave Vergeer Kester LLP
805 SW Broadway 8th Floor
Portland, OR 97205
*Fax: (503) 323-9019*
        *Of Attorneys for Defendant Farnham*

by electronic means through the Court's Case Management/Electronic Case File system.

/s/ Terrence Kay
Terrence Kay
Terrence Kay, P.C.
OSB #814375
503/588-1944
Attorney for Plaintiff

Page 13 -- Affidavit of Wayne McFarlin
G:\1-WP\McFARLIN\Aff McFarlin 111107.wmfinal1.doc

**TERRENCE KAY, P.C.**
*Attorney at Law*
3155 River Road S., Suite 150 - Salem, OR 97302
Telephone: 503/588-1944  Fax: 503/588-1946
Email: terrence@kaylawfirm.com