1

2

3

4

5

6

7

8

9                    IN THE UNITED STATES DISTRICT COURT

10                        FOR THE DISTRICT OF OREGON

11  WAYNE McFARLIN,                    )
                                       )
12                 Plaintiff,          )
                                       )    No.  CV-06-1594-HU
13       v.                            )
                                       )
14  EDWARD GORMLEY, an individual;)
    CITY of McMINNVILLE, a          )
15  Municipal Corporation; CITY      )
    COUNTY INSURANCE SERVICES        )
16  TRUST; ROD BROWN, an individ- )      OPINION & ORDER
    ual; PUBLIC SAFETY LIABILITY    )
17  MANAGEMENT, INC., an Oregon       )
    corporation; WALDO FARNHAM,       )
18                                     )
                   Defendants.         )
19  _____)

20  Terrence Kay
    TERRENCE KAY, P.C.
21  3155 River Road S., Suite 150
    Salem, Oregon 97302
22
         Attorney for Plaintiff
23
    Karen O'Kasey
24  HOFFMAN, HART & WAGNER, LLP
    1000 S.W. Broadway
25  Portland, Oregon 97205

26       Attorney for Defendants Ed Gormley and City of McMinnville

27  / / /

28  / / /


1 - OPINION & ORDER

Robert S. Wagner
Stan LeGore
MILLER & WAGNER LLP
2210 N.W. Flanders Street
Portland, Oregon 97210-3408

    Attorney for Defendants City County Insurance Services
    Trust, Rod Brown, and Public Safety Liability Management

Walter H. Sweek
Wendy M. Margolis
James M. Maldonado
COSGRAVE VERGEER KESTER LLP
805 S.W. Broadway, 8th Floor
Portland, Oregon 97205

    Attorney for Defendant Waldo Farnham

HUBEL, Magistrate Judge:

Plaintiff Wayne McFarlin, the former Chief of Police for defendant City of McMinnville ("the City"), brings various claims against the City and others for actions culminating in plaintiff's resignation as Chief of Police in October 2005. Defendants move for summary judgment. Plaintiff moves to conform the pleadings to evidence in the record on the issue of providing a tort claim notice to certain defendants. All parties have consented to entry of final judgment by a Magistrate Judge in accordance with Federal Rule of Civil Procedure 73 and 28 U.S.C. § 636(c).

I grant the summary judgment motions and deny plaintiff's motion to conform. All defendants also move to strike certain evidence submitted by plaintiff in opposition to the summary judgment motions. I deny the motions to strike as moot.

BACKGROUND

Plaintiff was hired as police chief for the City in June 2000. Previously, he worked for twenty-five years at the Salem police department, rising through the ranks from an officer, to corporal, sergeant, and lieutenant. He has a bachelor's degree in business

2 - OPINION & ORDER

1  administration and personnel management.

2      Defendant Edward Gormley is the Mayor of the City.  Defendant
3  Rod Brown is a former Chief of Police for the City, who resigned in
4  2000.  He started his own consulting business, defendant Public
5  Safety Liability Management, Inc. (PSLM), through which he provides
6  risk management services to law enforcement agencies throughout
7  Oregon.  His primary client is defendant City County Insurance
8  Services Trust (CCIST), a public entity which coordinates insurance
9  services for public bodies.  Defendant Waldo Farnham is a private
10 citizen; he has been the sole owner of Farnham Electric in
11 McMinnville since 1968.

12     The relevant facts in this case begin in October 2005, when
13 Matt Scales, newly-elected president of the police union in the
14 City, talked to Rod Brown about problems in the police department.
15 After they spoke, Brown drove to Gormley's plumbing business to
16 tell Gormley what he just heard from Scales.  Gormley was under the
17 impression from City Manager Kent Taylor, that things in the police
18 department were fine.  Brown suggested that Scales come personally
19 to talk with Gormley, and after Brown called Scales, Scales came to
20 Gormley's office and repeated to Gormley what he had told Brown.

21     Gormley had apparently previously received some written
22 complaints about plaintiff, including an October 9, 2005 letter and
23 another undated letter.  Pltf's Exhs. 2, 2A, 3, 4.  Gormley kept
24 these complaints at his plumbing business office and did not share
25 them with plaintiff.

26     Before Scales spoke to Brown, Brown knew that Farnham was
27 unhappy with plaintiff.  Farnham was upset with plaintiff for
28 failing to obtain a drug sniffing dog for the local high school.

3 - OPINION & ORDER

As a result, Farnham decided to do his own personal "review," or "investigation," of plaintiff's accomplishments.    He initially spoke to Brown about it because Brown was in Farnham's office, taking care of some electrical business.    Farnham conducted his investigation by making his pager number available to people and indicating that they could contact him.    Brown gave out Farnham's pager number to a couple of people.

Shortly after Scales met with Gormley, Taylor invited Brown to a meeting to discuss the issues in the police department and what could be done about them.    In addition to Taylor and Brown, others present were Gormley, Farnham, City Council President Rick Olson, and Yamhill County Sheriff Jack Crabtree.    The meeting occurred on October 20, 2005, or October 21, 2005.    According to Brown, no one asked that plaintiff's resignation be sought, or that he be fired, terminated, or replaced.    However, following the meeting, Taylor asked Brown to begin searching for a possible interim police chief.

Gormley states that in late October 2005, he learned from Scales that the police union was going to take a vote of no-confidence against plaintiff.    He also learned from the editor or publisher of the local newspaper, that the paper was going to publish an article critical of plaintiff and the police department.

According to Scales, at the time he met with Gormley, a no-confidence vote had not yet actually been scheduled.    It had been talked about, but the union membership did not formally discuss it until a union meeting on November 1st or 2d, 2005.

Also in October, plaintiff told Gormley that plaintiff was applying for the Chief of Police position in Salem.    In mid-October 2005, plaintiff told Gormley that he was a finalist for that

4 - OPINION & ORDER

1   position.

2       Gormley was concerned that the no-confidence vote and the
3   expected newspaper article might negatively affect plaintiff's
4   application for the chief's position with the City of Salem.   On
5   October 24, 2005, Gormley met with plaintiff, Taylor, and Olson at
6   Taylor's office in City Hall.   According to plaintiff, Gormley
7   stated, "Wayne, we need your resignation."   Gormley also told
8   plaintiff that the union "has told us" that it had scheduled a no-
9   confidence vote and that it was imminent.   Gormley told plaintiff
10  he wanted to save plaintiff the embarrassment of going through
11  that.   Gormley also stated that plaintiff was "just not a good fit
12  for the City of McMinnville," or words to that effect.   Gormley
13  also apparently mentioned "personnel issues."

14      During the October 24, 2005 meeting, neither Gormley, Taylor,
15  nor Olson told plaintiff that if he did not resign, he would be
16  fired.   Plaintiff alleges that while Gormley did not use words to
17  that effect, he "clearly communicated" it.   Gormley did not tell
18  plaintiff that the City Council was demanding his resignation.
19  Plaintiff, however, made that assumption when Gormley used the word
20  "we," when demanding plaintiff's resignation.

21      Plaintiff submitted a letter of resignation the next day, in
22  a meeting with Olson and Taylor.   On October 26, 2005, plaintiff
23  received via email, he believes from Taylor, a draft of a
24  "Resignation and Separation Agreement and Release of Claims" ("the
25  Separation/Release Agreement").   Plaintiff printed it out and made
26  changes to it.   He proposed that the release be mutual and
27  requested severance pay.   He also discussed continuing medical
28  benefits.

5 - OPINION & ORDER

1    On October 28, 2005, plaintiff signed the Separation/Release
2    Agreement in Taylor's office.  In addition to other provisions, the
3    Separation/Release Agreement provided that plaintiff would continue
4    working through November 14, 2005, and then from that date, through
5    November 30, 2005, he would be placed on leave with pay and
6    benefits.

7    On November 1st or 2d, 2005, Brown spoke to the police union
8    about unity in the police department.  Any additional relevant
9    facts are discussed below.

10                              STANDARDS

11    Summary judgment is appropriate if there is no genuine issue
12    of material fact and the moving party is entitled to judgment as a
13    matter of law.  Fed. R. Civ. P. 56(c).  The moving party bears the
14    initial responsibility of informing the court of the basis of its
15    motion, and identifying those portions of "'pleadings, depositions,
16    answers to interrogatories, and admissions on file, together with
17    the affidavits, if any,' which it believes demonstrate the absence
18    of a genuine issue of material fact."  Celotex Corp. v. Catrett,
19    477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

20    "If the moving party meets its initial burden of showing 'the
21    absence of a material and triable issue of fact,' 'the burden then
22    moves to the opposing party, who must present significant probative
23    evidence tending to support its claim or defense.'"  Intel Corp. v.
24    Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991)
25    (quoting Richards v. Neilsen Freight Lines, 810 F.2d 898, 902 (9th
26    Cir. 1987)).  The nonmoving party must go beyond the pleadings and
27    designate facts showing an issue for trial.  Celotex, 477 U.S. at
28    322-23.

6 - OPINION & ORDER

1    The substantive law governing a claim determines whether a
2  fact is material.  T.W. Elec. Serv. v. Pacific Elec. Contractors
3  Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).  All reasonable doubts as
4  to the existence of a genuine issue of fact must be resolved
5  against the moving party.  Matsushita Elec. Indus. Co. v. Zenith
6  Radio, 475 U.S. 574, 587 (1986).  The court should view inferences
7  drawn from the facts in the light most favorable to the nonmoving
8  party.  T.W. Elec. Serv., 809 F.2d at 630-31.

9    If the factual context makes the nonmoving party's claim as to
10 the existence of a material issue of fact implausible, that party
11 must come forward with more persuasive evidence to support his
12 claim than would otherwise be necessary.  Id.; In re Agricultural
13 Research and Tech. Group, 916 F.2d 528, 534 (9th Cir. 1990);
14 California Architectural Bldg. Prod., Inc. v. Franciscan Ceramics,
15 Inc., 818 F.2d 1466, 1468 (9th Cir. 1987).

16                            DISCUSSION

17   Plaintiff brings the following claims against Gormley and the
18 City: (1) a state law claim for fraud, requesting rescission,
19 brought against the City only; (2) a state law claim for fraud,
20 seeking money damages; (3) a federal claim under 42 U.S.C. § 1983
21 alleging a due process violation; (4) a state law claim for
22 interference with contract, brought against Gormley only; (5) a
23 state law breach of employment contract claim against the City; (6)
24 a state law wage claim against the City pursuant to Oregon Revised
25 States § (O.R.S.) 652.150; (7) a state law "conspiracy to defraud"
26 claim brought against Gormley and the City; (8) a state law
27 "conspiracy to interfere with contract rights" claim brought
28 against Gormley and the City; (9) a state law "conspiracy to

7 - OPINION & ORDER

interfere with prospective business relations" claim against the City and Gormley; (10) a common law wrongful discharge claim against the City; (11) a state law negligence claim against the City and Gormley; (12) a state law defamation claim against the City and Gormley; and (13) a declaratory judgment claim under state law, requesting that the court declare that the damages cap set forth in the Oregon Tort Claims Act does not apply to the state law claims against Gormley.

As against Brown and PSLM, plaintiff brings claims of (1) intentional interference with contract; (2) intentional interference with prospective business relations; (3) the three conspiracy claims recited in the preceding paragraph; (4) negligence; and (5) defamation. As to CCIST, plaintiff brings a negligence claim and the declaratory judgment claim recited in the preceding paragraph.

As against Farnham, plaintiff brings claims of (1) intentional interference with contract; (2) intentional interference with prospective business relations' (3) the three conspiracy claims recited in the preceding paragraphs; (4) negligence; and (5) defamation.

I.    Validity of Separation/Release Agreement as to Gormley
      & the City

I address issues regarding the Separation/Release Agreement first because if it is valid, it bars all of plaintiff's claims against the City and Gormley. The application of the Separation/Release Agreement to other defendants is discussed in the next section.

In pertinent part, the Separation/Release Agreement provides:

8 - OPINION & ORDER

This Agreement is by and between the City of McMinnville, a municipal corporation of the State of Oregon (hereinafter City) acting by and through its City Manager and Wayne McFarlin, an employee of the City (hereinafter Employee).

. . .

**Section 2.** On November 30, 2005, City will pay Employee, as severance, a lump sum equal to three times Employee's regular monthly base salary . . . plus an amount equal to three times the monthly amount City pays toward Employee's health insurance premium . . . .

. . .

**Section 4.** Employee hereby releases City, its officers, agents, employees, representatives, and insurers from any and all claims known or unknown arising out of Employee's employment with City and the termination of that employment relationship through Employee's resignation. This release includes, but is not limited to, all claims for additional salary or other forms of compensation, for pain and suffering damages, punitive damages, and all other applicable statutory, contract, tort, or other theories based on common law or upon any statute dealing with employment matters and discrimination in employment.
. . .

The release contained in this paragraph is intended to operate in all judicial, non-judicial, and administrative forums for all matters related to Employee's employment with City and shall act to bar all remedies for actions related to such employment including but not limited to claims for money damages, injunctive relief or re-employment rights.

Employee agrees not to lodge, file or bring any suit, charge, complaint, or any other form of action or claim against City or its officers, agents, or employees relating in any way to Employee's employment relationship with City. Employee agrees not to request, or to indirectly cause, any governmental agency or other person to commence any investigation or bring any action against city, its officers, agents, or employees, and Employee waives any remedy or recovery in any action which may be brought on Employee's behalf by any government agency or other person.

The release contained in this section is intended by the parties to be a full and complete release of all possible claims, and is to be construed by a court accordingly.

. . .

9 - OPINION & ORDER

**Section 7.**  Employee represents and acknowledges that in executing this Agreement, Employee does not rely and has not relied upon any representation or statement not set forth herein made by City, its officers, agents, or employees with regard to the subject matter, basis or effect of this Agreement.

**Section 9.**  After having carefully read each provision of this Agreement, Employee and City have chosen to execute the Agreement.  Employee and City know and understand the contents of the Agreement and have signed the Agreement as their own free act.

. . .

**Section 11.**  EMPLOYEE REPRESENTS AND AGREES THAT EMPLOYEE FULLY UNDERSTANDS EMPLOYEE'S RIGHT TO DISCUSS ALL ASPECTS OF THIS AGREEMENT WITH WHOMEVER EMPLOYEE DESIRES, THAT EMPLOYEE HAS EITHER DISCUSSED THIS AGREEMENT WITH WHOMEVER EMPLOYEE DESIRES OR CHOSEN NOT TO DISCUSS THIS AGREEMENT, THAT EMPLOYEE HAS CAREFULLY READ AND FULLY UNDERSTANDS ALL OF THE PROVISIONS OF THIS AGREEMENT, AND THAT EMPLOYEE IS VOLUNTARILY ENTERING INTO THIS AGREEMENT.

**PLEASE READ CAREFULLY.  THIS SEPARATION AGREEMENT INCLUDES A RELEASE OF ALL KNOWN OR UNKNOWN CLAIMS.**

Defts' Exh. 101 (appended to O'Kasey Affid.).

A settlement agreement is "'a contract in which one or more parties agrees to abandon a claim or right.'" Graves v. Tulleners, 205 Or. App. 267, 279, 134 P.3d 990, 997 (2006) (quoting Lindgren v. Berg, 307 Or. 659, 665, 772 P.2d 1336, 1339 (1989)).  "Release agreements are favored under the law because 'certainty and judicial economy are served when parties can negotiate settlement of their disputes with confidence that their settlement agreements will be upheld and enforced by the courts.'" Id. at 278, 134 P.3d at 997 (quoting Lindgren, 307 Or. at 665, 772 P.2d at 1339.

A release is valid if one party specifically promises to release the other party from liability for unanticipated claims. See Patterson v. American Med. Sys., Inc., 141 Or. App. 50, 53, 916 P.2d 881, 882 (1996) (in the absence of a specific promise to

10 - OPINION & ORDER

release liability for known and unknown claims, a release is valid when there is both the knowledge of the existence of the claim and an intention to relinquish it). Here, plaintiff expressly released the City from all claims, known and unknown.

Additionally, "a general release from all claims and demands is sufficient to bar a specific claim, unless the claim is excepted from the release agreement." Ristau v. Wescold, Inc., 318 Or. 383, 389, 868 P.2d 1331, 1335 (1994).

A release agreement is a contract subject to the rules of contract construction and interpretation. Id. at 387, 868 P.2d at 1333. If the terms are unambiguous, the construction is a question for the court and is treated as a matter of law. Id. "Unambiguous contracts must be enforced according to their terms." Id. (internal quotation omitted).

Releases and settlements are "favored by the law," and are not "rendered unenforceable either by ordinary mistakes or negligent [mistakes] in the parties' knowledge and understandings when they enter into them[.]" Walcutt v. Inform Graphics, Inc., 109 Or. App. 148, 151, 817 P.2d 1353, 1355 (1991) (citing Davis v. Brown, 280 Or. 561, 564, 571 P.2d 912, 914 (1977)).

The City and Gormley contend that the terms of this Separation/Release Agreement are clear and unambiguous. Thus, they argue, enforcement of those terms bars the claims brought against them.

Plaintiff contends that because the Separation/Release Agreement does not expressly bar a claim for fraud, concealment, or nondisclosure, the agreement does not preclude his fraud claims. I disagree.

11 - OPINION & ORDER

1    Plaintiff relies on <u>Lindgren</u>, which considered whether a
2  release barred the plaintiffs from litigating whether the release
3  itself was induced by the defendant's fraud.  The Oregon Supreme
4  Court held that the fraud claim was barred, relying on express
5  language in the release covering claims for "fraud, nondisclosure
6  and misrepresentation" as to the particular joint venture at issue
7  in the case, and on language applying the release to claims the
8  parties "ever had or now has or later may have[.]"  307 Or. at 664-
9  65, 772 P.2d at 1338-39.

10    Plaintiff contends that following <u>Lindgren</u>, if a release
11 agreement does not expressly release claims for fraud,
12 nondisclosure, concealment, or misrepresentation, the agreement
13 does not bar such claims.  Plaintiff's argument takes <u>Lindgren</u> too
14 far.  While <u>Lindgren</u> held that the release at issue barred a fraud
15 in the inducement claim, the court did not address the result in
16 the absence of a specific reference to the release of a fraud claim
17 and thus, it did not hold that such a specific reference is
18 <u>required</u> for such a bar.

19    A subsequent case by the Oregon Supreme Court refutes
20 plaintiff's argument.  In <u>Ristau</u>, the Oregon Supreme Court
21 addressed whether a release precluded a claim of fraud in the
22 inducement of a contemporaneously executed stock sale agreement.
23 318 Or. at 385, 868 P.2d at 1332.

24    The court noted that the terms of the release agreement were
25 unambiguous.  <u>Id.</u> at 387, 868 P.2d at 1334.  The release agreement
26 barred "any and all claims, . . . whether known or unknown, now
27 existing."  <u>Id.</u> at 388, 868 P.2d at 1334.  The release agreement
28 acknowledged that all the other agreements, including the stock

12 - OPINION & ORDER

sale agreement, were effective substantially contemporaneously with the release agreement. Thus, the court explained, the plaintiff's claims under O.R.S. 59.127, which accrued at the time of the "purchase," arose at the same time as the execution of the release agreement. Because the release agreement and the stock sale agreement came into effect contemporaneously, the claim under O.R.S. 59.127 was "now existing" at the time that the release agreement was executed. Id.

The court rejected the plaintiff's argument that a release does not bar claims arising contemporaneously with "delivery of the release" unless expressly stated. Id. at 389, 868 P.2d at 1334. The court agreed with the plaintiff that a release which expressly waived a claim for fraud in the inducement of that agreement would be honored. "[W]e will enforce an unambiguous release that covers the claim at issue." Id. at 389, 868 P.2d at 1335. But, the court continued, "[w]e decline to hold, however, that even an unambiguous release agreement must include an explicit reference to fraud claims arising contemporaneously with the release agreement in order to bar recovery." Id. The court continued, "[a]s this court held in Glickman v. Weston, 140 Or. 117, 125, 11 P.2d 281, 12 P.2d 1005 (1932), a general release from all claims and demands is sufficient to bar a specific claim, unless the claim is excepted from the release agreement." Id. Thus, "the mutual release agreement bars plaintiff's claim that the stock sale agreement fraudulently was induced in violation of ORS 59.127." Id. at 390, 868 P.2d at 1335.

Ristau controls the outcome here. The fact that there were two agreements in Ristau is immaterial. Plaintiff contends that

13 - OPINION & ORDER

misrepresentations and omissions occurred in the context of the separation or resignation portion of the Separation/Release Agreement. His fraud in the inducement claim is based on his assertion that he would not have resigned had he not been misled by omissions and express misrepresentations.

Plaintiff's fraud in the inducement claim is not directed to the release aspect of the Separation/Release Agreement. There is no argument that any misrepresentations were made, or that any facts were withheld, as to the release of claims. There is no evidence that plaintiff was either misled about what he was signing, or that he was misled about the nature, scope, or purpose of the release portion of the agreement.

Thus, as in Ristau, the general Separation/Release Agreement is sufficient to bar the fraud in the inducement claims. The release applies to "all claims known or unknown arising out of Employee's employment with City and the termination of that employment relationship through Employee's resignation." As in Ristau, the fraud in the inducement claim, as well as all of the claims plaintiff brings in this action, arose before or at the same time as, the execution of the Separation/Release Agreement and all arose out of plaintiff's employment with the City and the termination of that employment through his resignation. The Separation/Release Agreement is valid and bars all of plaintiff's state law claims, including the fraud in the inducement claim.

The Separation/Release Agreement also bars plaintiff's section 1983 claim. Federal law governs waiver of a section 1983 claim. Jones v. Taber, 648 F.2d 1201, 1203 (9th Cir. 1981). A release of section 1983 claims is valid only if it results from a decision

14 - OPINION & ORDER

1  that is voluntary, deliberate, and informed.  Id.  Relevant factors

2  are:  (1) the clarity and lack of ambiguity of the agreement; (2)

3  the plaintiff's education and experience; (3) the presence of a

4  noncoercive atmosphere for the execution of the release; and (4)

5  whether the employee had the benefit of legal counsel.  Stroman v.

6  West Coast Grocery Co., 884 F.2d 458, 462 (9th Cir. 1989).  Similar

7  to Oregon law, under federal law, a release agreement need not

8  recite the particular claims waived in order to be effective.  Id.

9  at 461.

10     The language of the Separation/Release Agreement plaintiff

11  signed is clear and unambiguous - plaintiff agreed to release any

12  and all claims against the City and its agents, and he knew that

13  the effect of the release was to bar a civil action.  As Chief of

14  Police, plaintiff was working in a supervisory capacity and had the

15  skills necessary to understand what he was signing.  He has a

16  degree in personnel management, and in the past, he has disciplined

17  employees and negotiated agreements with them.  At no time before

18  signing the release did plaintiff express the desire to consult an

19  attorney, and he expressly acknowledged in the release that he

20  understood he had the right to discuss the release with anyone he

21  chose.  See Sep. Agrmt at Section 11.  Finally, plaintiff

22  acknowledged that he was not threatened, verbally or physically,

23  into signing the document.

24     Additionally, I agree with defendants that the fact that

25  plaintiff actually negotiated with the City regarding the terms of

26  the agreement and the severance he would be paid in consideration,

27  is further evidence that his agreement was voluntary and

28  deliberate.  Thus, I agree with the City and Gormley that plaintiff

1  entered into the agreement in an informed, voluntary manner.

2      Plaintiff makes much of the fact that he was not advised to

3  obtain an attorney and that he did not have one.  He states that

4  because he was still an employee of the City, he relied on the City

5  Attorney to insure that the Separation/Release Agreement was

6  "proper."

7      This argument is unpersuasive.  While plaintiff was not orally

8  advised to seek counsel, it is undisputed that plaintiff received

9  a draft of the agreement a few days before signing it and that

10  Section 11 of the Separation/Release Agreement contains what

11  amounts to a written advice to seek counsel.  See Leavitt v.

12  Northwestern Bell Tel. Co., 921 F.2d 160, 163 (8th Cir. 1990)

13  (release of all ERISA claims enforceable when settlement agreement

14  advised the plaintiff of right to seek counsel and plaintiff chose

15  to sign without the benefit of such advice).

16      Plaintiff's assumptions about the role of the City Attorney

17  also do not warrant a different conclusion.  Objective

18  manifestations, not unspoken understandings, control.  See

19  Lindgren, 307 Or. at 665 n.5, 772 P.2d at 1339 n.5 (in interpreting

20  a contract, Oregon courts look to the parties' objective

21  manifestations rather than to their secret intentions or

22  understandings).  Thus, the Separation/Release Agreement bars the

23  section 1983 claim as well as the other claims.

24      Finally, the Separation/Release Agreement expressly applies to

25  claims against the City.  It also expressly applies to claims

26  against the City's officers, agents, employees, representatives,

27  and insurers.

28      Plaintiff asserts the release is ineffective as to Gormley

16 - OPINION & ORDER

because Gormley was acting outside his capacity as Mayor when he demanded plaintiff's resignation.    No evidence in the record supports this assertion.

First, on its face, the language of the Separation/Release Agreement, by referring expressly to officers, agents, employees, representatives, and insurers, reveals the parties' intention to broadly apply the release to any person or entity working on behalf of the City.

Second, in his deposition, Gormley testified that he did not act for himself personally in regard to plaintiff's employment termination and he did not act at the behest or request of anybody else.    There is no evidence in the record to the contrary.    The only reasonable conclusion from the record is that Gormley was acting as Mayor.

Third, based on the agreement's language and the record, it is unambiguously clear that the release includes the persons who met with plaintiff on October 24, 2005, to discuss and demand his resignation.    Because Gormley was there in his role as Mayor, the release applies to him.

I grant Gormley's and the City's motion for summary judgment based on the Separation/Release Agreement because it bars all claims brought against them.

II.  Validity of Separation/Release Agreement as to Brown,
     PSLM, & CCIST

The express language of the Separation/Release Agreement bars plaintiff's claims against CCIST.    There is no dispute that CCIST was the City's insurer.

As to Brown and PSLM, the undisputed evidence is that PSLM is

17 - OPINION & ORDER

indistinguishable from Brown and that Brown/PSLM provided services to CCIST and billed CCIST for his time. Brown billed both the City and CCIST for his actions taken in regard to plaintiff's employment with the City and his resignation. Brown also provided some services to the City without a charge.

The only argument plaintiff raises is that because Brown did not bill the City or CCIST for all of his time, but chose to provide some of his services gratis, he was not an agent, officer, or representative of the City or its insurer. I disagree.

All of the actions Brown took in this case and that plaintiff complains of, beginning with Scales talking to Brown, and continuing with Brown calling Gormley, Brown calling Scales, Brown listening to Scales talk to Gormley, Brown attending a meeting with Taylor, Gormley, and others to discuss problems in the police department, Brown making inquiries regarding a possible interim chief, and Brown attending the union meeting, are actions performed in the context of work for the City or for CCIST, regardless of whether Brown billed for his time. There is no suggestion, and no evidence, that Brown acted as a private citizen in any of these actions. Thus, he is an agent or representative of the City or CCIST and all claims against him and PSLM are barred by the plain language of the Separation/Release Agreement.

III. Claims Against Farnham

Farnham argues that the claims against him should be dismissed because his conduct is protected by the First Amendment as developed under the Noerr-Pennington doctrine. I agree with Farnham, except as to the defamation claim, which I address separately below.

18 - OPINION & ORDER

The Noerr-Pennington doctrine derives from the First Amendment's guarantee of "the right of the people . . . to petition the government for a redress of grievances." U.S. Const. amend. I.  Under the Noerr-Pennington doctrine, those who petition any department of the government for redress are generally immune from statutory liability for their petitioning conduct. . . . .

The Noerr-Pennington doctrine arose in the antitrust context and initially reflected the Supreme Court's effort to reconcile the Sherman Act with the First Amendment Petition Clause. . . . United Mine Workers v. Pennington, 381 U.S. 657 [] (1965), extended this antitrust immunity to those engaging in lobbying activities directed toward executive branch officials, regardless of any anticompetitive intent or purpose. . . .

Recognizing the constitutional foundation of the doctrine, the Supreme Court has applied Noerr-Pennington principles outside the antitrust field. . . . .

Sosa v. DIRECTV, Inc., 437 F.3d 923, 929-30 (9th Cir. 2006) (citing Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961); other citations and text omitted).

Earlier, the Ninth Circuit explained that while the Noerr-Pennington doctrine was "originally promulgated to protect efforts to influence legislative or executive action from liability under the Sherman Act[,]" the protection "has been expanded to apply to petitions to courts and administrative agencies . . . as well as to preclude claims other than those brought under the antitrust laws." Oregon Natural Resources Council v. Mohla, 944 F.2d 531, 533-34 (9th Cir. 1991) (citation omitted); see also Empress, LLC. v. City & County of San Francisco, 419 F.3d 1052, 1057 (9th Cir. 2005) (applying Noerr-Pennington to 42 U.S.C. § 1983 claim).

Noerr-Pennington protection is available regardless of the actor's motive.  E.g., City of Columbia v. Omni Outdoor Advertising, Inc., 499 U.S. 365, 380 (1991) ("That a private party's political motives are selfish is irrelevant"); Pennington,

19 - OPINION & ORDER

381 U.S. at 670 ("Noerr shields . . . a concerted effort to influence public officials regardless of intent of purpose"); Noerr, 365 U.S. at 139 ("The right of the people to inform their representatives in government of their desires with respect to the passage or enforcement of laws cannot properly be made to depend upon their intent in doing so").

Noerr-Pennington applies to claims for intentional interference with contract or prospective economic advantage. E.g., Video Int'l Prod., Inc. v. Warner-Amex Cable Comm'ns, Inc., 858 F.2d 1075, 1084 (5th Cir. 1988) (applying Noerr-Pennington to common law tortious interference with contract claim); Sierra Club v. Butz, 349 F. Supp. 934, 938 (N.D. Cal. 1972) (applying Noerr-Pennington to claim of interference with advantageous relationship when the "interference" consisted of petitioning a governmental body to alter policy).

Here, other than the defamation claim, Farnham's conduct is protected by Noerr-Pennington because his actions in talking to other citizens, collecting complaints, writing to Gormley, and attending a meeting in which problems in the police department were discussed, are appropriately viewed as petitioning City officials in order to influence a decision regarding plaintiff's tenure as Chief of Police.

While Noerr-Pennington protects a citizen's attempts to influence governmental decision-making, it does not shield alleged defamatory statements made during that petitioning. Rather, McDonald v. Smith, 472 U.S. 479 (1985), teaches that the right to petition the government is not absolute.

In McDonald, the plaintiff alleged that the defendant libeled

20 - OPINION & ORDER

1   him by writing letters containing allegedly false, slanderous, and

2   derogatory statements, to then-President Reagan concerning the

3   plaintiff's possible appointment as United States Attorney for

4   North Carolina. Id. at 480-81. The defendant moved for judgment

5   on the pleadings, arguing that the First Amendment's petition

6   clause gave him absolute immunity from liability.

7       The Court rejected this argument, noting that while "the

8   values in the right of petition as an important aspect of self-

9   government are beyond question, it does not follow that the Framers

10  of the First Amendment believed that the Petition Clause provided

11  absolute immunity from damages for libel." Id. at 483. The Court

12  explained that

13      [t]o accept petitioner's claim of absolute immunity
        would elevate the Petition Clause to special First
14      Amendment status.  The Petition Clause, however, was
        inspired by the same ideals of liberty and democracy that
15      gave us the freedoms to speak, publish, and assemble. .
        . . These First Amendment rights are inseparable, . . .
16      and there is no sound basis for granting greater
        constitutional protection to statements made in a
17      petition to the President than other First Amendment
        expressions.

18
        Under state common law, damages may be recovered
19      only if petitioner is shown to have acted with malice;
        "malice" has been defined by the Court of Appeals of
20      North Carolina, in terms that court considered consistent
        with New York Times Co. v. Sullivan, 376 U.S. 254 []
21      (1964), as "knowledge at the time that the words were
        false, or . . . without probable cause or without
22      checking for truth by the means at hand." . . . We hold
        that the Petition Clause does not require the State to
23      expand this privilege into an absolute one. The right to
        petition is guaranteed; the right to commit libel with
24      impunity is not.

25  Id. at 485 (citations omitted).

26      Other courts have similarly read McDonald as controlling and

27  have rejected Noerr-Pennington's application to defamation claims.

28  E.g., Chevalier v. Animal Rehab. Ctr., 839 F. Supp. 1224, 1236

(N.D. Tex. 1993) (in action for civil conspiracy, defamation, and intentional infliction of emotional distress arising out of letters sent to government officials regarding plaintiff's work, the court rejected the defendants' argument that <u>Noerr-Pennington</u> provided absolute privilege and immunity from the plaintiff's defamation claim; court explained that the defamation claim was not based on the defendants' attempt to influence governmental decision-making but rather challenged the defamation that occurred during the petition); <u>Myers v. Levy</u>, 348 Ill. App. 3d 906, 918-19, 808 N.E. 2d 1139, 1150-51, 283 Ill. Dec. 851, 862-63 (2004) (court rejected application of <u>Noerr-Pennington</u> to bar defamation claim when claim was not directed to the defendant's attempt to influence governmental decision-making but instead was directed to the alleged defamation that occurred during that petitioning).

Although <u>Noerr-Pennington</u> does not provide Farnham with immunity from the defamation claim, I nonetheless grant summary judgment to Farnham on this claim. I agree with Farnham that plaintiff fails to show that Farnham acted with actual malice.

As a public official, plaintiff must prove that Farnham acted with "actual malice." <u>New York Times Co. v. Sullivan</u>, 376 U.S. 254, 279-80 (1964); <u>see also</u> <u>Koch v. Laborico</u>, 66 Or. App. 78, 85, 674 P.2d 602, 606 (1984) (police sergeant with substantial responsibility for and control over the conduct of governmental affairs, was "public official" for purposes of <u>New York Times</u> actual malice rule); <u>McNabb v. Oregonian Publ'g Co.</u>, 69 Or. App. 136, 139-40, 685 P.2d 458, 460 (1984) (police officer was "public official" for purposes of <u>New York Times</u> actual malice rule).

Plaintiff has the burden to show, by clear and convincing

22 - OPINION & ORDER

evidence, that Farnham knew of the falsity of the statements at issue, or acted in reckless disregard of their truth or falsity. New York Times, 376 U.S. at 279-80; Dodds v. American Broadcasting Co., 145 F.3d 1053, 1060 (9th Cir. 1998) (to survive the defendant's motion for summary judgment, the public figure plaintiff had to establish that a reasonable jury could find by clear and convincing evidence that the defendant published the challenged statements with knowledge of their falsity or with reckless disregard for their truth or falsity).

Plaintiff's defamation claim against Farnham is based on the two-page memorandum Farnham sent to Gormley after Farnham conducted his "investigation" of plaintiff's performance. The memorandum, Plaintiff's Exhibit 18, contains both opinions and assertions of fact. Pltf's Exh. 18. Farnham also repeats statements and opinions he obtained from others. Id.

While plaintiff attempts to show the falsity of much of the assertions in the memorandum, he fails to show that when Farnham made any of the statements, or repeated those originally made by others, he knew they were false or recklessly disregarded their truth or falsity.

Farnham testified that as far as he knows, everything in the memorandum is true. Farnham's Depo. at p. 25. Plaintiff offers no evidence to undermine or contradict Farnham's testimony. See Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 511 n.30 (1984) (plaintiff must show that the defendant realized the statement was false or that he subjectively entertained serious doubt about its truth).

Plaintiff suggests that because Farnham never inquired of

23 - OPINION & ORDER

plaintiff, or others, during his investigation about the statements made in the memorandum, a jury could find that Farnham acted in reckless disregard of the truth or falsity of those statements. Plaintiff's argument is wrong as a matter of law. New York Times, 376 U.S. at 284 (actual malice is not presumed); Londsale v. Swart, 143 Or. App. 331, 339, 922 P.2d 1263, 1268 (1996) (actual malice may not be inferred from the fact of defamatory publication alone or from a failure to verify statements from an adequate source or from a "slipshod investigation.").

Farnham is entitled to summary judgment on the defamation claim. Accordingly, I grant summary judgment to Farnham on all of plaintiff's claims.

IV.  Discussion of Individual Claims

Although defendants are entitled to summary judgment for the reasons discussed above, I offer alternative holdings on the merits of several individual claims.

A.  Intentional Interference with Contract

In his fourth claim for relief, plaintiff alleges that Gormley intentionally interfered with his contractual relationship with the City through the improper means of defrauding or deceiving plaintiff, or with an improper purpose to wrongfully obtain plaintiff's resignation. Id.

The elements of this claim are:  (1) the existence of a professional business relationship; (2) intentional interference with that relationship or advantage; (3) by a third party; (4) accomplished through improper means or for an improper purpose; (5) a causal effect between the interference and the harm to the relationship or prospective advantage; and (6) damages. Allen v.

24 - OPINION & ORDER

1  Hall, 328 Or. 276, 281, 974 P.2d 199, 202 (1999); McGanty v.

2  Staudenraus, 321 Or. 532, 535-36, 901 P.2d 841, 844 (1995).

3      Gormley argues that plaintiff cannot, as a matter of law,

4  establish the third element requiring interference by a third party

5  because as Mayor, he was an agent of the City and thus, was a

6  "party" to any contract between the City and plaintiff.  As a

7  result, he cannot be considered a "third party."

8      A party to a contract cannot be liable for interference with

9  that contract.  McGanty, 321 Or. at 537, 901 P.2d at 844; Ziebert

10 v. Sun Valley Lumber, Inc., 198 Or. App. 162, 170, 107 P.3d 668,

11 672 (2005).  Here, for the reasons discussed above in regard to the

12 Separation/Release Agreement's application to the claims against

13 Gormley, the record establishes that Gormley acted only as Mayor

14 and thus, is considered an agent or official of the City.  As a

15 matter of law, he is not a third party.  Accordingly, Gormley is

16 entitled to summary judgment on this claim.

17     In his fifth claim for relief, plaintiff argues that Brown and

18 PSLM intentionally interfered with his contractual relationship

19 with the City through the improper means of defrauding or deceiving

20 plaintiff, or with an improper purpose to wrongfully obtain

21 plaintiff's resignation.

22     I grant summary judgment to these defendants because the

23 evidence fails to show that they acted wrongfully or that their

24 actions caused the alleged interference.  Brown's early November

25 2005 appearance at the union meeting could not have caused the

26 alleged wrongful resignation because the meeting occurred after

27 plaintiff's resignation was sought and obtained.  Brown's other

28 activities, which occurred before or simultaneously with,

25 - OPINION & ORDER

plaintiff's resignation, are not in and of themselves wrongful and thus, they cannot be the basis of an intentional interference claim.

B. Intentional Interference with Prospective Business Relations

Plaintiff brings this claim against Brown, PSLM, and Farnham, arguing that they interfered with his prospective employment with the City of Salem and that the interference was through an improper means or an improper purpose.

This claim cannot succeed in the absence of any evidence that Brown or Farnham knew about plaintiff's application with the City of Salem. Additionally, and more fundamentally, there is no evidence, other than plaintiff's conjecture, that he was not offered the City of Salem job because of his resignation. Plaintiff concedes that he has no information from any source that his resignation was the reason the City of Salem failed to hire him. Thus, summary judgment is granted to Brown, PSLM, and Farnham on this claim.

C. Conspiracy Claims

In these claims, brought against the City, Gormley, Brown, PSLM, and Farnham, plaintiff contends that these defendants conspired to defraud him (ninth claim), conspired to interfere with his contract rights (tenth claim), and conspired to interfere with his prospective business relations (eleventh claim).

In the absence of a statute or exceptional circumstances, conspiracy is not an independent tort under Oregon law. Bliss v. Southern Pac. Co., 212 Or. 634, 642, 321 P.2d 324, 328 (1958). However, while a civil conspiracy is not a separate theory of

26 - OPINION & ORDER

recovery, it is one of several ways in which a person may become jointly liable for another's tortious conduct. <u>Granewich v. Harding</u>, 329 Or. 47, 53, 985 P.2d 788, 792 (1999). Thus, "under certain circumstances, it is permissible to impute the tortious acts of one defendant to others acting in concert with that defendant." <u>Id.</u> at 55, 985 P.2d at 793.

As established in <u>Granewich</u>,

> when a plaintiff alleges and proves that several defendants conspired to commit a tort upon him, all the defendants involved in the conspiracy can be held liable for the overt act which is committed by one of the defendants pursuant to the conspiracy. If a conspiracy is not proved, only those defendants can be held liable who are alleged and proved to have personally committed a tortious overt act against the plaintiff.

<u>Id.</u> at 58, 985 P.2d at 795 (internal quotation omitted).

Plaintiff concedes that a civil conspiracy is not an independent tort, but following <u>Granewich</u>, he contends that the factfinder in this case could reasonably conclude that there was a meeting of the minds among two or more of the defendants to wrongfully and fraudulently obtain his resignation. The problem for plaintiff is that it is not tortious for any of the defendants to seek a resignation. The fact that these defendants may have acted in concert to seek plaintiff's resignation is not a meeting of the minds to commit a tort. Thus, I grant summary judgment to the defendants named in the three conspiracy claims.

D. Wrongful Discharge

Plaintiff brings this claim against the City. Oregon recognizes common law claims for wrongful discharge in the context of at-will employment relationships when the employee alleges he or she has been discharged for fulfilling a societal obligation or for

27 - OPINION & ORDER

pursuing an employment-related right of a public importance. _Dunwoody v. Handskill Corp._, 185 Or. App. 605, 609-12, 60 P.3d 1135, 1138-39 (2003). Here, there are no facts suggesting that plaintiff was "discharged" for fulfilling a societal obligation or for pursuing an employment-related right of public importance. I grant summary judgment to the City on the wrongful discharge claim.

E.  Negligence

Plaintiff brings this claim against all defendants. Plaintiff cannot prevail, however, because he has suffered no physical injury and he has no special relationship with defendants creating a heightened duty of care.

> One ordinarily is not liable for negligently causing a stranger's purely economic loss without injuring his person or property. . . . Instead, the plaintiff is required to allege some source of a duty outside the common law of negligence. . . . [L]iability for purely economic harm must be predicated on some duty of the negligent actor to the injured party beyond the common law duty to exercise reasonable care to prevent foreseeable harm.

_Oregon Steel Mills, Inc. v. Coopers & Lybrand, LLP_, 336 Or. 329, 341, 83 P.3d 322, 328 (2004) (citations and internal quotations omitted).

As a matter of law, an employee-employer relationship is not one in which the employer has a "duty" to pursue the interests of its employees. _Conway v. Pacific Univ._, 324 Or. 231, 243, 924 P.2d 818, 826 (1996). Such a relationship is not a special relationship able to support a negligence claim for purely economic damages. Thus, as to the City, there is no basis for a heightened duty of care. There is also no basis for finding a "special relationship" capable of supporting a negligence claim for only economic damages

1  between plaintiff and any of the other defendants named in this
2  claim.  I grant summary judgment to the defendants named in this
3  claim.

4       F.  Defamation

5       Plaintiff brings the claim against all defendants except
6  CCIST.  The defamation claim as to Farnham is discussed above.  As
7  to Brown and PSLM, plaintiff acknowledges that he has no
8  information or evidence that Brown said anything defamatory about
9  him.  Thus, I grant summary judgment to those defendants on the
10 defamation claim.

11      As to Gormley and the City, the basis for the claim is a
12 conversation Gormley allegedly had with Allan Springer, a member of
13 the City Council, during which Gormley allegedly told Springer that
14 plaintiff had a substance abuse problem, used drugs, had an anger
15 management problem, was mentally unbalanced, and lunged at city
16 Finance Director Carole Benedict.

17      The City and Gormley contend that the alleged statements are
18 protected by conditional privilege or alternatively, that plaintiff
19 cannot show actual malice.  I agree with the City and Gormley on
20 both arguments.

21      "A statement is conditionally privileged if: (1) it was made
22 to protect the interests of defendants; (2) it was made to protect
23 the interests of plaintiff's employer; or (3) it was on a subject
24 of mutual concern to defendants and the persons to whom the
25 statement was made."  Wattenburg v. United Med. Labs., Inc., 269
26 Or. 377, 380, 525 P.2d 113, 114 (1974); see also Benassi v. Georgia
27 Pacific, 62 Or. App. 698, 702, 662 P.2d 760, 763 (1983) ("A
28 qualified, or conditional, privilege to make a defamatory statement

29 - OPINION & ORDER

arises, among other occasions, when it is made to protect the interests of the plaintiff's employer or it is on a subject of mutual concern to the defendant and those to whom it is made."). Generally, unless the underlying facts are in dispute, whether a communication is conditionally privileged is a matter of law for the court. <u>Worley v. Oregon Physicians Serv.</u>, 69 Or. App. 241, 247-48, 686 P.2d 404, 408-09 (1984) (citing <u>Peck v. Coos Bay Times Publ'g Co.</u>, 122 Or. 408, 421-22, 259 P. 307, 312 (1927)).

Here, Gormley, as Mayor, and Springer, as a member of the City Council, enjoyed a conditional privilege to discuss plaintiff because plaintiff's tenure as police chief is clearly a subject of mutual concern to Gormley and Springer. Plaintiff fails to show any evidence suggesting that the conversation between Gormley and Springer does not meet this test.

Alternatively, as discussed above in connection with the claim against Farnham, because plaintiff is a public figure, he must show, by clear and convincing evidence that Gormley knew the statements he made were false or made them in reckless disregard of their truth or falsity. Plaintiff puts forth no evidence to show that Gormley possessed knowledge of the falsity of these alleged statements at the time he made them. Plaintiff contends that Gormley should have asked plaintiff about the truth or falsity of these statements before he made them and that his failure to do so amounts to reckless disregard of their truth or falsity. But, as with the claim against Farnham, a failure to perform an investigation does not establish reckless disregard. Thus, I grant summary judgment to Gormley and the City on the defamation claim. / / /

V.  Plaintiff's Motion to Conform

    I deny plaintiff's motion to conform as moot because even assuming plaintiff sent a timely tort claim notice to CCIST, Brown, and PSLM, his claims are dismissed for the reasons discussed above.

VI.  Defendants' Motions to Strike

    I deny the defendants' motions to strike as moot because even with the evidence in the record, defendants are entitled to summary judgment.

CONCLUSION

    Defendants' motions for summary judgment (#28, 32, 37), are granted.   Plaintiff's motion to conform (#48), and defendants' motions to strike (#70, 74, 78), are denied as moot.

    IT IS SO ORDERED.

                    Dated this  12th   day of  February    , 2008.



                         __/s/ Dennis James Hubel_____
                         Dennis James Hubel
                         United States Magistrate Judge

31 - OPINION & ORDER